Page 1

1          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA
2                 MIAMI DIVISION
3
                        Case No.:  23-12217-LMI
4                       Chapter 11
                        Subchapter V
5    In Re:
6    EDGEWATER CONSTRUCTION GROUP, INC.,
7        Debtor.
     _____/
8
9
10
                    ECF # 52, 84, 188
11
12                  June 26, 2023
13
14
15        The above-entitled cause came on for a
16   hearing before the Honorable LAUREL M. ISICOFF,
17   Chief Judge, in the UNITED STATES BANKRUPTCY COURT,
18   in and for the SOUTHERN DISTRICT OF FLORIDA, on
19   Monday, June 26, 2023, commencing at or about
20   1:00 p.m., and the following proceedings were had:
21
22
23
24        Transcribed from a digital recording by:
              Helayne Wills, Court Reporter
25

Page 2

1   APPEARANCES:
2

        AGENTIS PLLC, by
3       ROBERT P. CHARBONNEAU, ESQ.
        JACQUELINE CALDERIN, ESQ.,
4       on behalf of the Debtor
5

        GUNSTER YOAKLEY & STEWART, P.A., by
6       KENNETH G.M. MATHER, ESQ.,
        and
7       EARNEST DeLOACH, JR., ESQ., In-house Counsel
        on behalf of Balfour Beatty
8
9
10      THE BARTHET FIRM, by
        SUNDEEP K. MULLICK, ESQ.,
11      on behalf of Gator Gypsum
12

        OFFICE OF THE UNITED STATES TRUSTEE, by
13      DAN L. GOLD, ESQ., (via Zoom)
        on behalf of the U.S. Trustee
14
15      ALSO PRESENT:
        ECRO:  Electronic Court Reporting Operator
16      ULYSSES VAZQUEZ
        MICHAEL VAZQUEZ
17      JASON SIZEMORE
        DOMINIC BALDERAS
18
                        INDEX
19   WITNESS                                  PAGE
20   ULYSSES VAZQUEZ
     (Direct by Mr. Charbonneau)              38
21   (Cross by Mr. Mather)                    57
     (Rebuttal Direct by Mr. Charbonneau      81
22   (Rebuttal Cross by Mr. Mather)           82
23   DOMINIC BALDERAS
     (Direct by Mr. Charbonneau)             64
24   (Cross by Mr. Mather)                    79
     (Redirect by Mr. Charbonneau)           80
25                               continued...

Page 3

1  JASON SIZEMORE
   (Direct by Mr. Mather)                          85
2  (Cross by By Mr. Charbonneau)                   95
3

   MICHAEL VAZQUEZ
4  (Rebuttal Direct by Mr. Charbonneau)           104
   (Rebuttal Cross by Mr. Mather)                 108
5  (Rebuttal Redirect by Mr. Charbonneau)         112
6
7                        EXHIBITS
8  DEBTOR'S IN EVIDENCE                           PAGE
    Nos. 1 through 7                               12
9   Nos. 8 through 14                              22
10 BALFOUR BEATTY'S IN EVIDENCE
    Nos. 20 through 36                             15
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          THE COURT:  Good afternoon.  Please be

2    seated.

3          There's Mr. Gold.  I guess he got tired of

4    being here this morning.  I'm saying hello, but

5    since you're the only one appearing by camera, I'm

6    turning my camera off.

7          MR. GOLD:  Very good.

8          THE COURT:  Okay.  All right.  We're here

9    this afternoon on Edgewater Construction Group, Inc.

10   I will forgo the usual spiel, because everybody's

11   heard it a thousand times, including Mr. Gold, at

12   least twice today.

13         Just a reminder, however, please remember

14   that because you are all here, to spell your full

15   last name for the record when you make your

16   appearance, and also your client, if your client is

17   not the debtor or the movant.  All right?

18         So with that we'll get started in the

19   matter 23-12217.  We have a motion to vacate, and

20   then the evidentiary hearing, and then we have the

21   various objections that relate to the exhibits.

22         First I'll take appearances, and then you

23   can all announce that you settled everything and

24   everybody can go home today.  All right.  So we'll

25   start with Mr. Charbonneau.

```
 1              MR. CHARBONNEAU:  Good afternoon, Your

 2   Honor.  Robert Charbonneau.  I'm with the law firm

 3   of Agentis, along with my partner -- oh,

 4   C-H-A-R-B-O-N-N-E-A-U -- along with my partner,

 5   Jacqueline Calderin, who's also present in court,

 6   C-A-L-D-E-R-I-N.  We represent the debtor, Edgewater

 7   Construction.

 8              Your Honor, both Mr. Michael Vazquez in

 9   the blue shirt and Ulysses Vazquez, principals of

10   the debtor, are also present.

11              THE COURT:  All right.  Welcome, sir.

12   Welcome back, Mr. Vazquez, Sr.

13              All right.  Mr. Mather.

14              MR. MATHER:  Good afternoon, Your Honor.

15   Ken Mather, M-A-T-H-E-R, of the Gunster Yoakley &

16   Stewart firm, Tampa office, and also in-house

17   counsel for Balfour Beatty -- and Balfour Beatty is

18   B-A-L-F-O-U-R, Beatty, B-E-A-T-T-Y -- in-house

19   counsel, Ernest DeLoach, Jr.  D-e-L-O-A-C-H is his

20   last name.  And also on behalf -- our two witnesses,

21   including our corporate representative, Jason

22   Sizemore, S-I-Z-E-M-O-R-E, and Dominic,

23   D-O-M-I-N-I-C, Balderas, B-A-L-D-E-R-A-S.

24              Thank you, Your Honor.

25              THE COURT:  Welcome to all of you.
```

1          Mr. Mullick.

2          MR. MULLICK:  Good afternoon, Your Honor.

3   Sundeep Mullick on behalf of creditor Gator Gypsum.

4   M-U-L-L-I-C-K.

5          THE COURT:  Okay.  Spell your client's

6   name.

7          MR. GOLD:  Gator, G-A-T-O-R, Gypsum,

8   G-Y-P-S-U-M.

9          THE COURT:  All right.  Thank you.

10         And last but not least, Mr. Gold.

11         MR. GOLD:  Good afternoon.  Dan Gold for

12   the U.S. Trustee.

13         I'm online, because I don't have any plans

14   to examine any witnesses.  So I'm really just here

15   for status.

16         THE COURT:  Okay.  All right.  So why

17   don't we start with status, and then we'll go to the

18   various motions?  I guess we'll do opening

19   statements, or we'll do evidence first, and then

20   we'll do opening statements.

21         How are we on status of anything?

22         MR. CHARBONNEAU:  So, Your Honor, we've

23   been able to narrow the issues somewhat, in that the

24   motion was a multi-prong motion seeking a

25   determination that the stay was violated and for

1  turnover.

2           Judge, turnover has sort of become -- I

3  don't want to say academic, because we are talking

4  to special counsel to be retained on a

5  contingency-fee basis, but given everything that's

6  transpired factually and procedurally, it makes no

7  sense to pursue turnover at this point.

8           So the sole issue today that Mr. Mather

9  and I have agreed to is the issue of whether Balfour

10  Beatty has violated the automatic stay or not, and

11  if so, what we do about it.

12           THE COURT:  Okay.  I did notice the

13  stipulation, which I reviewed this morning.  So what

14  you're saying is, with respect to the disputed

15  facts, we're going to eliminate anything that has to

16  do with turnover, and just focus on stay?

17           MR. CHARBONNEAU:  I believe that would not

18  be particularly helpful today.  That's right, Your

19  Honor.

20           THE COURT:  Okay.  All right.  Thank you.

21           So I know that there are some evidentiary

22  issues.  Have you and Mr. Mather resolved any of

23  them?

24           MR. CHARBONNEAU:  Your Honor, if it

25  pleases the Court, can I address another motion

1    first?

2                 THE COURT:  Sure, absolutely.

3                 MR. CHARBONNEAU:  There's a motion to

4    vacate an order that was entered in the very first

5    days in the case.

6                 THE COURT:  The critical vendor motion.

7                 MR. CHARBONNEAU:  Right.  I don't know

8    that I necessarily oppose it.  That order has not

9    been performed under, can't be performed under

10   anymore.

11                Maybe the motion should be denied as moot,

12   or the order vacated as moot.  I don't really

13   particularly care, but that's something I think we

14   can get out of the way rather quickly.

15                THE COURT:  Okay.  It's Mr. Mather's

16   motion, so, Mr. Mather, do you agree that we can

17   just deny it as moot?

18                MR. MATHER:  Your Honor, I hate to start

19   off with a relatively long answer to a short

20   question, but I would prefer that the Court grant

21   the motion.

22                And the Court can do that simply on the

23   basis that although Balfour Beatty is referenced in

24   the motion, there is a stipulation that you have in

25   the evidentiary hearing portion of the case that

1   Balfour Beatty never agreed to the motion, never had

2   notice of the motion, did not have notice of the

3   emergency hearing, did not participate in the

4   hearing, and did not participate or was not aware of

5   the order.

6          So I think the appropriate thing is to set

7   it aside, because this does tie, it overlaps into

8   the stay motion issues, in that this motion was

9   filed the day after a meeting occurred between the

10  parties, which is sort of the focus of the stay.  We

11  think that this pattern of conduct by the debtor

12  tells something to the Court.

13         So I'd prefer that our motion be granted

14  and not be vacated.

15         THE COURT:  Okay.  I'm going to grant it

16  in part and deny it in part.  And I'm going to grant

17  it in part to state that any part of the order that

18  is purported to impact Balfour Beatty is stricken,

19  and the balance is denied as moot, because the order

20  was never effectuated.

21         I believe there might have been a couple

22  of dangling issues that were non-Balfour Beatty

23  issues, if I'm remembering correctly.

24         MR. MATHER:  It had to do with the payment

25  of --

1          THE COURT:  I remember the order, but

2    weren't there a couple of other vendors that might

3    not necessarily have had anything to do with the

4    Balfour Beatty matter?

5          Ms. Calderin, you have to talk into a

6    microphone.

7          MS. CALDERIN:  Jacqueline Calderin, Your

8    Honor.

9          I don't recall that with this specific

10   motion there was.  This was -- there may have been

11   another contractor in there, and I just honestly

12   don't recall, Your Honor.

13         THE COURT:  That's why I figured I'd do it

14   this way.  We'll just strike it in part and deny it

15   in part.

16         Mr. Mather, since it's your motion, you

17   take the first stab at the order, and then you can

18   share it with Mr. Charbonneau and Ms. Calderin, and

19   I'll sign it if you like it.  How's that?

20         MR. MATHER:  Be glad to do so.  Thank you,

21   Your Honor.

22         THE COURT:  Thank you.

23         All right.  So now we get to the case in

24   hand.  I know there were some evidentiary

25   objections.  We do have some exhibits.  It is my

1   practice, as Mr. Charbonneau and Ms. Calderin know,

2   perhaps not you, Mr. Mather, to the extent that we

3   can get evidentiary objections out of the way before

4   we get started, we do that.

5               So, Mr. Charbonneau, why don't we start

6   with your exhibit register, and you tell me where

7   you all are.

8               MR. CHARBONNEAU:  Yes, Your Honor.  We

9   really have disagreement on only one set of

10  documents.

11              THE COURT:  Okay.

12              MR. CHARBONNEAU:  I believe, Your Honor --

13  do you want me to run through them, or just we'll go

14  to each one and ask Mr. Mather whether he agrees or

15  not?

16              THE COURT:  Didn't you and Mr. Mather

17  speak before the hearing?

18              MR. CHARBONNEAU:  We did.

19              THE COURT:  Then you know which ones

20  Mr. Mather has a problem with, correct?

21              MR. CHARBONNEAU:  Okay.

22              THE COURT:  So why don't you tell me which

23  ones Mr. Mather doesn't have the problem with.

24              MR. CHARBONNEAU:  Okay.  Judge, I believe

25  Exhibits 1 through 7.

```
 1              MR. MATHER:  Seven.
 2              MR. CHARBONNEAU:  Seven, yes, thank you --
 3              THE COURT:  Okay, 1 through 7.
 4              MR. CHARBONNEAU:  -- are admitted without
 5    objection.
 6              THE COURT:  Okay.  Give me all the numbers
 7    that you believe are admitted without objection,
 8    I'll ask Mr. Mather if he agrees, and then we'll get
 9    to the good stuff.
10              MR. CHARBONNEAU:  Exhibits 15 and 16
11    really were not offered as exhibits.  They're
12    transcripts for impeachment purposes, should that
13    become necessary.
14              THE COURT:  Okay, got it.
15              MR. CHARBONNEAU:  And the rest of the
16    exhibits are subject of a motion in limine.
17              THE COURT:  Okay.  So 1 through 7.
18    Mr. Mather, do you agree 1 through 7?
19              MR. MATHER:  That's correct, Your Honor.
20              THE COURT:  So I'm going to admit Exhibits
21    1 through 7.  We'll circle back to the motion in
22    limine in a minute.
23              (Thereupon, Debtor's Exhibits Nos. 1
24         through 7 were admitted into evidence.)
25              MR. MATHER:  Your Honor, may I interrupt?
```

```
1              One of the -- 15 and 16 is a transcript, I
2    believe, from Mr. Balderas.  Mr. Balderas has not
3    yet seen or reviewed that transcript.
4              THE COURT:  Okay, noted.  If and at such
5    time as it's used, then we can talk about it then.
6              MR. MATHER:  Thank you.  I just didn't
7    want the Court to be unaware of that.  Thank you.
8              THE COURT:  Okay.  Thank you.
9              All right.  So let's go now to Balfour
10   Beatty's exhibits, and then we'll circle back to the
11   motion in limine.  So, Mr. Mather, you're up.
12             This is good, the way you guys did this.
13   You used subsequent numbering.
14             MR. CHARBONNEAU:  I have to give credit
15   where it's due, Your Honor.  That was Mr. Mather's
16   idea.
17             THE COURT:  Okay.
18             MR. MATHER:  Well, it was more likely the
19   result of not knowing another way to do it.  I think
20   we tried -- I shouldn't confess this.
21             Thank you, Your Honor.
22             THE COURT:  Just go with the praise.
23   There you go.
24             MR. MATHER:  Thank you.
25             THE COURT:  This is a function of allowing
```

```
 1    the exhibits to be uploaded electronically.  For
 2    some reason the computer doesn't like letters.  So
 3    we all have to have numbers.
 4            Okay.  So which of your exhibits,
 5    Mr. Mather, do you believe will not be a problem
 6    with respect to admission, based on your
 7    conversations?
 8            MR. MATHER:  It is my understanding from
 9    my conversations with Mr. Charbonneau that they do
10    not object to our initial set of exhibits, and we
11    have filed a motion for leave to add six exhibits.
12    It's my understanding there's not an objection to
13    those.
14            So I have brought hard paper copies for
15    the Court and your clerk, of those, with exhibit
16    registers.
17            THE COURT:  Okay.  So that would be -- so
18    I have an exhibit register here that just goes to
19    36.  So is there an updated version, too?
20            MR. MATHER:  No.  That's the one, Your
21    Honor.
22            THE COURT:  Okay.  All right.  So with
23    respect to your Exhibits 20 through 36, it's your
24    understanding there's no objection; is that correct?
25            MR. MATHER:  Correct, Your Honor.
```

```
 1              THE COURT:  Mr. Charbonneau, is that
 2   consistent with your understanding of the agreement?
 3              MR. CHARBONNEAU:  It is, Your Honor, as to
 4   admissibility.  I told Mr. Mather that I had issues
 5   of relevance with some of them, but we can deal with
 6   that when that occurs.
 7              THE COURT:  Okay.  So I'm going to admit
 8   them all, and I'll just put a little star, subject
 9   to relevancy.
10              That's a great thing about a bench trial,
11   right?  We don't have to worry about those niceties
12   at the start.
13              So Exhibits 20 through 36 will be
14   admitted.
15              (Thereupon, Balfour Beatty's Exhibit Nos.
16       20 through 36 were admitted into evidence.)
17              MR. MATHER:  Would you like the binders,
18   Your Honor?
19              THE COURT:  Yes.  Hand them to the court
20   security officer, the court security officer who is
21   going to bring them up.
22              Is it one for me, Mr. Mather, and then the
23   other is for my law clerk?
24              MR. MATHER:  Yes.
25              THE COURT:  And what about what you have,
```

1    Mr. Charbonneau?

2              MR. CHARBONNEAU:  The one large binder,

3    Your Honor.

4              MR. MATHER:  I had one small one, Your

5    Honor, and the other one is for your clerk.

6              THE COURT:  Okay.  Thank you.  Because the

7    District Court still wants paper.

8              All right.  Let's go back to the motion in

9    limine then.  Mr. Mather, it's your motion.

10             MR. MATHER:  Yes, Your Honor.

11             The remaining exhibits of the debtor, we

12   filed a motion in limine or objected to, because

13   they are so interwoven with -- well, they are purely

14   communications between counsel that are laced with

15   settlement communications and information gathering.

16   In terms of this particular case, where we're being

17   accused of a stay violation, the subsequent sorting

18   out and/or attempts to settle, I don't think are

19   appropriate under these circumstances.  So that was

20   the basis of it.

21             I understand we don't have a jury here,

22   Your Honor.  I understand you can sort it all out,

23   but there is always that prejudice of, are you

24   confessing something if you're talking about how to

25   resolve something.

1          THE COURT: Okay. So your concern is that

2    the discussions that the debtor believes are

3    relevant are interlaced with settlement discussions

4    at the same time?

5          MR. MATHER: Yes.

6          THE COURT: Okay.

7          MR. MATHER: In short, Your Honor, the

8    parties were trying to figure out what the heck

9    happened. So there's a lot of that you'll see in

10   there, and part of that was other ways to resolve

11   it. It strikes me as being potentially prejudicial,

12   understanding again, we don't have a jury.

13         THE COURT: Okay, thank you.

14         MR. MATHER: Thank you, Your Honor.

15         THE COURT: All right. Mr. Charbonneau,

16   you're going to respond?

17         MR. CHARBONNEAU: Yes, Your Honor.

18         THE COURT: Okay.

19         MR. CHARBONNEAU: Your Honor, Mr. Mather

20   makes the point, as did the Court, that there is no

21   jury here, and of course 408 is here to prevent a

22   trier of fact, who is usually a layperson, from

23   getting the impression that just because an offer of

24   settlement is made means that there's attendant

25   liability with it. I don't think we have this issue

1    with the Court.

2              But moreover, if you review the e-mails,

3    Your Honor, there is no -- there is not a settlement

4    discussion in there.  There is a one-way

5    conversation, Your Honor, between Ms. Calderin on

6    the one hand and Mr. Mather on the other, about

7    violations of the automatic stay, where certain

8    property of the estate is, certainly requests to

9    settle.  But there's no detailed settlement

10   discussions in there at all, Judge.

11             So when you couple that -- and I disagree

12   with Mr. Mather's characterization of the e-mails,

13   but when you couple that with the purpose of 408, I

14   don't think this becomes an issue, especially since

15   408(b) provides that we can use settlement

16   communications for a different purpose.

17             We are not here attempting to introduce

18   these e-mails for the purpose of demonstrating that

19   Balfour Beatty violated the automatic stay.  That

20   happened probably on the petition date, if not the

21   petition date, several days after that.  These

22   e-mails, which go on for weeks and weeks after that,

23   are attempts by Ms. Calderin to recover property of

24   the debtor, to counsel, and advised Balfour Beatty

25   to please not pay off liens without consulting with

```
 1    us, because we know what the amount of the liens
 2    are, and otherwise attempt to have Balfour Beatty
 3    undo what it's been doing.
 4              It's not settlement, Judge.  It fits
 5    squarely within 408(b), and the objection ought to
 6    be overruled.
 7              I have a case on that, Judge, if the Court
 8    wants to see it.
 9              THE COURT:  You can cite it if you'd like.
10              MR. CHARBONNEAU:  It's In re:  Diana S.
11    Donahoe, D-O-N-A-H-O-E versus -- I'm sorry.  That's
12    the bankruptcy case.  It's an adversary, Wortman,
13    W-O-R-T-M-A-N, versus Donahoe.  It's found at 180
14    B.R. 491.  It's a 1995 case out of the Northern
15    District of Ohio, Western Division.
16              THE COURT:  And what does it say?
17              MR. CHARBONNEAU:  Just what I said, Judge.
18              THE COURT:  You said a lot.  Which part of
19    it?
20              MR. CHARBONNEAU:  It said that
21    communications that may appear to be facially
22    settlement in nature can be offered for another
23    purpose.
24              Actually, this case was a
25    non-dischargeability action, and there was an offer
```

```
 1   by the creditor to allow the debtor to keep certain
 2   money.  But the Court found, just because that
 3   sounds like a settlement offer doesn't mean that it
 4   was necessarily a settlement offer, and it was
 5   admitted for another purpose.
 6              I read this yesterday.  I can't remember
 7   exactly what the other purpose is, Judge, but that's
 8   in the line of 408(b).
 9              THE COURT:  Okay.  Thank you.
10              Mr. Mather, any brief response?
11              MR. MATHER:  Yes, Your Honor.  A couple of
12   points.
13              This is going to dip a little bit into
14   where we're going with the trial, but you cannot
15   have a stay violation if these are claims by a
16   debtor against Balfour Beatty.  That's what these
17   were.  The debtor is saying, "You owed us money and
18   you have our materials."
19              And what we're going to find out and where
20   this case is going is that the funds, according to
21   the contract between the parties, the funds that
22   were payable to the debtor's subs are not property
23   of the estate.  We had a contractual obligation to
24   pay those things, and we have paid those things.
25              THE COURT:  But what do those have to do
```

```
 1   with your argument regarding the motion in limine?
 2              MR. MATHER:  Well, for the motion in
 3   limine, at the beginning of the case we did not get
 4   notice of the bankrupting filing.  We were not
 5   listed as a creditor.
 6              THE COURT:  I know all that, and I read
 7   that in the stipulation.  I just want to know what
 8   that has -- what you're telling me has to do with
 9   the motion in limine.  I'm just trying to refocus
10   you.  That's all.
11              MR. MATHER:  I understand.
12              So, Your Honor, to the extent -- really,
13   the materials may be the better example.  So, the
14   materials, again, were things that were -- we now
15   know were delivered to the site, which Balfour
16   Beatty has now paid for, or is in the process of
17   paying for it.
18              To the extent that we were saying in these
19   communications that we will pay the debtor something
20   for those, to me that could read like a confession
21   that it was their materials.  I don't think it's --
22   we now don't believe they are their materials.
23   That's the finer point.
24              THE COURT:  What I'm going to do is, I'm
25   going to overrule the motion in limine, but
```

Page 22

```
1   everything you've just told me I'll allow you to
2   include in your closing argument and make those
3   observations, okay?
4              All right.  So I'm going to admit 8, 9,
5   10, 11, 12, 13, 14, but again, to the extent that
6   they're being used for a purpose other than
7   demonstrating that there was a settlement between
8   the parties, or negotiations.
9              (Thereupon, Debtor's Exhibit Nos. 8
10       through 14 were admitted into evidence.)
11             THE COURT:  All right.  So let's get
12   going.  I'll take opening statement from the debtor
13   and then from Balfour Beatty, and then we'll get
14   rolling.
15             By the way, we do have three law students
16   here.  Not that either one of you would not be on
17   your best behavior, and by best behavior I mean your
18   most superlative litigation skills, but --
19             MR. CHARBONNEAU:  Keep it clean, Your
20   Honor?
21             THE COURT:  Keep it clean, right.  Keep it
22   clean for the young people.
23             MR. CHARBONNEAU:  Okay.  So may it please
24   the Court, Your Honor.
25             I think some of the arguments that
```

1   Mr. Mather just made, stipulations of -- especially

2   of disputed law, point to a fundamental

3   misunderstanding between Balfour Beatty and the

4   debtor about what constitutes a violation of the

5   automatic stay.

6           Balfour Beatty and the debtor's principals

7   had a meeting on March 22nd, which was one day after

8   the bankruptcy filing.  I beg your pardon, the 23rd.

9   The petition date was March 22nd.  I stand

10  corrected.

11          At that meeting, Your Honor, you're going

12  to hear testimony that Balfour Beatty and Michael

13  and Ulysses Vazquez had a very productive

14  conversation about how they were going to move

15  forward.  We don't need to get into that now for

16  purposes of opening, but when the agreement fell

17  apart, the debtor forwarded to Ms. Calderin two

18  letters, which are in evidence.

19          They are letters from Balfour Beatty, sent

20  pursuant to Article 5 of the contract, which is also

21  in evidence, telling the debtor they had 72 hours to

22  cure certain defaults, and in the absence of that

23  cure, Balfour Beatty had the right to do certain

24  things, in subparagraphs Romanette i through vii in

25  that Article 5.

1           Ms. Calderin received that letter and

2    immediately sent what I believe is in evidence as

3    Exhibit 4, a letter to Mr. Mather explaining that

4    the debtor was in bankruptcy, the automatic stay was

5    in effect, and at that time demanding turnover --

6    I'm sorry, am I blowing your eardrums out with this

7    thing -- demanding turnover of certain personal

8    property that was still on the job site.

9           Judge, you may recall that this very same

10   instance occurred with John Moriarty.  The day of

11   the notice sent by Ms. Calderin, John Moriarty &

12   Associates rescinded the default notice.

13          What did Balfour Beatty do here?  Balfour

14   Beatty did nothing to rescind the notice, but what

15   they did was, they continued to exercise the

16   contractual rights they had under Article 5.  They

17   replaced Edgewater with other subcontractors.  They

18   retained and used approximately 30 pallets of

19   stucco, which Mr. Vazquez will say the debtor paid

20   for.  They retained scaffolding with great value

21   that Mr. Vazquez is going to testify to.

22          I'm sorry, Judge.  I'm not sure how it's

23   pronounced, but I believe in the ultimate move of --

24   and I'll try it -- chutzpah, Balfour Beatty now

25   wants to assert a setoff claim against the debtor

Page 25

1   for any sanction that might be levied against them

2   for paying off liens; liens that Ms. Calderin in

3   those correspondence begged them to not pay, because

4   we wanted to verify the amounts that the lienholders

5   were asserting.

6          So settle requires mutuality, as the Court

7   knows.  Balfour Beatty has taken the claims

8   allowances process out of the hands of the debtor

9   and the supervision of the Court.  Balfour Beatty

10  now appears to be saying in asserting that, "Okay,

11  maybe we violated the stay, maybe we're subject to

12  sanctions, Judge, but you have to set off those

13  damages against the favor that we did to the estate

14  in paying off those liens."

15         That would be a pretty neat trick if a

16  creditor could always come before the Court and say,

17  "Yeah, I violated the automatic stay, but I took

18  care of these liens, because it was in my

19  self-interest to do so, and thereby reduce claims

20  against the estate.  You're welcome."  It doesn't

21  work that way, as the Court knows.

22         Judge, when Balfour Beatty was asked to

23  return the scaffolding material and the stucco, they

24  initially denied that they were in possession of the

25  material, then used an excuse that the scaffolding

1    in question was not our property, was leased and had

2    been picked up by someone else.  Over the course of

3    discovery, Judge, we found that that was not the

4    case.

5         Balfour Beatty will tell you that they did

6    not know about the existence of the automatic stay

7    when they sent those letters of default.  Maybe they

8    did, maybe they didn't.  You'll hear testimony on

9    that today and you'll decide.  But there's no

10   question that when they got the letter from

11   Ms. Calderin towards the end of March notifying them

12   of the bankruptcy, attaching the notice of the

13   commencement, they were on notice of the bankruptcy

14   case.

15        At that point they had to stop what they

16   were doing, and as Moriarty did, come before the

17   Court and either seek relief from the automatic stay

18   or seek a motion to assume or reject what is an

19   executory contract.

20        Judge, they might even say that this is

21   all academic.  They paid the liens.  There was

22   nothing to assume here.  Well, I've got to tell you,

23   Judge, we'll never know now, but if you look at ECF

24   136, the debtor made a deal with Coastal

25   Construction to continue the stucco work on the

1    Astin Martin project.  It's a contract that they

2    partially assumed, and it's going great, and there

3    was wonderful, positive publicity in the local media

4    concerning that.

5              Judge, I don't know what Balfour Beatty

6    was thinking here.  They're represented by great

7    counsel.  I don't personally know Mr. Mather, but I

8    know him by reputation.  So to me there's only two

9    things that could have happened here.  One, Balfour

10   Beatty said, "Automatic stay, not important, we're

11   not going to worry about it."

12             I don't see that with a gentleman like

13   Mr. Mather at the helm.  This is not a bonded

14   project.

15             The only rational alternative for me, Your

16   Honor, is that Balfour Beatty weighed the cost

17   benefit, weighed the cost of a delay charge from the

18   owner, weighed the cost of coming before the Court

19   on a stay relief violation, hoping that maybe the

20   debtor wouldn't do anything, or hoping that the

21   Court might find a technical violation, and giving

22   them a slap on the wrist.

23             Judge, that is the only reasonable

24   explanation for me, because we got a letter from

25   Mr. Mather a day or two after Ms. Calderin sent her

1   notice, and it says, and I'm going to quote, among

2   other things --

3           THE COURT:  What exhibit is this?

4           MR. CHARBONNEAU:  Give me a moment, Your

5   Honor.  It is Exhibit 5.

6           THE COURT:  Okay.

7           MR. CHARBONNEAU:  Among other things it

8   says, "Now that Balfour Beatty is aware of the

9   bankruptcy filing it will comply with all provisions

10   of the Bankruptcy Code and the local rules for the

11   U.S. Bankruptcy Court for the Southern District of

12   Florida," except they didn't.

13           Not only did they not, but they played

14   what is effectively a game of Three-card Monte with

15   Ms. Calderin, after sending that letter saying,

16   "Your property is here, no, your property is not

17   here, oh, we have your scaffolding, oh, no, it's

18   leased and somebody picked it up," Judge.

19           If I'm right about the two theories for

20   violating the automatic stay, then the Court has the

21   authority under 362(K) and 105, to sanction Balfour

22   Beatty, in an amount at least that's equal to the

23   cost and fees expended by the estate in prosecuting

24   this motion.

25           But the Court also has the authority under

```
 1   Jove and -- I'm sorry, Judge.  I'm getting old.
 2   There was a wonderful Judge Kimball case in 2009.
 3              WVF -- thank goodness for Ms. Calderin --
 4   In re:  WVF Acquisition, Inc., where you can award
 5   punitive damages, Judge, for the action that's
 6   taken, so that you can send a message to Balfour
 7   Beatty -- and frankly, any other general contractor
 8   in South Florida, because this will not be the last
 9   construction case -- that the automatic stay is
10   sacred, and it's to be taken seriously and not
11   disregarded.
12              Thank you, Judge.
13              THE COURT:  There was also that brilliant
14   case by Judge Isicoff called In re:  Leo Barsky
15   (phonetic), but that's for another day.
16              Okay.  Thank you.
17              MR. CHARBONNEAU:  I'll look that one up,
18   Judge.
19              THE COURT:  Mr. Mather, your opening.
20              MR. MATHER:  Yes.  Thank, you Your Honor.
21              Your Honor, understanding the relationship
22   of the parties is very important under these
23   circumstances, and I believe Debtor's Exhibit 1 is
24   the long-form contract between Balfour Beatty and
25   the debtor in this case.
```

1           The two most important -- and I don't want

2    to belabor the long-form contract in my opening,

3    Your Honor, but the two most important concepts that

4    are incorporated into this long-form contract are,

5    it was a pay-when-paid provision, which I'm sure the

6    Court knows, but for purposes of the record, means

7    that Balfour Beatty had no obligation, in fact, it

8    was condition precedent, that any payment to be made

9    to the debtor as a subcontractor, was conditioned

10   upon payment from the owner first.

11           The provisions of the contract specify a

12   number of conditions precedent, and I would just

13   direct the Court to Article 2, Subsections (a) and

14   (b), that set forth these conditions precedent.  And

15   so -- well, let's go ahead and include (a), (b), (d)

16   and (e).  It talks about joint checks.

17           But what that's all premised upon, Your

18   Honor, is that there are certain things the debtor

19   was obligated to do before it would be entitled to

20   be paid, and Balfour Beatty is not the financier, it

21   is not a lender in this situation.  Balfour Beatty's

22   obligation to the subcontractor is specifically

23   conditioned upon Balfour Beatty submitting all this

24   information to the owner, and having the owner and

25   then -- the owner then pay Balfour Beatty, and only

1    at that time would the debtor be entitled to be

2    paid.

3              The reason that's important in this

4    particular situation, Your Honor, is that this

5    subcontractor -- we're calling the debtor a

6    subcontractor -- the debtor here really is a broker.

7    The debtor didn't have men and materials out there

8    of its own volition.  The debtor was arranging with

9    other subcontractors to come do the stucco work.  So

10   the debtor is really in this situation a middleman.

11             And why is that important for purposes of

12   our inquiry today?  Because of this pay-when-paid

13   provision and the condition precedent provisions of

14   the contract, the debtor was not entitled to be paid

15   anything until all of those conditions were met.

16             That's not an automatic stay issue.  That

17   was a contractual obligation.  That would be a claim

18   by the debtor against Balfour Beatty if they thought

19   that that had been violated.  It had not been

20   violated.  And I can tell the Court, the reason we

21   know that is, there were two projects that the

22   debtor was involved with.  One was called 2000

23   Biscayne, one was called RD East Las Olas.

24             You will hear evidence, although I don't

25   think it's controverted, that the debtor never

1    commenced work on the 2000 Biscayne project.  The

2    debtor did commence work on the RD East Las Olas

3    project, but abandoned that work and left the

4    jobsite -- when I say, "they left the

5    jobsite," their subcontractors left the jobsite

6    prior to the bankruptcy filing.

7              So as of the date of the bankruptcy filing

8    on March 22nd, both of these projects had been

9    abandoned by the debtor.  They were no longer

10   working there.  They had nothing to do -- they were

11   not carrying forward.  They didn't provide notice to

12   Balfour Beatty.  They were not listing -- they did

13   not list Balfour Beatty on the initial creditor

14   matrix.

15             Then we get the motion to pay the critical

16   vendors.  That's important, Your Honor, because if

17   you read the motion to pay the critical vendors,

18   what the debtor asks is to have this Court modify

19   the long-form contract that it had with Balfour

20   Beatty.  It's tantamount to a rejection, Your Honor.

21   They said, "We're leaving the project, we can't

22   perform."

23             That was the essence of the March 23rd,

24   the day after the bankruptcy, meeting.  They said

25   they can't perform.  Then they file a motion without

1    our consent that tells the Court and everyone else,

2    they can't perform unless that contract is modified.

3    So they've effectively rejected and abandoned this

4    contract before the bankruptcy was even filed.

5            Then, Your Honor, that theme is carried

6    out through the other pleadings in the case, which

7    is why I've raised judicial estoppel, because the

8    debtor ultimately filed schedules on April 14th.  In

9    the schedules, on Schedule F, they identified

10   Balfour Beatty for "notice purposes only."  They

11   don't identify us as a creditor with a claim.

12           In Schedule G, if the debtor believed that

13   we had an executory contract still existing, they

14   would have listed Balfour Beatty on Schedule G.

15   They did not.  They listed others, but they did not

16   list us.  They amended Schedule G, still did not

17   list Balfour Beatty.  So from a pleading verified

18   under oath point of view, the debtor has told us in

19   every way possible that they considered the

20   contracts to have been rejected and abandoned, at

21   least by the petition date.

22           Your Honor, I can point further in the

23   claim of liens that were filed more recently by the

24   debtor -- they filed a claim of lien in the real

25   estate records both as to 2000 Biscayne and as to

Page 34

1   RD East Las Olas.  And as the Court is aware, in

2   those lien claims you have to identify the period of

3   time within which the work was done.  In both cases

4   those lien claims say that the work was completed

5   pre-bankruptcy.

6            So in everything we've received, other

7   than argument from counsel, the debtor has said

8   there were no contracts involved anymore.  The

9   contracts were gone.

10           So where does that leave Balfour Beatty,

11  Your Honor?  Balfour Beatty has a job site that is

12  now going to be subject to claims by the owner.  It

13  has subcontractors, it has material men that all

14  need to be paid.  So it had to pay them.

15           Your Honor, I've got cases on subcontract

16  law that specify that that contractual relationship,

17  that obligation under situations like this, for the

18  contractor to pay the -- let's call them

19  sub-subcontractors -- is not property of the estate.

20  The materials that were abandoned by the debtor that

21  we had to pay for are not the debtor's property if

22  they never paid for it.  They were just a broker

23  that arranged for these things to be delivered, and

24  that we have now paid for.

25           So if this was a stay violation, this stay

1   violation has cost Balfour Beatty hundreds of

2   thousands of dollars.  It simply does not exist,

3   Your Honor.

4           One last point is, even though the debtor

5   has filed a claim of lien as to both projects, and

6   we have filed a motion to modify stay, apparently,

7   the debtor must think that the claim of liens

8   constitutes an asset of the estate.  I'll admit I

9   gave it a brief review, but the plan that was just

10  filed by the debtor makes no reference to this being

11  an asset of the estate.

12          So, Your Honor, if we're going to hold

13  somebody to a strict construction of pleadings they

14  filed with the Court, we have to start with the

15  debtor, and in every instance, when given the

16  opportunity, the debtor did anything but

17  characterize this as a relationship other than, they

18  are asserting a claim against us and not vice versa.

19  So there couldn't have been a stay violation.

20          I believe that's all I have, Your Honor.

21  Thank you.

22          THE COURT:  All right.  Thank you.

23          All right.  So, Mr. Charbonneau, you have

24  your documents in evidence.  Who is your first

25  witness?

1          MR. CHARBONNEAU:  Ulysses Vazquez, Your

2  Honor.

3          THE COURT:  Mr. Vazquez, if you would

4  please come forward to be sworn.  Do you remember

5  how to get into the -- or the court security officer

6  can assist you.

7          Court security officer, can you assist the

8  witness, please?

9          MR. CHARBONNEAU:  Your Honor, we've been

10  doing so well with the books.  I have my media set

11  up here.

12          Does the Court have a preference as to

13  which way we should go?

14          THE COURT:  No.

15          MR. CHARBONNEAU:  You don't?

16          THE COURT:  I want the one that works.

17          MR. CHARBONNEAU:  Then let's use books.

18          THE COURT:  Okay.  So, Ms. Sanabria, if

19  you'll please swear in the witness.

20  Thereupon:

21                  ULYSSES VAZQUEZ

22  was called as a witness, and having been first duly

23  sworn, was examined and testified as follows:

24          THE COURT:  It looks like our screen is

25  frozen.  Can we unfreeze the screen?  What do we

1   have to do, turn off the camera and start it again?

2           Is this different than the other book?

3           MR. CHARBONNEAU:  Your Honor, that's for

4   the witness.

5           THE COURT:  Oh, this is for the witness.

6           MR. CHARBONNEAU:  This is why I always

7   bring paper.

8           THE COURT:  Okay.  Mr. Vazquez, remember

9   you need to speak slowly and clearly and into the

10  microphone.  Remember that.

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  And, Mr. Charbonneau, please

13  remember, let Mr. Vazquez finish his answer before

14  you ask your next question.

15          And Mr. Vazquez, if Mr. Mather stands up

16  and says "objection," don't answer until I hear the

17  objection.  Okay?

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  Okay.  And remember, speak

20  into the microphone.  You can bring the microphone

21  closer to you.  You can even bring it down if that's

22  easier for you.  Okay?

23          THE WITNESS:  Yes.

24          THE COURT:  Go ahead.

25

1                      DIRECT EXAMINATION

2    BY MR. CHARBONNEAU:

3         Q    Good afternoon, sir.  Please state your

4    name for the record.

5         A    Ulysses Vazquez.

6         Q    What's your position with the debtor?

7         A    I'm the president of Edgewater

8    Construction.

9         Q    I'm going to ask you to take that book,

10   sir, and flip to Tab Number 1.

11             THE COURT:  The electronics didn't work?

12             MR. CHARBONNEAU:  When I saw the freeze,

13   Judge, I decided not to.

14             THE COURT:  Okay.

15             MR. CHARBONNEAU:  We only have an

16   afternoon.

17   BY MR. CHARBONNEAU:

18        Q    Do you see that document, sir?

19        A    Yes.

20        Q    Flip to the second page if you would.

21             That's your signature there on the bottom

22   left?

23        A    Yes.

24        Q    Okay.  What is this contract for?

25        A    This is for stucco work at the RD Las Olas

1    project.

2         Q     Is that a subcontracting contract?

3         A     Yes.

4               MR. CHARBONNEAU:  Your Honor, I'm sorry.

5    We put one contract in, because over the course of

6    discovery we learned that the long-form contract for

7    RD Las Olas and 2000 Biscayne are essentially the

8    same, other than, obviously, the stucco details.

9    The terms and conditions are the same.

10              THE COURT:  Okay.

11              MR. CHARBONNEAU:  Can I get a stipulation

12   from Mr. Mather that that is, in fact, correct?

13              THE COURT:  Mr. Mather, is that acceptable

14   to you?

15              MR. MATHER:  May I ask my client, Your

16   Honor?

17              THE COURT:  Yes.

18              MR. MATHER:  We're unable to stipulate,

19   because we don't know for sure without comparing

20   them.  We did not engage in that.

21              THE COURT:  Okay.  You can post if that

22   works out.  Then you can file the stipulation.

23   Otherwise, we'll deal with it.  Okay?

24              MR. CHARBONNEAU:  Okay.

25

Page 40

1    BY MR. CHARBONNEAU:

2        Q    Mr. Vazquez, you said that Exhibit 1 is

3    for RD Las Olas?

4        A    Yes.

5        Q    Did the debtor have more than one contract

6    with Balfour Beatty?

7        A    Yes.

8        Q    What projects was the debtor working on

9    with Balfour Beatty?

10       A    We were working on the RD Las Olas, and

11   also 2000 Biscayne.

12       Q    What's marked as Exhibit 1, did you sign a

13   contract that was similar to this with Balfour

14   Beatty on 2000 Biscayne?

15       A    Yes.

16       Q    You're familiar with the terms of both

17   contracts?

18       A    Yes.

19       Q    Other than what I would call the

20   attachments, because the jobs are obviously

21   different, is the boiler plate language effectively

22   the same?

23       A    Yes.

24       Q    Okay.  And just for the Court, what were

25   the projects the debtor was working on with Balfour

Page 41

1    Beatty?

2        A    The RD Las Olas --

3        Q    Right, but what kind of projects?

4        A    These are residential high-rise projects.

5        Q    Okay.  Did you have a meeting with

6    representatives of Balfour Beatty on March 23, 2023?

7        A    Yes.

8        Q    Did Edgewater Construction file a Chapter

9    11 petition the day before?

10       A    Yes.

11       Q    Did you sign that petition on behalf of

12   the debtors?

13       A    Yes.

14       Q    Was Jason Sizemore at that meeting on

15   March 23rd?

16       A    Yes.

17       Q    Okay.  How about Dominic Balderas?

18       A    Yes.

19       Q    Who is he?

20       A    He's the project manager for RD Las Olas.

21       Q    Okay.  Can you tell the Court what was

22   discussed with representatives of Balfour Beatty in

23   that meeting?

24       A    The meeting took place because -- we

25   actually called for the meeting, and we requested

1    that we needed to speak to them concerning our

2    financial issues.  We explained to them that we have

3    lost millions of dollars due to material escalation

4    on several projects.

5          To be honest, they were very sympathetic.

6    They were -- that meeting went well, in my opinion.

7    They said, "We're going to work this out."

8          Jason ran the meeting, and they said that

9    they've gone through this in the past, and that we

10   would work something out with like joint checks.  I

11   said, "Look, whatever you guys want to -- whatever

12   is convenient, we want to get back to work if you

13   guys can do this."

14         We were owed money at that point.  RD had

15   not paid -- this is March, and RD had not even paid

16   January or February.  And in March we were still

17   expected to continue to perform.

18         They understood that.  They said that we

19   would work something out.  They asked me to send

20   them a list of what was owed between vendors and

21   labor subs.  That afternoon they had it.

22     Q    And what do you mean that afternoon they

23   had it?

24     A    I e-mailed them that afternoon what was

25   owed to the labor subs and the material subs.

Page 43

1      Q    Okay.  Mr. Vazquez, I'm going to ask you
2   to flip to Tab 2 in that binder.
3           Are you there?
4      A    Yes.
5      Q    Okay.  Through the course of discovery,
6   Mr. Vazquez, we learned that these were meeting
7   minutes taken by Nathan Atkin at Balfour Beatty.
8           Who is Mr. Atkin?
9      A    I think he's a project executive, and he
10  was on 2000 Biscayne.
11     Q    Okay.  If you go to the bottom of the
12  first page, Mr. Vazquez, you see a sub heading joint
13  checks?
14     A    Yes.
15     Q    Why joint checks?
16     A    This was something brought up by Balfour,
17  specifically Jason, that they would just do
18  two-party checks, joint checks, for the vendors and
19  the labor subs that were owed.  They said that any
20  money for Edgewater would be held until the end.
21          I said, "Fine.  I just want to make sure
22  the guys can get back to work and we can pay the
23  vendors."
24          I thought it would be a good thing, and
25  then at the end Edgewater could get some money and

Page 44

1    we would salvage this project.

2         Q    Okay.  Was this for both projects or was

3    this just for RD?

4         A    This was for both projects.

5         Q    You heard Mr. Mather's opening statement,

6    and he characterized Edgewater's departure from the

7    two job sites as abandonment.

8              Did you hear that?

9         A    Yes.

10        Q    Do you agree with that statement?

11        A    I do not.

12        Q    Can you tell the Court why?

13        A    We left everything there.  The only thing

14   that we said we slow down the labor, but we left

15   equipment, we left tools, we left scaffolding, we

16   left -- on both projects, by the way.  There was

17   material already in stock for the labor forces to

18   continue to work.

19             We couldn't afford the labor guys, but we

20   did not leave the job.  We were hoping to work

21   something out, as we've been working out with some

22   of the other large general contractors.

23        Q    When was the last time Edgewater had

24   personnel on the RD Las Olas job site?

25        A    If my memory serves me, I think it was

Page 45

1    March 21st or 22nd.  I don't --

2         Q    So a day or two before the petition?

3         A    Yes.

4         Q    Okay.

5         A    But again, we left everything there.  We

6    didn't take all of our stuff.  We left toolboxes,

7    tools, scaffolding.

8         Q    Mr. Mather said that -- I don't want to

9    put words in his mouth, but that 2000 Biscayne, that

10   project had not been commenced.

11             Do you recall that?

12        A    Yes.

13        Q    Is that true?

14        A    Well, we had not stuccoed the building,

15   but we had already done all the mockups for the

16   owners.  We actually did it twice.  We also did --

17   we also had material delivered.  A substantial

18   amount of material had been requested and delivered

19   to the site.  We took scaffolding to the site.

20             THE COURT:  Slow down.  Slow down.

21             THE WITNESS:  Oh, I'm sorry.

22             We took -- as I was saying, we took

23   stucco.  We had stucco delivered, so we could start

24   working on the building.  We delivered scaffolding,

25   which we own.  We were ready to go.

1   BY MR. CHARBONNEAU:

2        Q    Was there scaffolding delivered at both

3   projects?

4        A    Yes.

5        Q    Do you recall how much?

6        A    It's in the hundreds of pieces.  I think

7   we have a breakdown somewhere, but I don't have it

8   on the top of my head.  I'm sorry.

9        Q    How long has it been since you've had --

10  when I say you -- the debtor had access to that

11  scaffolding?

12       A    We weren't -- well, since after that

13  March 23rd, we haven't had access to any of our

14  stuff.

15       Q    Okay.  Have you filed a claim with your

16  insurance carrier on that?

17       A    Yes.  We filed a police report with the

18  police department, and we filed a claim, because we

19  were told by Balfour that the equipment had been

20  picked up by some kind of leasing company, which I

21  don't know how, because we owned it.

22       Q    Okay.  Do you recall who your carrier is

23  with whom you filed a claim?

24       A    It's a division of Chubb Insurance.

25       Q    Okay.  How much is the claim?

1      A      96,000, I think.

2      Q      Okay.  Mr. Vazquez, look at the next page,

3  please, and the second subheading down, suppliers.

4             Do you see that?

5      A      Yes.

6      Q      Okay.  It says -- I'm sorry -- it says at

7  the last bullet point, "Per Edgewater's estimate

8  stucco will remain fairly close to approximately $8

9  a bag."

10             Is that what you told them?

11     A      Yes.

12     Q      Is that still the price today?

13     A      Yeah.  I just bought some and it was $7.90

14  a bag.

15     Q      Okay.  Did you deliver stucco to the RD

16  Las Olas project?

17     A      Yes.

18     Q      How much?

19     A      During the course, a lot.  I think when

20  the labor guys stopped going, I think we had like 36

21  pallets.

22     Q      Okay.  How about at 2000 Biscayne?

23     A      I think they had close to 20 pallets.

24     Q      Was that stucco all paid for by Edgewater?

25     A      Not yet.

1    Q    So go ahead and please go down to the

2  third bullet point, incentive for Edgewater to

3  complete projects.

4         Do you see that?

5    A    Yes.

6    Q    It says that, "Edgewater advised that they

7  can complete the jobs and still make a profit."

8         Is that what you told those folks?

9    A    Yes.  We were confident that if we were

10 allowed to finish the job and we could do this

11 two-party check, as they suggested, and they would

12 pay the vendors and the labor subs, that we could

13 finish it.  We would supply, you know -- project

14 management, we would supply supervision and we could

15 get it done.

16    Q    Okay.  The last bullet point under

17 incentive for Edgewater to complete projects, let me

18 ask you, sir, was Edgewater in litigation with

19 Balfour Beatty before the bankruptcy filing?

20    A    No.

21    Q    They hadn't sued you?

22    A    No.

23    Q    And you hadn't sued them?

24    A    No.

25    Q    Okay.  The third bullet point under

1    incentive for Edgewater says -- and I'm going to

2    quote -- "The courts are supporting Edgewater to

3    move forward and finish the job - need to create an

4    agreement that all parties are good with."

5             What courts are being referred to?

6        A    I'm referring to this court.  I was

7    explained that any -- anything that we did, be it

8    pay somebody or anything like this, had to be

9    advised to the Court and I guess get Court

10   permission.  That's how I understood that this

11   process worked.  So --

12       Q    So -- I'm sorry.

13       A    I'm sorry.

14            Any type of payment or any type of, you

15   know, continuing forward, we just had to advise the

16   Court of what we were doing.

17       Q    So Balfour Beatty knew about the

18   bankruptcy?

19       A    I told them.

20       Q    Did you tell them that you were going to

21   file or that you had filed?

22       A    I told them I was in bankruptcy.

23       Q    Okay.

24       A    And that's the reason why, knowing that

25   I'm already in it, I knew that I had to advise the

Page 50

1    Court.

2         Q    Based on what's set forth in Exhibit 2,

3    the joint checks and the incentives for Edgewater to

4    complete practices, is that why the debtor moved for

5    approval of the joint check arrangement with Balfour

6    Beatty?

7         A    Yes.

8         Q    And did you subsequently learn that

9    Balfour Beatty eventually did not want to proceed,

10   as set forth in Exhibit 2?

11        A    Yes.  If memory serves me right, this

12   meeting was on like a Thursday.  By Friday I

13   contacted -- the point person on this was Nathan

14   Atkin and Vince Hall (phonetic), and we corresponded

15   and spoke on the phone.

16             They said, well, it's got to get approved

17   by, I guess, some upper powers or something, upper

18   management, and it may take a day or two.  That was

19   on Friday.  I followed up again Monday.  They said

20   they were still waiting.  I continued to follow up,

21   until eventually I got a letter with a 72-hour

22   notice.

23        Q    Did you receive any communication before

24   that?

25        A    No.

Page 51

1      Q    Okay.  Mr. Vazquez, how long have you been
2   engaged in stucco contracting work?
3      A    Over ten years.
4      Q    Would you say that you were pretty
5   familiar with what it took to complete the stucco
6   job at RD Las Olas?
7      A    Yes.
8      Q    How about 2000 Biscayne?
9      A    Yes.
10      Q    In your experience, if you were able to
11   complete -- if Edgewater were able to complete the
12   stucco job at RD Las Olas, do you believe all of
13   your sub subs would have been paid?
14      A    Absolutely.
15      Q    So they wouldn't have claims against the
16   estate now?
17      A    No.
18      Q    And they wouldn't have had to be paid by
19   Balfour Beatty; is that right?
20           Bad question.  Let me withdraw it.
21           Other than the joint check arrangement,
22   Balfour Beatty wouldn't have had to come out of its
23   pocket to pay those sub subs; am I right?
24      A    No.  There would not have been any
25   additional costs above and beyond the contract

Page 52

1   numbers.

2       Q    The scaffolding that was left at the RD

3   Las Olas job -- frankly, both jobs -- was that

4   property of Edgewater?

5       A    Yes.

6       Q    Did you lease any of that scaffolding?

7       A    No.

8       Q    Subsequent to March 30th of this year, did

9   you have an opportunity to visit either of these job

10  sites?  And by "either," I mean RD Las Olas or 2000

11  Biscayne.

12      A    Not myself.  I had somebody who works for

13  me go by the job site.

14      Q    Okay.  Scaffolding still there?

15      A    Yes.  And it was being used.

16           MR. CHARBONNEAU:  Your Honor, may I confer

17  with Ms. Calderin for a moment?

18           THE COURT:  Yes.

19           (Discussion off the record.)

20  BY MR. CHARBONNEAU:

21      Q    Let's go back to Exhibit 2 for a moment,

22  Mr. Vazquez.  If you would go to the third page,

23  please.  At the top of that page, the first bullet

24  point, it says, "Work complete to date on 2000

25  Biscayne."

Page 53

1              Do you see that?

2        A     Yes.

3        Q     What does mobilization mean?

4        A     That means that we've taken all of our

5    equipment, our tools, to start work; our

6    scaffolding, everything we need to start the job.

7        Q     So these notes seem to indicate that 14

8    pallets of stucco were there, as well as scaffolding

9    equipment, right?

10       A     Yes.  And if you look at the second line

11   item it says that we've done all the mockup, which

12   the mockups are the samples that you do so the owner

13   of the project can approve the stucco.

14       Q     Okay.  Mr. Vazquez, the debtor filed a

15   motion to approve a partial assumption of an

16   agreement with Coastal Construction.

17             Am I correct about that?

18       A     Yes.

19       Q     What was that job for?

20       A     The Austin Martin.

21       Q     And that was approved by -- was that

22   approved by Judge Isicoff?

23       A     I would say yes.

24       Q     Has Edgewater been working on that project

25   with Coastal?

1        A     Yes, we are.

2        Q     How's it going so far?

3        A     It's going great.

4              MR. MATHER:  Your Honor, I'd lodge an

5   objection.  I don't see the relevance of that

6   relationship.

7              THE COURT:  Okay.  I'll sustain the

8   objection, unless you have an argument,

9   Mr. Charbonneau, as to why that's relevant.

10             MR. CHARBONNEAU:  I think it's relevant,

11  Judge, to the damage done to the estate by not

12  giving the debtor an opportunity to assume the

13  agreement because, by way of example, other

14  agreements have been assumed, which have either

15  generated revenue to the estates or minimized

16  claims.  So I think from a background perspective

17  it's relevant.

18             THE COURT:  All right.  I'm going to allow

19  the question.  I'll allow you to answer it,

20  Mr. Vazquez.

21             If I rely on it in my ruling, Mr. Mather,

22  I will note that so that your objection is

23  preserved.

24             MR. MATHER:  Your Honor, if I might just

25  add to my objection, I believe that the Moriarty

1    situation factually is different, in that the debtor

2    was performing with Moriarty both pre- and

3    post-petition.  Again, what we are relying on is the

4    abandonment here, that they walked away from it.  So

5    I think factually it's distinguishable, and

6    therefore, irrelevant to this proceeding.

7                THE COURT:  I think the question was with

8    regard to Coastal, not Moriarty, but it's noted.

9                MR. MATHER:  Would the Court note a

10   continuing objection to relevance, to the extent

11   this goes forward?

12               THE COURT:  Absolutely.

13               All right.  So do you want to repeat the

14   question, Mr. Charbonneau, so that Mr. Vazquez can

15   answer?

16               MR. CHARBONNEAU:  I do, Your Honor.  I

17   just have a few follow ups, that I assume will

18   likewise be objectionable.

19               THE COURT:  Okay.

20   BY MR. CHARBONNEAU:

21       Q    Mr. Vazquez, how is the Astin Martin job

22   that you're doing with Coastal going?

23       A    It's going well, and it's helping us get

24   back on our feet.  We're able to complete scope,

25   we're able to get paid.  They're pushing our

1    payments quicker.

2              They understand our situation.  They've

3    been in the business a long time.  They know these

4    things happen at times.  We were doing quality work

5    for them.  They said, "Let's just get through this.

6    It's painful for both of us, but let's get through

7    this."

8              THE COURT:  Stop.

9              MR. MATHER:  Your Honor, hearsay.

10             THE COURT:  I'm going to sustain the

11   objection.  I'm going to strike everything after,

12   "The project is going well."

13             MR. CHARBONNEAU:  Understood.  I'm not

14   going to argue that, Judge.

15             THE COURT:  Okay.

16   BY MR. CHARBONNEAU:

17       Q    Mr. Vazquez, was Edgewater on the Astin

18   Martin project when the debtor filed?

19       A    Yes.

20       Q    But it hadn't been actively working on the

21   project, was it?

22       A    Yeah -- yes.

23             MR. CHARBONNEAU:  Your Honor, I tender

24   Mr. Vazquez to Mr. Mather.

25             THE COURT:  Okay.  Are you okay with

Page 57

```
 1    continuing, Mr. Vazquez?  Do you need a break or
 2    you're good?
 3                    THE WITNESS:  No.  I'm good, Your Honor.
 4    Thank you for asking.
 5                    THE COURT:  Mr. Mather, the witness is
 6    yours.
 7                    Reminder, Mr. Mather is going to wait
 8    until you finish an answer before he asks his next
 9    question.  You're going to wait until Mr. Mather
10    finishes his question before you answer.  If
11    Mr. Charbonneau stands up, don't answer.  Okay?
12                    THE WITNESS:  Yes, Your Honor.
13                    THE COURT:  Go ahead, Mr. Mather, please.
14                    MR. MATHER:  Your Honor, just as a point
15    of clarification, we may need to call Mr. Vazquez in
16    our case in chief, but I would like to ask just a
17    few cross questions, unless the Court is going to
18    say I waived calling him later, if necessary.
19                    THE COURT:  No.  I wouldn't do that.
20                    MR. CHARBONNEAU:  No objection by the
21    debtor, Your Honor.
22                    MR. MATHER:  Thank you, Your Honor.
23                        CROSS-EXAMINATION
24    BY MR. MATHER:
25         Q    Mr. Vazquez, you testified that you --
```

Page 58

1    after the March 23rd meeting, you provided a list of

2    labor subs and materials to Balfour Beatty; is that

3    correct?

4         A    Yes.

5         Q    Did you provide that list to your

6    attorneys?

7         A    I don't recall.

8         Q    Do you have it with you today?

9         A    I did not bring that with me.  There were

10   other people in my office that were handling the

11   stuff with the attorney's office.  I felt it prudent

12   to get as quickly as possible what I had been asked

13   for.  I actually put that list together myself.

14        Q    But you do not have it with you?

15        A    I did not bring that list.

16        Q    And you do not recall giving it to your

17   attorneys?

18        A    I do not recall.

19        Q    And it is not an exhibit here today?

20        A    I don't know.

21        Q    In your testimony about the timing after

22   the March 23rd meeting, I lost you.  I'm not asking

23   to confuse you.  I just want to make sure I

24   understand.

25             I think you said the March 23rd meeting

Page 59

1   happened, you understood that Balfour Beatty would

2   have to do some checking and that that would take

3   several days; is that correct?

4       A    I did not understand it would take several

5   days.  I was in a room with a bunch of senior

6   management guys.  I think Jason is one of the VPs.

7   Vince Hall was there.  I think he's one of the VPs,

8   or he's a senior management personnel also.

9            I think they said they had to check with

10  like one person, one more person above them.  So I

11  was not expecting it to take days.

12      Q    How long did you think it would take?

13      A    A day or so.  Time was of the essence.

14  They themselves said it.  They said, "Could you get

15  back on the job a week -- once this is agreed upon?"

16           They were extremely positive.  I really

17  thought this was going to get done.

18      Q    Okay.  The motion, the critical vendor

19  motion, was filed the next day.

20           Is it your testimony that you received

21  confirmation from Balfour Beatty to go forward with

22  this structure in time to file that critical vendor

23  motion?

24      A    I don't understand the question.

25      Q    Did you ever receive confirmation from

1    Balfour Beatty as to this whole arrangement?

2         A    I did not.

3         Q    Okay.  You authorized the filing of the

4    critical vendor motion without having that

5    authority; is that correct?

6              MR. CHARBONNEAU:  Your Honor, I'm going

7    to --

8              THE WITNESS:  I'm not familiar with that

9    term.  I'm sorry.

10              MR. CHARBONNEAU:  Hold on.

11              THE COURT:  What's your objection?

12              MR. MATHER:  I'll back up.

13              MR. CHARBONNEAU:  Your Honor, the answer

14    could be predicated in part on Mr. Vazquez's

15    conversations with either Ms. Calderin or myself.

16    It could be invasive of the privilege.

17              THE COURT:  Okay.  Let me make the

18    following instruction to the witness:  Mr. Vazquez,

19    one, if you don't know an answer to a question, it's

20    okay to say you don't know.  Lightning will not come

21    down and strike you.  Maybe Mr. Charbonneau, but not

22    you.  Okay?  That's number one.

23              Number two, if your answer requires you to

24    share with anyone anything that Ms. Calderin or

25    Mr. Charbonneau said to you or you to them with

Page 61

1    respect to legal advice, then you should not answer.
2    Okay?
3              THE WITNESS:  Yes, Your Honor.
4              THE COURT:  You understand that?  Okay.
5              So now, Mr. Mather is going to ask you
6    again the question, which since we don't have a
7    court reporter here, you're going to have to
8    remember what the question was.
9              MR. MATHER:  I'll back up a little bit to
10   make sure the foundation is clear.
11             THE COURT:  Okay.
12   BY MR. MATHER:
13        Q    Mr. Vazquez, you are the corporate
14   representative of Edgewater Construction, correct?
15        A    Yes.
16        Q    And you are the person that authorizes
17   your attorneys to file or to not file pleadings in
18   this case, correct?
19        A    I don't -- I don't know how to answer
20   that, because I've not -- you're asking me if I'm
21   telling them what to do, and I've never told them
22   what to do.  They advise me, I don't advise them.
23   So I'm confused on your question.
24             Did I tell them to file this or that?  I'm
25   sorry.  I don't have an answer to that.

1      Q    Do they run things by you before they
2   file?
3           And I'm not asking you to tell me what
4   they said, but do they run things by you before they
5   file them with the Court?
6      A    We speak about certain things, but again,
7   they're the experts in this.  This is all new to me.
8   Some of the terms and the things that you said
9   are -- you know, I'm still learning this whole
10  process.
11     Q    Mr. Vazquez, is there anyone else at
12  Edgewater that would authorize or act on behalf of
13  the company, other than yourself, in terms of
14  directing your attorneys to do or to not do
15  something?
16     A    No.
17          MR. MATHER:  That's all I have for now,
18  Your Honor.  Thank you.
19          THE COURT:  All right.  Thank you.
20          Any redirect?
21          MR. CHARBONNEAU:  No, Your Honor.
22          THE COURT:  Okay.  All right.
23  Mr. Vazquez, you can step down for now.
24          THE WITNESS:  Thank you.
25          THE COURT:  All right.  Who's your next

1   witness, Mr. Charbonneau?

2            MR. CHARBONNEAU:  Our next witness, Your

3   Honor, is Dominic Balderas.

4            THE COURT:  Okay.  Mr. Balderas, if you'll

5   come forward to be sworn.  Raise your right hand.

6   The court security officer will assist if you have

7   any questions.

8            If you wish to wipe off the microphone

9   that's totally your call.  We're just trying to be

10  sensitive to people's concerns.  Are there wipes

11  there?  And if not --

12           THE WITNESS:  It's okay.

13           MR. GOLD:  Rise your right hand.

14  Thereupon:

15                    DOMINIC BALDERAS

16  was called as a witness, and having been first duly

17  sworn, was examined and testified as follows:

18           THE COURT:  Again, just as I said with

19  Mr. Vazquez, one, make sure you're speaking into the

20  microphone.  Number two, the interruption rule still

21  applies.  Same rule regarding lightning, except it

22  will be Mr. Mather, not Mr. Charbonneau, if you

23  don't know the answer.  Okay?

24           THE WITNESS:  Yes, ma'am.

25

1                    DIRECT EXAMINATION

2    BY MR. CHARBONNEAU:

3         Q    Good afternoon.  State your name again for

4    the record, please.

5         A    Dominic Balderas.

6         Q    Sir, you're a project manager for Balfour

7    Beatty; is that right?

8         A    Yes.

9         Q    And you're the project manager for RD East

10   Las Olas?

11        A    Yes.

12        Q    But not for 2000 Biscayne?

13        A    No.

14        Q    That name is a bit of a mouthful for

15   purposes of this exam.  Can we just call it RD?

16        A    Yes.

17        Q    Okay.  Mr. Balderas, you have a degree in

18   construction engineering and management from Purdue

19   University, correct?

20        A    Yes.

21        Q    And you have a master's in real estate

22   development from Nova Southeastern University?

23        A    Yes.

24        Q    Okay.  And as project manager for Balfour

25   Beatty, you manage the day-to-day operations out in

1  the field; is that right?

2      A    Yes, and in the office.

3      Q    Okay.  You manage, among other things,

4  various subcontractors?

5      A    Yes.

6      Q    Financials?

7      A    Yes.

8      Q    Scheduling?

9      A    Yes.

10     Q    Anything else?

11     A    RFI submittals, the day-to-day things that

12  go on in the office.

13     Q    Just for record purposes, what's an RFI?

14     A    Request for information.

15     Q    And who would file that or send that?

16     A    It would be anybody on the project.  It's

17  just sort of a request for subs, us, Balfour, or the

18  owner, in certain cases.

19     Q    Edgewater Construction was the stucco

20  subcontractor on the RD project, right?

21     A    Yes.

22     Q    Okay.  And one of your job

23  responsibilities would be to terminate

24  subcontractors; is that right?

25     A    It would fall in the description of my

Page 66

1    scope of my title.

2        Q    Okay.  You were present at the March --

3    well, strike that.

4            You've been listening to the testimony,

5    Mr. Balderas?

6        A    Yes.

7        Q    You heard about this March 23rd meeting?

8        A    Yes.

9        Q    You were present there, right?

10       A    Yes.

11       Q    Okay.  And Mr. Sizemore was there, along

12   with Mr. Atkin?

13       A    Yes.

14       Q    Okay.  Mr. Atkin took meeting minutes,

15   right?

16       A    Yes.

17       Q    Okay.  And those are the same minutes

18   reflected in Exhibit 2 right there in that book?

19           If I could ask you to just take a quick

20   look at that.  You see the tabs on the right side?

21   There you go.

22           MR. MATHER:  Your Honor, while

23   Mr. Balderas is reviewing, I understand getting some

24   of this done through leading questions, but when we

25   get to the meat of the matter, I would ask that we

Page 67

```
 1   shift to direct questions if he's called on on
 2   direct.
 3             MR. CHARBONNEAU:  It's a hostile witness.
 4             THE COURT:  He's an adverse witness.  He
 5   can lead him until the cows come home.
 6             Your objection is overruled.
 7             MR. MATHER:  I did not hear him ask to
 8   treat him as an adverse.  Maybe I missed it.  I
 9   understand it.
10             THE COURT:  I hear you.  As a practice
11   point, maybe that's the way it should be.  I just --
12   when it's the witness for the -- if it's the
13   principal or a representative of the other side, I
14   just assume it.
15             Yes, you may treat Mr. Balderas as an
16   adverse witness.
17             MR. CHARBONNEAU:  Thank you, Your Honor.
18   BY MR. CHARBONNEAU:
19        Q    Nothing personal, Mr. Balderas.
20        A    It's okay.
21        Q    Are those the meeting minutes that
22   Mr. Atkin took?
23        A    Yes.
24        Q    Okay.  You were referring to those minutes
25   during your deposition.
```

Page 68

1          Do you recall that?

2     A    Correct.

3     Q    Okay.  And at that meeting Ulysses Vazquez

4  indicated that Edgewater was experiencing financial

5  distress, correct?

6     A    Yes.

7     Q    Okay.  Did he mention that Edgewater was

8  in bankruptcy?

9     A    To my recall, I don't remember him

10 mentioning bankruptcy.  All I remember is the

11 courts.

12    Q    Okay.  Were you aware of any pending

13 litigation between Edgewater and Balfour?

14    A    No.

15    Q    Would you be aware if there were any?

16    A    We would be notified, yes.

17    Q    Okay.  Edgewater wasn't suing Balfour?

18    A    No.

19    Q    And Balfour wasn't suing Edgewater?

20    A    For this, no.

21    Q    Have you ever since you've been on the

22 job?

23    A    No.

24    Q    I had the opportunity, the pleasure, to

25 examine you last week, and I asked you if the

Page 69

1    subject of bankruptcy was mentioned.  In your

2    response -- you can read along if you'd like,

3    because I know you did not get an opportunity to

4    read this.  If you want to go to Tab 15 and flip to

5    Page 24 of your examination.

6             Do you see that?

7    A     Page 15?

8    Q     It's Tab 15, Page 24.

9             MR. CHARBONNEAU:  Your Honor, is it

10   possible that I may assist Mr. Balderas?

11            THE COURT:  You can, but I want to know

12   what the question is.

13            MR. CHARBONNEAU:  Okay.  I just want to

14   show him what the page is.  Then I'll come back to

15   the podium.

16            THE COURT:  Yes, you can show him the

17   page, but I want to know what the question is.

18   BY MR. CHARBONNEAU:

19   Q     Beginning on Line 10 or 9, I asked you if

20   the subject of bankruptcy was mentioned, and your

21   response was -- and I'm going to read that aloud,

22   you don't have to read it -- "It was talked that

23   they were -- that they were filing.  You mentioned

24   courts.  I remember he mentioned something about the

25   courts, that he had to take -- after the outcome of

Page 70

1    this meeting he had to go to the courts to talk

2    about his -- what was discussed in this meeting."

3              Do you see that?

4         A    Yes.

5         Q    Do you recall that that was my question

6    and that was your answer?

7         A    Yes.

8         Q    Do you have any doubt that the court

9    reporter took that down incorrectly?

10        A    This is the first time I've seen this, so

11   if she took it down incorrectly --

12        Q    Okay.  Any reason to believe that that is

13   not what you testified to?

14        A    No.  To my knowledge, no.

15        Q    Okay.  Let's go back to Tab 2,

16   Mr. Balderas.  I'm sorry to keep flipping back and

17   forth here.

18              If you go to the second page,

19   Mr. Balderas, subheading incentive for Edgewater to

20   complete projects.  Let me know when you're there.

21        A    Yeah.

22              THE COURT:  What page?

23              MR. CHARBONNEAU:  It is the second page of

24   Exhibit 2, Your Honor.

25              THE COURT:  Okay.  Go ahead.

1           MR. CHARBONNEAU:  Let me know when you're

2     there, Judge.

3           THE COURT:  Go ahead.

4           MR. CHARBONNEAU:  Okay.

5     BY MR. CHARBONNEAU:

6     Q     So at the last bullet point it says, "The

7     courts are supporting Edgewater to move forward and

8     finish the jobs - need to create an agreement that

9     all parties are good with."

10          What courts do you believe Mr. Atkin was

11    referring to there?

12          MR. MATHER:  Your Honor, objection.

13    Mr. Atkin is not here.  This is not something

14    Mr. Balderas drafted.

15          MR. CHARBONNEAU:  But Mr. Balderas was

16    there, Your Honor.

17          THE COURT:  Okay.  What is your objection?

18          MR. MATHER:  The question that I heard

19    was, he was asking what Mr. Atkin meant by the

20    drafting of this.

21          THE COURT:  So your objection would be

22    what?

23          MR. MATHER:  Hearsay.

24          THE COURT:  Hearsay, or is there anything

25    else?

Page 72

```
 1              MR. MATHER:  Whatever the Court is
 2    thinking, Your Honor.
 3              MS. CALDERIN:  I'll give him A for effort.
 4              MR. CHARBONNEAU:  I'll give him that.
 5              THE COURT:  Okay.  I'm going to deny on
 6    the basis of hearsay, but I'll sustain on what I
 7    think you were saying, which is lack of foundation.
 8    I mean, why would Mr. Balderas know what Mr. Atkin
 9    was thinking.
10              MR. CHARBONNEAU:  Fair enough.
11    BY MR. CHARBONNEAU:
12         Q    Did you hear, Mr. Balderas, any mention
13    that, "The courts are supporting Edgewater to move
14    forward and finish the jobs - need to create an
15    agreement that all parties are good with"?
16         A    He talked about the courts, but the
17    particular job for RD?
18         Q    What court did you think he was referring
19    to?
20         A    To my knowledge, I don't know what courts
21    he's talking about.
22         Q    But you weren't aware of any litigation?
23         A    No.
24         Q    Edgewater left certain materials at the
25    jobsite, right?
```

Page 73

1       A       Yes.

2       Q       Sorry.  RD job site.

3       A       RD, yes.

4       Q       Scaffolding was one of those items?

5       A       Yes.

6       Q       Okay.  Scaffolding that was brought on to

7   the project by Edgewater; is that right?

8       A       Yes.

9       Q       And approximately 30 pallets of stucco was

10  your testimony, right?

11      A       Correct.

12      Q       And after Edgewater was terminated,

13  Advanced Stucco was brought on to the job to

14  complete it; is that right?

15      A       Terminated?  No.  We brought Advanced

16  Stucco on much later on, until we knew the outcome

17  of what we were --

18      Q       Did you invite Edgewater back on to the

19  jobsite?

20      A       When?

21      Q       As the project manager, did you tell

22  Edgewater, "Come on back and complete the job"?

23      A       After the meeting?

24              MR. MATHER:  Objection, Your Honor, time.

25  There's no time reference.

```
 1              THE COURT:  Okay.  That's not -- is it
 2   lack of foundation again?
 3              MR. MATHER:  Lack of foundation would be
 4   much better.
 5              THE COURT:  Okay.  Back up.
 6              MR. CHARBONNEAU:  I'll ask the question.
 7   BY MR. CHARBONNEAU:
 8       Q    Mr. Balderas, after the March 23rd
 9   meeting, did Balfour Beatty go forward with the
10   joint check proposition with the debtor?
11       A    No.
12       Q    Did Balfour Beatty invite the debtor back
13   to complete the stucco project under any other
14   terms?
15       A    Not to my knowledge, no.
16       Q    Okay.  If Edgewater had come on to the
17   jobsite to try to finish the job, would you have let
18   them in?
19              MR. MATHER:  Objection, Your Honor.  It's
20   a hypothetical.  There's no foundation for this.
21              THE COURT:  Overruled.  You may answer.
22              THE WITNESS:  We requested documents the
23   day after that meeting, and to this date we still
24   haven't received those documents of -- prior to
25   writing the joint checks.  We needed to know what
```

1   was owed, based off that meeting, and we never --

2   myself, I never received anything to verify what was

3   owed to them.

4   BY MR. CHARBONNEAU:

5       Q    And receiving those documents was in your

6   mind a condition precedent to letting them back on

7   the job?

8       A    Until we also got higher, upper

9   authorities also.  Once we got all the information,

10  then we could go ahead and we could go from there.

11      Q    Did you ever get -- I'm sorry.  I didn't

12  mean to step on your answer.

13           Did you ever get authority from anyone at

14  Balfour Beatty to authorize Edgewater to come back

15  on the project and complete the stucco?

16      A    No.

17      Q    Okay.  And Advanced Stucco eventually came

18  on the project site to do the job; is that right?

19      A    Yes.

20      Q    And the 30 or so pallets of stucco left on

21  the job by Edgewater, that's been used up; is that

22  right?

23      A    It's no longer in the garage, so yes.

24      Q    Okay.  And the scaffolding that Edgewater

25  left on the job, that's been used, as well, right?

1        A     It's been used, yes.

2        Q     Okay.  As project manager, if there was

3    any rental or lease payments made on that

4    scaffolding, you'd know about it, wouldn't you?

5        A     We would by lower tiers, the sub tiers

6    under the subcontractor.  They would file notice to

7    the owner.

8        Q     Have you seen that?

9        A     To?

10       Q     For the scaffolding.

11       A     We've seen the -- we reached out to the

12   lower tier for -- I've seen what I -- when I reached

13   out to one of the lower tiers, we asked them to

14   verify the scaffolding, what was for our job, and

15   that's what we received.

16       Q     Okay.  And you have no reason to believe

17   that that scaffolding is not property of Edgewater,

18   right?

19       A     No.  We received information to verify

20   that from Edgewater.

21       Q     I'm asking you a different question,

22   Mr. Balderas.

23             Do you have any reason -- let me back up.

24             You saw Edgewater bring the scaffolding on

25   the project?

1       A    I didn't see them.  It was there one day.

2       Q    Scaffolding was used by Edgewater?

3       A    Yes.

4       Q    Scaffolding remained after Edgewater left

5  the job?

6       A    Yes.

7       Q    Do you have any reason to believe, as you

8  sit here today, that that scaffolding is not the

9  property of Edgewater?

10           MR. MATHER:  Your Honor, he's asking for a

11  legal conclusion.

12           THE COURT:  I'm going to overrule the

13  objection and ask you to answer, to the extent you

14  can do so, that does not require you to make a legal

15  decision, but just what you think.

16           THE WITNESS:  Okay.  Can you repeat the

17  question?

18  BY MR. CHARBONNEAU:

19       Q    Any reason to believe that the scaffolding

20  that's on the job is not the property of Edgewater?

21       A    Not to my knowledge, no.

22       Q    Okay.

23           MR. CHARBONNEAU:  If I may just have a

24  moment to confer, Your Honor?

25           THE COURT:  Yes.

Page 78

1          MR. CHARBONNEAU:  Nothing further for

2    Mr. Balderas.

3          Mr. Balderas, thank you.

4          THE COURT:  Don't go anywhere.  Not so

5    fast.

6          Okay.  We have to see what Mr. Mather

7    wants to do to you, I mean with you.  I know it's

8    very easy for us, but it's very hard for witnesses.

9    I don't think we appreciate that.

10          MR. MATHER:  Your Honor, may I have just a

11    minute?

12          THE COURT:  Absolutely.

13          That means you have to stay here, but you

14    can stand up if you want to stretch your legs.

15          THE WITNESS:  I'm okay.  Thank you.

16          MR. CHARBONNEAU:  Your Honor, may I

17    approach the witness to get a cup of water?

18          THE COURT:  Well, he's not going to pour

19    it for you, but you can approach the water jug.

20    That is fresh water, right?  Oh, it's cold, too.

21          Try not to destroy the courtroom when

22    you're drinking the water.

23          MR. MATHER:  Your Honor, may I proceed?

24          THE COURT:  Yes.  So this is now your

25    cross-examination by Mr. Mather.  Same rules apply,

Page 79

1    if Mr. Charbonneau stands up, no interruptions, et

2    cetera.  Okay?

3                THE WITNESS:  Yes.

4                THE COURT:  Go ahead, Mr. Mather.

5                MR. MATHER:  Thank you, Your Honor.

6                     CROSS-EXAMINATION

7    BY MR. MATHER:

8         Q    Mr. Balderas, the materials that you

9    referenced earlier in your testimony, who paid for

10   those materials?

11        A    Balfour.

12        Q    The scaffolding that you referred to in

13   your testimony, did you ever receive any

14   verification from Edgewater that they owned or had

15   paid for that scaffolding?

16        A    No.

17        Q    Any information you received on the

18   scaffolding, did you receive from third-party

19   vendors?

20        A    Yes.

21        Q    And has Balfour Beatty paid for any of the

22   scaffolding?

23        A    Yes.

24                MR. MATHER:  Thank you, Your Honor.

25                THE COURT:  All right.  Redirect?

1              REDIRECT EXAMINATION

2    BY MR. CHARBONNEAU:

3         Q    Mr. Balderas, I'm a little confused.  I've

4    asked you if you had any reason to believe that the

5    scaffolding was not property of Edgewater.  Your

6    answer was no, right?

7         A    No, to if it's theirs.  We haven't

8    verified if it was theirs.  So no.

9         Q    Okay.  But any reason to believe that it's

10   not theirs?

11        A    No, unless -- if we paid for it, if we

12   paid for a portion of that.  I don't know what was

13   the entire thing for the scaffolding.

14        Q    Do you know what portion?

15        A    No.  Whatever is on that invoice, or

16   whatever is on the ticket from the lower tiers.

17        Q    I'm not a construction person, so forgive

18   me.

19        A    No problem.

20        Q    From a percentage basis, what percentage

21   of the scaffolding would you say was purchased by

22   Balfour Beatty?

23        A    I don't know.  I would have to verify all

24   of that with the lower tiers.

25             MR. CHARBONNEAU:  One moment, Your Honor,

Page 81

1    if I may.

2              Your Honor, nothing further for

3    Mr. Balderas.  I do want to put Mr. Vazquez up as a

4    quick rebuttal.

5              THE COURT:  Okay.  You're free to go.  I

6    mean, you have to do whatever Mr. Mather tells you.

7              Mr. Vasquez, please come forward and get

8    back in the witness stand.  You're still under oath.

9              MR. CHARBONNEAU:  May I proceed, Your

10   Honor?

11             THE COURT:  Please go forward.

12                  REBUTTAL DIRECT EXAMINATION

13   BY MR. CHARBONNEAU:

14       Q    Mr. Vazquez, did you just hear the

15   testimony elicited from Mr. Balderas?

16       A    Yes.

17       Q    Okay.  Mr. Balderas indicated that there

18   was a portion of the scaffolding that wasn't paid

19   for by the debtor.

20             Do you agree with that?

21       A    Yes.

22       Q    Okay.  Can you explain to the Court what

23   portion was not paid for by the debtor?

24       A    We ordered some additional components that

25   we needed, and they were delivered directly to the

Page 82

1    site.  It was like $8,000.  If I'm not mistaken, I
2    think they were what we call outriggers, so we can
3    go past, beyond the slab edge, and then stucco the
4    slab edge.  But everything else came from our
5    inventory.
6         Q    "Our inventory," meaning Edgewater's?
7         A    Yes.
8         Q    Inventory that Edgewater purchased?
9         A    Yes.  We've been buying scaffolding little
10   by little.  We buy so much for this job, and we've
11   just been stocking it and stocking it and stocking
12   it.  We've got invoices that go back almost ten
13   years, and we've been buying and buying and buying.
14   Our inventory was somewhat large.
15             MR. CHARBONNEAU:  Nothing further, Your
16   Honor.
17             THE COURT:  Do you have any
18   cross-examination for Mr. Vazquez on this one issue,
19   Mr. Mather?
20             MR. MATHER:  Very briefly, Your Honor.
21             THE COURT:  Sure.
22                  REBUTTAL CROSS-EXAMINATION
23   BY MR. MATHER:
24        Q    Mr. Vazquez, you've heard Mr. Balderas say
25   that Balfour Beatty didn't receive any verification

1   as to the scaffolding from Edgewater.

2           Did you hear him testify to that effect?

3       A   Yes.

4       Q   Do you agree with that?

5       A   I disagree.

6       Q   What did you provide?

7       A   We provided multiple invoices of the

8   different purchases that we've had over the years.

9       Q   To whom did you provide those?

10      A   To our attorneys, which I am assuming that

11  they provided it to you.

12          MR. MATHER:  That's all I have, Your

13  Honor.

14          THE COURT:  All right.  Thank you.

15          Any redirect?

16          MR. CHARBONNEAU:  No other witnesses, Your

17  Honor.

18          THE COURT:  Okay.  You may step down,

19  Mr. Vazquez.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  I asked if you had redirect.

22          MR. CHARBONNEAU:  No redirect, Your Honor.

23          THE COURT:  Okay.  You can step down,

24  Mr. Vazquez.

25          THE WITNESS:  Thank you.

Page 84

```
 1              THE COURT:  I would let you stay there,
 2   but probably it's going to be needed by somebody
 3   else.
 4              You have no further witnesses,
 5   Mr. Charbonneau, other than any rebuttal?
 6              MR. CHARBONNEAU:  That's correct, Your
 7   Honor.
 8              THE COURT:  Okay.  Does the debtor rest,
 9   subject to rebuttal?
10              MR. CHARBONNEAU:  It does, Your Honor.
11              THE COURT:  Okay.  Mr. Mather, it's your
12   turn.
13              MR. MATHER:  Your Honor, may we take a ten
14   or 15 minute break?
15              THE COURT:  Absolutely.  We'll take a ten
16   minute -- well, we'll take a break until 2:45.
17   How's that, okay?
18              MR. MATHER:  Thank you, Your Honor.
19              THE COURT:  You may leave everything in
20   the courtroom.  If it's not chocolate it will be
21   safe.
22              (Thereupon, a recess was taken, after
23   which the following proceedings were had:)
24              THE COURT:  Thank you.  Please be seated.
25              Mr. Mather, are you ready?
```

1        MR. MATHER:  Yes.  Thank you, Your Honor.

2   I call Jason Sizemore.

3        THE COURT:  Okay.  Mr. Sizemore, if you'll

4   come forward.  Please raise your right hand.

5   Thereupon:

6                    JASON SIZEMORE

7   was called as a witness, and having been first duly

8   sworn, was examined and testified as follows:

9        THE COURT:  Mr. Sizemore, all the same

10  rules apply, okay?

11       THE WITNESS:  Yes, Your Honor.

12                  DIRECT EXAMINATION

13  BY MR. MATHER:

14       Q    Mr. Sizemore, will you state your full

15  name and your occupation for the record, please?

16       A    Jason Sizemore, vice-president of

17  operations for Balfour Beatty.

18       Q    And what is your educational background,

19  briefly?

20       A    I have a bachelor of science in building

21  science from Auburn University.

22       Q    And how long have you been with Balfour

23  Beatty?

24       A    Six years.

25       Q    All right.  Your current role, would you

Page 86

1  generally describe for us layman what your duties

2  cover?

3       A    I oversee the operations and serve the

4  South Florida market from project conception to

5  completion, and all the staffing, pretty much the

6  whole thing.

7       Q    And are you familiar with the two projects

8  commonly referred to 2000 Biscayne and RD East Las

9  Olas?

10       A    I am.

11       Q    And how are you familiar with those?

12       A    Those are two projects that we acquired a

13  couple of years ago and are in the process of

14  building.

15       Q    Have you been involved with them from the

16  very beginning?

17       A    I have.

18       Q    Okay.  So there are some critical dates

19  relating to these projects.  Just to remind you, the

20  bankruptcy filing date here was March 22, 2023.

21            Can you give the Court the general idea of

22  the status of the 2000 Biscayne project prior to

23  March 22nd of 2023?

24       A    Yes.  We had been asking Edgewater to

25  mobilize and start work for two or three months, at

Page 87

1    which point they said they would not, and actually

2    sent a letter to senior project manager Nathan Atkin

3    stating that -- "go ahead and terminate us then,"

4    were the words Michael Vazquez used.

5         Q    And did they give any explanation as to

6    why they would not start the project?

7         A    They did not believe that the stucco

8    pattern had been picked by the owner.

9         Q    Do you have reason to doubt that?

10        A    We enacted the contract.  Whether or not

11   they did is irrelevant.  The contract said they must

12   proceed when we tell them to.  They chose not to.

13        Q    After that period of time, did Edgewater

14   show back up to work at the 2000 Biscayne at all?

15        A    Not to my knowledge.

16        Q    Okay.  How about the status of RD East Las

17   Olas, prior to March 22nd of 2023?

18        A    They were in the process of stuccoing the

19   balconies, specifically, I believe, at which time

20   their workers left the project, the people that were

21   actually installing the work.  They abandoned the

22   project.

23        Q    So the people actually doing the work I've

24   been referring to as the sub subvendors or sub

25   subcontractors.

Page 88

1          Is that accurate?

2     A    That's accurate.

3     Q    Okay.  Is it unusual for a subcontractor

4   to just abandon the work like this?

5     A    Extremely unusual, yes.

6     Q    Is it unusual in your experience with

7   Balfour Beatty?

8     A    Yes.

9     Q    You've heard testimony today about the

10  March 23, 2023 meeting.

11         Do you recall that testimony?

12    A    I do.

13    Q    And at Tab 2 of the debtor's book are the

14  meeting minutes, if you'd like to refer to those for

15  any reason to refresh your memory, but can you tell

16  the Court generally your understanding of what the

17  meeting was about?

18    A    The work at the project at RD Las Olas,

19  when we noticed that, we asked to meet with Ulysses

20  Vazquez and Edgewater to discuss what happened, what

21  was going on, and what was their intention of

22  finishing the project.

23    Q    Okay.  Now, I believe I heard you say

24  Balfour Beatty asked for the meeting?

25    A    That's my understanding, yes.

Page 89

1     Q    Okay.  And was Balfour Beatty wanting to
2  support efforts for Edgewater to continue work on
3  this project?
4     A    First we wanted to understand what was
5  happening, because we were unaware of why the
6  workers left and what situation Edgewater was in.
7  Secondly, we wanted to investigate options that we
8  had, and discuss with them those options.
9     Q    Okay.  Were there requests for information
10  made by Balfour Beatty to Edgewater prior to that
11  March 23rd meeting?
12     A    That was the first meeting, correct?
13     Q    Yes.
14     A    So prior to that --
15     Q    First and only meeting.
16     A    The first and only meeting.
17          No, because we didn't know what was going
18  on.  We had to first set a base for what we would
19  then ask them during the meeting, which was the list
20  that you've heard that we did not receive.  But at
21  that time we were just trying to figure out what was
22  going on.
23     Q    Okay.  So was there a request for
24  information made by Balfour Beatty to Edgewater at
25  that March 23rd meeting?

1      A     Yes.

2      Q     And did they provide that information to

3  you?

4      A     Not to my knowledge.

5      Q     Okay.  Since that time have they provided

6  any information to you?

7      A     I think after that time there's been

8  information traded back between legal

9  representatives.

10      Q     But not directly to the company, not

11  company to company?

12      A     No.

13      Q     Since the March 23rd meeting, has Balfour

14  Beatty had to expend any sums relating to either one

15  of these projects?

16      A     Yes.

17      Q     Will you describe those for us?

18      A     It's hard to put it in a couple of --

19            MR. CHARBONNEAU:  I'm sorry, Mr. Sizemore,

20  for interrupting.

21            Your Honor, there's evidence, there's

22  documentary evidence in the record of liens paid off

23  by Balfour Beatty, but we have an afternoon, Your

24  Honor, and I just don't think this testimony is

25  relevant to the issue before the Court, which is

Page 91

```
 1   whether Balfour Beatty violated the automatic stay
 2   or not.
 3             It may be relevant to the motion for
 4   relief from the automatic stay that Balfour Beatty
 5   finally filed earlier this month seeking stay relief
 6   to pursue claims in state court against Edgewater,
 7   based on their notice of filing, but for this I'm
 8   not sure it's relevant.
 9             THE COURT:  Okay.  You brief response,
10   Mr. Mather.
11             MR. MATHER:  Yes, Your Honor.  It is
12   relevant, because there has been no damage -- well,
13   while we dispute that there was any stay violation,
14   there's absolutely no damages been caused to the
15   debtor by any of the things we've talked about
16   today.  The only damage that's been caused has been
17   caused to Balfour Beatty, because of all of the
18   items that he's going to testify about.
19             THE COURT:  Okay.  And what does that have
20   to do with whether there was a stay violation?
21             MR. MATHER:  Well --
22             THE COURT:  Damages is separate, right?
23             MR. MATHER:  Well, I don't know.  I
24   thought it was part and parcel of this.  But it also
25   goes to intent, whether there was a malicious intent
```

Page 92

```
 1   to violate the stay that rendered a benefit on
 2   Balfour Beatty.
 3                 THE COURT:  Why don't we just get to the
 4   question, because we're running out of time and I
 5   don't want to spend more time arguing about this
 6   than doing the question.
 7                 MR. MATHER:  Okay.
 8                 THE COURT:  Did Balfour Beatty expend any
 9   money with respect to the projects after Edgewater
10   left with respect to the stucco job?
11                 THE WITNESS:  Yes, Your Honor.
12                 THE COURT:  Okay.  Ask your next question.
13   BY MR. MATHER:
14       Q    What was the nature of those expenditures?
15       A    There were several.  First, to pay other
16   subcontractors and free title.  You have to clear
17   liens that were filed by suppliers and by Edgewater.
18   Those liens -- buying those loans costs money.
19                 Secondly, this was not a bonded project,
20   as I stated, but it was an SDI project, which is
21   subcontractor default insurance.  In order to
22   complete the stucco work we had to enact that to the
23   tune of about 1.6 million over what was original
24   contracts.
25                 There's also a cost for deductibles and
```

Page 93

```
1    other things associated with that, somewhere around
2    a million.
3         Q    Okay.  And you are aware that the debtor
4    has filed a claim of lien against the 2000 Biscayne
5    project, and also against the RD East Las Olas
6    project?
7              MR. CHARBONNEAU:  Same objection, Your
8    Honor, relevance.
9              THE COURT:  Okay.  What is the relevance
10   of that?
11             MR. MATHER:  Same thing, Your Honor.  The
12   debtor, by filing a claim of lien -- well, first of
13   all, as I mentioned, that marks the period of time
14   that ends pre-bankruptcy.  So that's important.
15             But by filing the claim of lien, they have
16   now put a lien on the title of the owner's project,
17   which the owner now has claims against Balfour
18   Beatty.
19             THE COURT:  What does that have to do with
20   the stay violation?
21             MR. MATHER:  Because again, we are the
22   ones being damaged, not the debtor.
23             THE COURT:  I'm going to sustain the
24   relevancy objection at this point.  You want to go
25   into that, we'll talk about it another day.
```

```
1              MR. MATHER:  Okay.
2              THE COURT:  Right now I want to focus on
3    whether there was a stay violation.
4              MR. MATHER:  Okay.
5    BY MR. MATHER:
6         Q    Mr. Sizemore, did Balfour Beatty pay for
7    the scaffolding and materials at these locations?
8         A    I believe they did, yes, or we did.
9              MR. MATHER:  Your Honor, may I have a
10   moment, please?
11             THE COURT:  Absolutely.
12             Mr. Sizemore, if you need to stand up,
13   that's fine.
14             THE WITNESS:  Thank you, Your Honor.
15             THE COURT:  I think there's enough room to
16   stand there.
17             MR. MATHER:  May I resume, Your Honor?
18             THE COURT:  Please.
19   BY MR. MATHER:
20        Q    Mr. Sizemore, you attended the March 23rd
21   meeting, correct?
22        A    I did.
23        Q    Did you -- is it your understanding or
24   were you told that Edgewater was in bankruptcy when
25   you were at that meeting?
```

1        A    It was unclear as to whether they were in
2    bankruptcy.
3              MR. MATHER:  That's all I have, Your
4    Honor.
5              THE COURT:  Okay.  Mr. Charbonneau, or
6    Ms. Calderin?
7                      CROSS-EXAMINATION
8    BY MR. CHARBONNEAU:
9        Q    Mr. Sizemore, good afternoon.  When
10   Mr. Mather was examining you, you said it was your
11   understanding that Balfour Beatty asked for the
12   meeting.
13             Did you ask for the meeting?
14       A    No.  I informed the people to ask for the
15   meeting, Jessica Quintana.
16       Q    Okay.  Let's go back to Exhibit 2 for a
17   moment.  If you need me to assist you, Mr. Sizemore,
18   I'm happy to do so.
19             Are you there?
20       A    Got it.
21       Q    These are the meeting minutes from that
22   March 23rd meeting, right?
23       A    Yes.
24       Q    Okay.  And was Balfour Beatty suing
25   Edgewater at that time?

1        A    No.

2        Q    Was Edgewater suing Balfour?

3        A    No.

4        Q    Okay.  And your title again was VP of

5   operations, right?

6        A    Yes.

7        Q    If Edgewater was suing Balfour you'd know

8   about it, right?

9        A    Yes.

10       Q    Okay.  When you go back to the second

11  page, Mr. Sizemore, where it says, "Incentive for

12  Edgewater to complete projects," and you go down to

13  the third bullet point, it says, "The courts are

14  supporting Edgewater to move forward and finish the

15  job - need to create an agreement that all parties

16  are good with," what courts were being referred to

17  there?

18       A    I'm unaware of what court was being

19  referred to there.

20       Q    Okay.  But there was no litigation pending

21  at the time, right?

22       A    No, there wasn't.

23       Q    Okay.  I'm going to ask you, sir, to flip

24  to Tab 16, and then from there, if you would, sir,

25  go to Page 57.  Let me know when you're there.

1        A    I'm there.

2        Q    Okay.  Do you recall me asking you about

3   whether Balfour Beatty contracted for the purchase

4   or rent -- to either purchase or rent the

5   scaffolding on this job?

6        A    I do.

7        Q    Okay.  And your answer on Line 9 is, "Not

8   specific to the work of Edgewater.  We may have for

9   other things."

10            Do you see that?

11       A    Yes.

12       Q    Okay.  The court reporter -- did you get a

13   chance to read this transcript?

14       A    Yes.

15       Q    Oh, you did?

16       A    Yes, I did.

17       Q    Okay.  Let's go, sir, to Exhibit 4.  If

18   you need me to help --

19       A    No, I'm good.  I'm there.

20       Q    Have you seen this document before?  Feel

21   free to page through it.

22       A    I believe I have.

23       Q    Okay.  On the second page, second to the

24   last, is that your e-mail address?

25       A    Yes.

1      Q    Okay.  What did you do when you got this

2  document?

3      A    I don't know of a specific action that I

4  took, in my memory.  I would assume that I contacted

5  counsel to discuss.  I don't know exactly what I

6  did, sir.

7      Q    Okay.  When you received this document,

8  was there any doubt in your mind that Edgewater was

9  in bankruptcy?

10           MR. MATHER:  Object.

11           THE COURT:  What is your objection?

12           MR. MATHER:  (Inaudible).

13           THE COURT:  Overruled.

14           THE WITNESS:  It says it on the first

15  page, sir.

16  BY MR. CHARBONNEAU:

17      Q    Okay.  I appreciate that answer.  Let me

18  ask it another way.  Please listen to my question

19  and answer my question.

20           When you received this document, was there

21  any doubt in your mind after receiving it and

22  reviewing it, that Edgewater was in Chapter 11?

23      A    I don't specifically remember reading the

24  document, sir, but my name is on it.  I would have

25  to say yes, it is clear that they were in Chapter 11

1    bankruptcy.

2         Q    Okay.  The termination -- sorry.  I keep

3    referring to them as termination letters and you

4    corrected me.

5              The 72-hour letter that was sent by

6    Ms. Quintana and is Exhibit 3, that is dated

7    March 28th of 2023.

8              Do you see that?

9         A    I do.

10        Q    Okay.  That's two days before the date of

11   the letter on Exhibit 4, right?

12        A    Yes.

13        Q    Okay.  Upon receiving the letter in

14   Exhibit 4, did you ask Ms. Quintana to do or not do

15   something?

16        A    I did not.

17        Q    You didn't tell her, "Hey, the company is

18   in bankruptcy, maybe we should rethink this letter"?

19             MR. MATHER:  Asked and answered, Your

20   Honor.

21             THE COURT:  Overruled.

22             THE WITNESS:  No, I did not.

23   BY MR. CHARBONNEAU:

24        Q    Can I ask why?

25        A    At this point in-house counsel was

1   handling this, and I was leaning on their counsel.

2            MR. CHARBONNEAU:  Your Honor, is Balfour's

3   exhibit register up with Mr. Sizemore?

4            THE COURT:  I don't --

5            MR. MATHER:  Yes.

6            THE COURT:  Is it, it's up there?

7            Do you see the smaller notebook up there,

8   Mr. Sizemore?

9            THE WITNESS:  No, Your Honor.

10           THE COURT:  Perhaps my law clerk's copy

11  could go to the witness.

12           THE WITNESS:  Thank you.

13           THE COURT:  Luckily you're neighbors.

14  BY MR. CHARBONNEAU:

15       Q    Mr. Sizemore, would you please go to

16  Exhibit 32 of your exhibit register?

17       A    I'm there.

18       Q    What is that document?

19           THE COURT:  Could you tell me the exhibit

20  again?

21           MR. CHARBONNEAU:  Yes, Your Honor.  That

22  is 32.

23           THE COURT:  Okay.

24  BY MR. CHARBONNEAU:

25       Q    What is that document?

1      A    It's a text message.

2      Q    Is this a text string between you and

3  Ulysses Vazquez?

4      A    It is.

5      Q    So up top it says April 4, 2023, but

6  actually, if you look into the text string it

7  appears that the date of the texts are from

8  March 24th through March 28th.

9           Would you agree with me, sir?

10     A    Yes.

11     Q    The dark bubbles, is that Mr. Vazquez?

12     A    Could you ask it differently, the left and

13  the right-hand side, because I don't know what --

14     Q    Okay.  I just noticed that.

15          The bubbles on the left, who is that

16  texting?

17     A    That's Mr. Vazquez.

18     Q    So the bubbles on the right --

19          MR. CHARBONNEAU:  Which happen to be the

20  darker bubbles, Your Honor.  That's how I

21  differentiate them.

22          THE COURT:  I got it.

23  BY MR. CHARBONNEAU:

24     Q    -- are Mr. Sizemore?

25          THE COURT:  Somehow I managed to figure it

1    out.

2    BY MR. CHARBONNEAU:

3        Q    What is Mr. Vazquez doing here?

4        A    He's following up with the meeting that we

5    had.

6        Q    And when he says, "Yes, please, just

7    following up," your response is, "Slammed brother,

8    have not received the word yet."

9            That's pretty familiar, isn't it?

10       A    Yes.  We spoke about it in the deposition.

11       Q    That's a pretty familiar way to refer to

12   Mr. Vazquez, isn't it?

13       A    It's normal speech for me with anyone.

14       Q    Okay.  And then he says, "I have attorneys

15   asking me if we have deal and my guys are now also

16   calling me."

17           Your response is, "Understood.  As soon as

18   I get the word I will call you if Vince/Jason

19   doesn't first."

20           So as of March 28th, it sounds like the

21   discussion that was had and the plan that was laid

22   out in Exhibit 2 from that March 23rd meeting, there

23   hadn't been a decision of Balfour Beatty yet, right?

24       A    We had not entered into any agreement

25   based off of that meeting, no.

1      Q    But from looking at this text string,

2  Mr. Sizemore, it appears that Balfour Beatty was at

3  least considering it at that time, right?

4      A    We were considering options, yes.  That's

5  what the meeting was about.

6      Q    Okay.  Now, he refers to attorneys again.

7           Did you think to ask what attorneys?

8      A    No, I did not.

9           MR. CHARBONNEAU:  Your Honor, if I may

10 have a moment?

11          THE COURT:  Yes.

12          MR. CHARBONNEAU:  Nothing further on

13 cross, Your Honor.

14          Thank you, Mr. Sizemore.

15          THE COURT:  All right.  Mr. Mather, any

16 redirect?

17          MR. MATHER:  Nothing further, Your Honor.

18 Thank you.

19          THE COURT:  Mr. Sizemore, you can step

20 down.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  Mr. Mather, any other

23 witnesses that you'd like to call?

24          MR. MATHER:  No, Your Honor.  We'll rest.

25          THE COURT:  Okay.  All right.

Page 104

1    Mr. Charbonneau, any rebuttal testimony?

2                I'm sorry.  Ms. Calderin, any rebuttal

3    testimony?  Please go to a microphone to respond.

4                MS. CALDERIN:  Your Honor, may we have

5    just a couple of minutes to confer?

6                THE COURT:  How about we take -- it's now

7    3:10.  How about 3:15?  Is that enough time.

8                MS. CALDERIN:  Yes, Your Honor.

9                THE COURT:  Okay, 3:15.

10               (Thereupon, a recess was taken, after

11   which the following proceedings were had:)

12               THE COURT:  Thank you.  Please be seated.

13               All right.  Mr. Charbonneau.

14               MR. CHARBONNEAU:  Your Honor, very brief

15   rebuttal with Michael Vazquez.

16               THE COURT:  All right.  Mr. Vazquez,

17   please come forward to be sworn in.  Please raise

18   your right hand.

19   Thereupon:

20                         MICHAEL VAZQUEZ

21   was called as a witness, and having been first duly

22   sworn, was examined and testified as follows:

23                       DIRECT EXAMINATION

24   BY MR. CHARBONNEAU:

25        Q    Sir, would you please just state your name

1    for the record?

2         A    Michael Vazquez.

3         Q    Okay.  And are you employed?

4         A    Yes.

5         Q    By whom?

6         A    Edgewater Construction.

7              THE COURT:  Mr. Vazquez, I need you to

8    speak into the microphone.  Thank you.

9    BY MR. CHARBONNEAU:

10        Q    And what position do you hold at

11   Edgewater?

12        A    Project manager.

13        Q    Were you the project manager or RD Las

14   Olas, or RD East Las Olas, I should say?

15        A    Correct.

16        Q    Okay.  Were you the project manager for

17   2000 Biscayne?

18        A    Correct.

19        Q    Okay.  And in terms of being a project

20   manager, among your other responsibilities is, you

21   supervise the application of stucco to the projects?

22        A    Yes.

23        Q    Okay.  A little while ago Mr. Sizemore was

24   testifying or giving testimony about Edgewater and

25   2000 Biscayne.

1           Do you recall the testimony generally?

2       A    Yes.

3       Q    Okay.  Do you recall where Mr. Sizemore

4   told the Court that Edgewater was not on the job at

5   all?

6       A    Yes.

7       Q    Do you recall when Mr. Sizemore told the

8   Court that Edgewater was not ready to proceed?

9       A    Yes.

10      Q    Do you agree with those statements?

11      A    No.

12      Q    Can you tell the Court exactly why they're

13  not correct?

14      A    We had numerous amount of meetings showing

15  defects in the natural job site, that the project

16  wasn't ready.  Along with that, ownership was

17  deciding to do a different texture on the building.

18      Q    Can you explain to the Court exactly what

19  that means, because I'm not sure I know?

20      A    When that project was bought out, that was

21  a full texture job, and then ownership was deciding

22  to go to a smooth finish.

23      Q    Okay.  So when it was purchased -- when

24  you say it was bought out, who bought it out?

25      A    Balfour Beatty bought -- contracted us to

1    do the job.

2         Q    Got it.  Okay.  So when you were

3    contracted to do the job, was it the contractor that

4    called for a full -- what did you call it, a full

5    what?

6         A    Texture.

7         Q    Full texture, what does that mean exactly?

8         A    A textured stucco as opposed to a smooth

9    finish stucco.

10        Q    And I think you said Balfour Beatty wanted

11   you instead to apply a smooth finish; is that right?

12        A    No.  Ownership had submitted an RFI

13   stating that they wanted to do that.

14        Q    Okay.  And did Balfour Beatty direct you

15   to do that?

16        A    They asked us to price it out, we did, and

17   then we proceeded to do a sample for them.

18        Q    Okay.  What does a sample look like?

19        A    This was a, I want to say 10 by 20-foot

20   sample, just a mockup showing how we could perform

21   this work.

22        Q    Was it a smooth texture sample?

23        A    Correct.

24        Q    Did Balfour Beatty review the sample?

25        A    Yes.

1        Q      What did they tell you?

2        A      They were initially disappointed, because

3    they had asked us to perform that sample poorly, so

4    that wouldn't be an option for ownership.

5        Q      I don't understand.  Why would they do

6    that?

7        A      They wanted to proceed and have the job

8    move forward on the original scope.

9        Q      The original scope, meaning the textured

10   finish?

11       A      Correct.

12       Q      Because if they had to change to smooth it

13   would delay the job?

14       A      Correct.

15       Q      Okay.  Did you eventually give them the

16   sample they requested?

17       A      No, I didn't.

18       Q      Why not?

19       A      I won't want to make the company look like

20   they're not able to perform what they wanted.  I

21   didn't want to do that.

22              MR. CHARBONNEAU:  Nothing further, Your

23   Honor.

24              THE COURT:  All right.  Cross-examination?

25

1                    CROSS-EXAMINATION

2   BY MR. MATHER:

3        Q    Mr. Vazquez --

4             MR. MATHER:  Your Honor, may I approach

5   with hard copies of Exhibit 20, just to save passing

6   books along?

7             THE COURT:  I think the book is right in

8   front of Mr. Vazquez.

9             MR. MATHER:  Oh, okay.

10  BY MR. MATHER:

11       Q    If you still have it, will you turn to our

12  Exhibit 20?

13            Mr. Vazquez, are you looking at an e-mail

14  at the top of the page from you to Nathan Atkin,

15  with a copy to your father -- Ulysses is your

16  father, correct?

17       A    Correct.

18       Q    Are you looking at the e-mail dated

19  March 3rd of 2023?

20       A    Yes.

21       Q    Okay.  And isn't it true, Mr. Vazquez,

22  that the last paragraph of your e-mail says, "We

23  keep getting the run around for a very simple ask,

24  and I'm beginning to wonder, if this is the same

25  service we can expect when you commence your work,

Page 110

1    then remove us for convenience on this project.

2    Edgewater will not tolerate this type of behavior."

3              MR. CHARBONNEAU:  Objection.  I'm going to

4    object to the question.  It's not a faithful

5    recitation of the paragraph.

6              THE COURT:  Okay.  I agree.  I can read

7    it.

8              So why don't you read the exact statement,

9    Mr. Mather?

10             MR. MATHER:  Okay.

11   BY MR. MATHER:

12        Q    Mr. Vazquez, the last paragraph of -- this

13   is your e-mail, correct?

14        A    Correct.

15        Q    You remember sending it?

16        A    Yes.

17        Q    Okay.  "Furthermore, if you truly believe

18   your statement below, 'we keep getting the run

19   around for a very simple ask, and I'm beginning to

20   wonder if this is the same service we can expect

21   when you commence your work,' then remove us for

22   convenience on this project.  Edgewater will not

23   tolerate this type of behavior."

24        A    Yes.

25        Q    Those are your words?

1        A     Yes.

2        Q     And did Edgewater go back to -- and this

3    is the 2000 Biscayne project, right?

4        A     Yes.

5        Q     Did Edgewater ever go back to this

6    project?

7        A     After this, yes.

8        Q     When?

9        A     I want to say like three days after.

10       Q     And you performed services?

11       A     Yeah, actually, we did.

12       Q     What services did you perform?

13       A     We had to relocate our scaffolding.  Where

14   they asked us to put it, our designated area was no

15   longer available to us.

16       Q     So you did not do any stuccoing work after

17   this date?

18       A     Physical stucco work, no.

19       Q     I'm going to ask you to turn to Exhibit

20   22.  Tell me when you're there.

21       A     I'm there.

22       Q     Do you see the e-mails -- there are two

23   e-mails -- and please tell me if you disagree with

24   this, but there are two e-mails from Francesca Perez

25   to you and to your father, one dated March 21st of

Page 112

1    2023, and one dated March 22nd of 2023.

2              Do you agree with that?

3        A    Yes.

4        Q    Okay.  And would you agree with me,

5    Mr. Vazquez, that these were requests for further

6    information from Balfour Beatty?

7        A    Yes.

8        Q    And did you provide that information?

9        A    No.

10              MR. MATHER:  That's all I have, Your

11    Honor.

12              THE COURT:  Okay.  Thank you.

13              Any redirect?

14              MR. CHARBONNEAU:  Yes, Your Honor.

15                   REDIRECT EXAMINATION

16    BY MR. CHARBONNEAU:

17        Q    Mr. Vazquez, please keep that same Exhibit

18    20 open.

19              THE COURT:  Twenty or 22?

20              MR. CHARBONNEAU:  Twenty.

21              THE COURT:  Okay.  Because we were looking

22    at 22.

23    BY MR. CHARBONNEAU:

24        Q    Mr. Vazquez, please turn to Exhibit 20.

25        A    I'm there.

1      Q    Okay.  So Mr. Mather was asking you about

2  the last paragraph in that e-mail.  Remember?

3      A    Yes.

4      Q    I want you to go ahead and take a minute

5  and read the paragraph that precedes that paragraph.

6  Let me know when you're done.

7      A    Yes.

8      Q    Okay.  So, I want to start in the second

9  line.  You say, "Wait till ownership decision.

10  Unfortunately this is not how you bought out this

11  project.  That is why Edgewater did not start."

12         Does that relate to the textured versus

13  smooth stucco change?

14      A    Yes.

15      Q    Okay.  You further say, "Until today you

16  stated you wanted us to proceed with textured

17  stucco.  I made you aware if we start then the

18  change order will need to increase for the

19  remobilization of those completed units and the

20  removal of the textured stucco to be able to apply

21  smooth."

22         What is mobilization again?

23      A    To go back into the area again to perform

24  work.

25      Q    Okay.  Doing this was going to delay

Page 114

1    completion of the stucco job, wasn't it?

2         A    Tremendously.

3         Q    By how much?

4         A    Approximately a month.  I explained to

5    them the stucco had to be removed if we applied it

6    onto the walls.

7         Q    Okay.  How did the job end up proceeding,

8    smooth or rough -- textured, I should say?

9         A    It ended up proceeding with textured.

10        Q    Okay.  The way it was originally

11   specified?

12        A    Correct.

13             MR. CHARBONNEAU:  Nothing further, Your

14   Honor.

15             THE COURT:  All right.  Thank you,

16   Mr. Vazquez.  You can step down.

17             Do you have any additional rebuttal?

18             MR. CHARBONNEAU:  No, Your Honor.

19             THE COURT:  Okay.  All right.  So the

20   debtor rests?

21             MR. CHARBONNEAU:  We already rested, Your

22   Honor.

23             THE COURT:  I mean rests, like completely

24   rests.

25             MR. CHARBONNEAU:  Yes, that's right.

Page 115

```
 1              THE COURT:  Really resting.  Practically
 2   napping.
 3              MR. CHARBONNEAU:  We're kicking back.
 4              THE COURT:  So now I've gotten the
 5   evidence.  I have the testimonial evidence that you
 6   all chose.  I've got the stipulation, I have the
 7   exhibits.
 8              I'm assuming you wish to submit written
 9   closings, or how do you all wish to proceed?
10              MR. MATHER:  Your Honor, I think written
11   would be preferable, because there is -- there's
12   some authority that I don't think really has been
13   captured up to this point, so I would prefer
14   written.
15              THE COURT:  Okay.  Do you agree?
16              MR. CHARBONNEAU:  I'm fine with that, Your
17   Honor.
18              THE COURT:  All right.  So what we'll do
19   is, you'll do a written closing, which can be also
20   proposed findings of fact and conclusions of law.
21   Just mush it all together.
22              That's a complex legal term for my law
23   students.  You'll learn that in your third year of
24   law school.
25              What I'll ask you each to do is to prepare
```

```
 1   it in Word, as well as uploading it on the docket
 2   when it's ready, send it to my chambers's e-mail
 3   box, copy each other, so that there's no ex parte
 4   communication, but in Word form.
 5              So the question is, when can I expect
 6   these written closings?  No trick question.  Do you
 7   want to have until the 14th.  I don't really want to
 8   push it out much past that, unless people have
 9   vacation.  I don't believe in interfering with
10   vacation if it's not an emergency.
11              MR. MATHER:  I've already been on
12   vacation, so the 14th is fine.
13              MR. CHARBONNEAU:  We'll be on vacation,
14   Judge.  Can we do the 3rd.
15              MS. CALDERIN:  One week from now.
16              MR. CHARBONNEAU:  One week from today.
17   It's not a huge record.
18              THE COURT:  The Court is closed on the
19   3rd.
20              MR. CHARBONNEAU:  How about the 2nd?
21              THE COURT:  How about Friday, the 7th?
22              MR. CHARBONNEAU:  All right.
23              MS. CALDERIN:  I'll finish it this week,
24   Your Honor, but I am on grandmother duty the entire
25   week next week.
```

1          THE COURT:  Okay.  That's fine.  You can
2  submit it early.  It's not a trick.
3          Is the 7th okay with you, Mr. Mather?
4          MR. MATHER:  Of course, Your Honor.
5          THE COURT:  So Friday, the 7th.
6          She naps, right?
7          MS. CALDERIN:  I am not going to let her
8  out of my sight.
9          THE COURT:  My granddaughters don't nap,
10  so I can't -- I don't ever get a break.
11          MS. CALDERIN:  I will not let her sleep.
12  I have her for a week.
13          THE COURT:  Barbie Dream House went well,
14  but don't tell my daughter I did that.  Okay.
15          All right.  So the 7th, proposed findings
16  of fact, conclusions of law.  If they get done
17  earlier that's fine.  Nothing will happen that's
18  bad.  I will not look at them before the 5th,
19  because I will be on grandmother duty for at least a
20  portion of that week.  I will not be back until the
21  5th.  So don't feel compelled to submit them,
22  because no one will look at them before then.  But
23  the 7th will be the deadline for sure.
24          Proposed findings of fact, conclusions of
25  law, closing statement, all mixed in together and

1    then we'll take care of it.  Because the good

2    knows -- maybe it's bad news, I don't know -- for

3    you all is that I will not be traveling again until

4    the beginning of August.  So plenty of time to take

5    a look at this.

6              Any questions, Mr. Mather?

7              MR. MATHER:  No, Your Honor.  Thank you,

8    and thank you to your IT people for helping.

9              THE COURT:  We didn't end up using it, but

10   they're really great guys.

11             MR. CHARBONNEAU:  I actually had one

12   question, Your Honor.

13             THE COURT:  Go ahead.

14             MR. CHARBONNEAU:  During one of

15   Mr. Mather's questions and colloquy to the Court,

16   the Court indicated that that was an issue for

17   another day, and the "that" was --

18             THE COURT:  Damages.

19             MR. CHARBONNEAU:  Damages.  We're just

20   talking about liability today?

21             THE COURT:  Well, in terms of the

22   evidence, that's in the books.  What I didn't want

23   to do was start getting into the whole setoff issue,

24   because if I don't find that there was a stay

25   violation, then we never get to setoff.  That's why

1    I stopped that for now.

2              Or it could be that ultimately I find that

3    even if there are damages, that they cannot be set

4    off, because of the setoff rules.  I just did not

5    want to spend time today on something that may never

6    become relevant.

7              Now, if you have damages already in the

8    calculation, in the exhibits, then -- okay, my

9    understanding was that the purpose of today was to

10   determine whether there was a stay violation.  If I

11   determine that there's a stay violation, then we

12   will have a further hearing on damages.

13             Prior to that hearing on damages, although

14   I know, Mr. Mather, you love coming down to South

15   Florida, especially in the summer when the storms

16   hit, usually around the time you'd be on the

17   highway, then we can have that legal argument

18   before.

19             So if I find that there was a stay

20   violation, before we do the evidentiary hearing on

21   damages, we'll have legal argument on whether any

22   damages that Balfour Beatty asserts would be

23   subject -- would be allowed to be used as a setoff,

24   or that's a separate issue not subject to setoff.

25             That way, once we get past that legal

1    issue, then we'll know, assuming I find there's a

2    stay violation -- because if I don't find there's a

3    stay violation we don't go any further, right?

4    Okay.  Once I rule on that legal issue, then we will

5    know whether we're just having a trial -- an

6    evidentiary hearing on the debtor's damages for

7    purposes of the stay violation damages, and we can

8    determine whether there will be a separate trial on

9    damages for the claim amount.  Because I'm assuming

10   Balfour Beatty will be filing a claim, regardless of

11   whether it's going to be subject to setoff.

12              Is that fair, Mr. Mather?

13              MR. MATHER:  Yes, Your Honor.  We did,

14   because of the lien claim.

15              THE COURT:  Okay.  So you've already filed

16   your proof of claim.  Okay.

17              If the debtor doesn't object to the proof

18   of claim, which I'm going to guess you are going to

19   object to the proof of claim, but if you weren't,

20   then we wouldn't have to have a trial on the claim

21   amount, right?

22              So I'm trying to just minimize the amount

23   of time that folks are in court, not that I don't

24   love seeing all of you, but I know it costs money

25   for both sides.  Let's try to keep the attorney's

```
1   fees as low as we can, within reason, with everybody
2   asserting their reasonable rights.
3              MR. CHARBONNEAU:  Thanks for the
4   clarification.
5              THE COURT:  Determination of stay
6   violation.  If the answer is yes, legal argument on
7   any damages that Balfour Beatty asserts are
8   setoffable -- subject to setoff -- I'll rule on
9   that.  Then we'll determine how we go forward with
10  the evidentiary hearing on damages.  Or there might
11  not need to be an evidentiary hearing.  Or it can be
12  like it was today.
13             I want to thank you both -- all three of
14  you.  I want to thank all three of you for the time
15  that you spent doing what you needed to do so we
16  could keep the time today to a minimum.
17             MR. CHARBONNEAU:  Always a pleasure to
18  work with someone like Mr. Mather, Your Honor.
19             THE COURT:  Well, that's what
20  professionals are for.
21             So, students, this is the good stuff.
22             I told them I'm going to show them the bad
23  stuff and the good stuff.  This is the good stuff.
24             Thank you all very much for your time.
25  Stay well, stay safe.  If you're traveling far,
```

Page 122

1   please travel safe.

2              MR. CHARBONNEAU:  Thank you, Your Honor.

3              MR. MATHER:  Thank you, Your Honor.

4              MS. CALDERIN:  Thank you, Your Honor.

5              (Thereupon, the hearing was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 123

CERTIFICATION

STATE OF FLORIDA:

COUNTY  OF  DADE:


I, HELAYNE F. WILLS, Shorthand
Reporter and Notary Public in and for the State of
Florida at Large, do hereby certify that the
foregoing proceedings were taken by electronic
recording at the date and place as stated in the
caption hereto on Page 1; that the foregoing
computer-aided transcription is a true record of my
stenographic notes taken from said electronic
recording.

WITNESS my hand this 29th day of
June, 2023.



_____

HELAYNE F. WILLS
Court Reporter and Notary Public
In and For the State of Florida at Large
Commission No:  HH157788  Expires 8/2/2025