*Tagged opinion*



**ORDERED in the Southern District of Florida on August 1, 2023.**

**Laurel M. Isicoff
Chief United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

EDGEWATER CONSTRUCTION GROUP, INC.,

   Debtor.   /

Case No.: 23-12217-LMI

Chapter 11
Subchapter V

**ORDER ON DEBTOR'S EMERGENCY MOTION FOR AN ORDER
ENFORCING THE AUTOMATIC STAY; SETTING FURTHER HEARING ON
REQUEST FOR SANCTIONS FOR INTENTIONAL AND
WILLFUL VIOLATION OF THE AUTOMATIC STAY; AND
SETTING FURTHER HEARING ON REQUEST FOR TURNOVER**

This matter came before the Court on June 26, 2023 for trial (the "Trial") on *Debtor's Emergency Motion for an Order (I) Enforcing the Automatic Stay, (II) Awarding Sanctions for Intentional and Willful Violation of the Automatic Stay (III) Requiring Turnover of Property of the Estate and Matured Debts* (ECF #52)

(the "Sanctions Motion")[1] filed by Edgewater Construction Group, Inc. (the "Debtor" or "Edgewater") against Balfour Beatty Construction, LLC ("Balfour Beatty"). The Sanctions Motion alleges that Balfour Beatty willfully and intentionally violated the automatic stay of 11 U.S.C. §362 by serving the Default Letters (defined herein) declaring the Debtor to be in default under the Contracts (defined herein), refusing to rescind the Default Letters, kicking the Debtor off the Projects (defined herein), and refusing to turnover the property of the Debtor after receiving the Stay Violation Letter (defined herein).

For the reasons more fully outlined below, and having considered the Sanctions Motion, Balfour Beatty's response thereto (the "Response")[2], the evidence submitted, including the testimony of witnesses, the stipulated facts set forth in the Joint Pretrial Stipulation (ECF #193) (the "Stipulation"), as well as the docket in this case, and all pleadings filed associated with the Sanctions Motion, including the competing proposed Findings of Fact and Conclusions of Law submitted by the parties and the post-trial arguments, the Court finds that Balfour Beatty violated the automatic stay, that the violation was willful, and that the Debtor is entitled to compensatory damages for reasonable attorney's fees and costs, as well as punitive damages, which sums will be

---

[1] The Debtor deferred the portion of the Sanctions Motion seeking turnover of sums due and has preserved such causes of action in its Plan of Reorganization (ECF #177). Thus, the issue for turnover, and whether with respect to those sums due that request is subject to any kind of setoff or recoupment, will be resolved in any subsequently filed litigation.
[2] *Balfour Beatty Construction, LLC's Response in Opposition to Debtor's Emergency Motion for an Order (I) Enforcing the Automatic Stay, (II) Awarding Sanctions for Intentional and Willful Violation of the Automatic Stay, (III) Requiring Turnover of Property of the Estate and Matured Debts (DE #52)* (ECF #108).

determined by further order of this Court after an additional evidentiary hearing.

## FINDINGS OF FACT[3]

The Debtor and Balfour Beatty had a prepetition contractual relationship with respect to stucco work on two projects - the 2000 Biscayne Project ("2000 Biscayne") and on the RD East Las Olas Project ("RD East Las Olas") (collectively the "Projects"). The contracts for the two Projects (collectively the "Contracts") were virtually identical except with respect to project specific specifications.

On March 22, 2023 (the "Petition Date"), Edgewater[4] filed a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code (ECF #1). The parties dispute the status of the Debtor's work on the Projects on the Petition Date, although both parties agree that on the Petition Date there were no Edgewater employees on either job site. Ulysses Vazquez testified that because Edgewater had not been paid for the past two months, Edgewater was unable to pay its labor force; consequently, Edgewater pulled its personnel from the Project sites a day or two prior to the Petition Date.

The parties also agree that on the Petition Date, scaffolding and stucco supplies that Edgewater had delivered or had had delivered on its behalf, were

---

[3] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."). To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, as conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.
[4] A summary recitation of the Debtor's business and operational history is set forth in the Sanctions Motion.

3

located at the RD East Las Olas Project. The Debtor testified, and Balfour Beatty did not dispute, that the Debtor had caused stucco supplies to be delivered to the site of the 2000 Biscayne project. Among Edgewater's material and equipment, Balfour Beatty was holding approximately 36 pallets of stucco for RD East Las Olas and 14 for 2000 Biscayne.

Upon the filing of the bankruptcy case, Edgewater requested a meeting with Balfour Beatty to discuss the Projects. On March 23, 2023, one day after the Petition Date, Ulysses Vasquez and Michael Vasquez met with representatives of Balfour Beatty - Vince Hull (Vice President – Director of Construction), Nathan Atkin (project executive for the 2000 Biscayne Project), Jason Sizemore (Vice President), Douglas Poff (general superintendent on the RD East Las Olas Project), Elena Ficarra (accounting) and Dominic Balderas (project manager for the RD East Las Olas Project) (the "March 23rd Meeting").

At the March 23rd Meeting, the Edgewater representatives and the Balfour Beatty representatives discussed possibilities for Edgewater continuing on the Projects. At the March 23rd Meeting, the parties discussed a possible resolution for moving forward, including the issuance of joint checks, a procedure that Balfour Beatty had used at least once with respect to a different subcontractor having issues. However, the Balfour Beatty representatives informed Edgewater that the proposal would have to be "run up the chain" as a formality. Once approved, the goal was to get Edgewater back on the jobs as soon as possible. Mr. Vazquez testified that he left the March 23rd Meeting with the belief that the parties had an agreement, subject only to a final sign off by

4

"one more person above [the four senior managers present at the March 23rd Meeting]."

At the March 23rd Meeting, the parties discussed that Balfour Beatty had not made any payments to Edgewater for its January, February, and March billings. Balfour Beatty requested a list of open payables and statement of accounts from all vendors/tiered subcontractors so that Balfour Beatty could prepare the joint checks if that procedure was approved. Ulysses Vazquez testified that he emailed the list of amounts owed to labor subcontractors and material subcontractors to Balfour Beatty on the afternoon of March 23rd, soon after the meeting. Balfour Beatty denies ever receiving that list.

Ulysses Vazquez testified that he told the Balfour Beatty representatives at the March 23rd Meeting that Edgewater had filed bankruptcy. Ulysses Vazquez testified that he expressly advised Balfour Beatty at the March 23rd Meeting that, because the company had already filed for bankruptcy, any arrangements reached required court approval.

Witnesses for Balfour Beatty testified equivocally about whether Mr. Vazquez told them about the bankruptcy. Mr. Balderas testified he doesn't remember Mr. Vazquez telling them about the bankruptcy although he does remember there was something mentioned about "the Courts." Jason Sizemore testified that "it was unclear" at the time of the March 23rd Meeting whether Edgewater had filed bankruptcy. In follow up texts from Mr. Vazquez inquiring about the status of the "higher ups" review, the texts advised Mr. Sizemore that "attorneys [are] asking me if we have [a] deal." Sizemore acknowledged he never

5

asked Vazquez to what attorneys Vazquez was referring because "in house counsel was handling [it]".

Nathan Atkin took minutes of the March 23rd Meeting. The meeting minutes of the March 23rd Meeting include the following notes. First that "*Edgewater opened up about their company's current state in which they are filing for bankruptcy.*" Second, that *"[Balfour Beatty] want[s] to do everything we can to help Edgewater succeed at the end of the day and finish the project(s) strong … The Courts are supporting Edgewater to move forward and finish the jobs."*

Every witness examined both in deposition and at the Trial admitted that there was never any litigation by and between the parties, and none prior to Edgewater's bankruptcy filing, or any dealings with lawyers. Each witness acknowledged that had there been any kind of litigation, they would have known about it. In other words, no other "courts" were then involved in any dealings between Edgewater and Balfour Beatty.

Following the March 23rd Meeting, on March 24, 2023, the Debtor filed its *Emergency Motion for Entry of an Order Authorizing the Debtor to Pay Critical Vendor Claims in the Ordinary Course of Business* (the "Critical Vendor Motion") (ECF #14). In the Critical Vendor Motion, the Debtor requested authority, and the Court authorized (but did not require), the Debtor to enter into the joint check agreement discussed by the parties at the March 23rd Meeting.[5]

---

[5] For reasons that the Debtor has never explained, Balfour Beatty was not served with a copy of the Critical Vendor Motion nor with the notice of hearing.  Balfour Beatty filed a motion asking that the *Order Authorizing the Debtor to Pay Critical Vendor Claims in the Ordinary*

There was never any further communication from Balfour Beatty regarding the joint check arrangement. However, on March 28 Balfour Beatty sent two letters (the "Default Letters") to the Debtor (one for each of the Projects). The Default Letters asserted that the Debtor is in default under the Debtor's Contracts with Balfour Beatty, and provided the Debtor 72 hours to cure the alleged default. Additionally, the Default Letters stated that this default triggered cross default provisions in the Contracts, pursuant to which Balfour Beatty threatened to assess further costs and damages against money owed to the Debtor.

On March 30, 2023, Debtor's counsel sent a letter to Balfour Beatty in response to the Default Letters.  The letter advised, *inter alia*, that the Default Letters constituted a violation of the automatic stay, and demanded  immediate turnover of Edgewater's material and equipment left on the Projects' premises (the "Stay Violation Letter"). Debtor's counsel sent the letter by email to all representatives of Balfour Beatty present at the March 23rd Meeting[6] as well as to the superintendent for each of the Projects and Balfour Beatty's general counsel.

On March 31, 2023 at 8:54 a.m., Balfour Beatty's counsel delivered to Debtor's counsel a letter acknowledging that an automatic stay was in place as to the Debtor and that Balfour Beatty would abide by all applicable laws and

---

*Course of Business* (ECF #38)  be vacated , which the parties ultimately came to agreement on. However, a review of the docket does not show an order, which the Court had directed be prepared by counsel for Balfour Beatty.

[6] At Trial Mr. Sizemore claims he doesn't remember receiving the Stay Violation Letter, but doesn't deny having received it.


rules.

Notwithstanding the March 31 letter sent by Balfour Beatty's counsel, Mr. Sizemore admitted that he did not take any action to rescind the Default Letters after having reviewed the Stay Violation Letter.

During the course of the day on March 31, 2023, Debtor's counsel wrote to counsel for Balfour Beatty advising that the Debtor had learned that, notwithstanding the automatic stay, Balfour Beatty had retained another subcontractor to do Edgewater's work and that said subcontractor was using Edgewater's equipment, as well as 50 pallets (between the two Projects) of material purchased by Edgewater. In response Balfour Beatty's counsel suggested that the Debtor had, it seemed, "walked away from the job and abandoned any materials that might have been left out there." Nonetheless, counsel did not deny the material and equipment were being used at the Projects. At Trial, Mr. Balderas, the Balfour Beatty project manager for the RD East Las Olas Project, admitted the Edgewater material was being used on the RD East Las Olas Project.

In a series of inconsistencies leading up to the Trial, Balfour Beatty admitted it was holding Edgewater's scaffolding, and then claimed the scaffolding had been claimed as leased by someone so Balfour Beatty let this third party (not named) take the scaffolding, and then, when confronted with testimony that Edgewater representatives actually saw the scaffolding being used on site at the RD East Las Olas Project, admitted that Balfour Beatty retained Edgewater's equipment and allowed it to be used by a substitute

8

stucco subcontractor.

On May 1, 2023, the Debtor learned that Balfour Beatty was making direct payments to Edgewater's subcontractors without Edgewater having an opportunity to review supporting documentation and confirm the amounts owing to those subcontractors. Counsel for Debtor requested that Balfour Beatty not make any further payments to the Debtor's subcontractors and vendors without first consulting with the Debtor to corroborate supporting documentation. That did not happen.

## CONCLUSIONS OF LAW AND ANALYSIS

Section 362 of the Bankruptcy Code provides that a stay, applicable to all entities, arises on the filing of a bankruptcy petition. 11 U.S.C. §362(a). The stay prohibits a wide variety of conduct, including:

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
> (4) any act to create, perfect, or enforce any lien against property of the estate;
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor;

11 U.S.C. §362(a)(3) & (4)–(7).

"If the Court finds a willful violation of the stay, the violator may be subject to appropriate sanctions, including damages, an award of attorney's fees and costs, and injunctive relief." *In re Daya Medicals, Inc.*, 560 B.R. 855, 859 (Bankr. S.D. Fla. 2016) (citing *Jove Eng'g v. IRS*, 92 F.3d 1539, 1554 (11th Cir. 1996)). "If a party willfully violates the automatic stay a debtor who is

injured by the willful violation is entitled to recover his or her actual damages including costs and attorneys' fees, and if appropriate, may also recover punitive damages." *In re Lyubarsky*, 615 B.R. 924, 929 (Bankr. S.D. Fla. 2020)

"To establish a willful violation of the automatic stay, the movant bears the burden of showing by a preponderance of the evidence that: (1) a bankruptcy petition was filed; (2) the violator received notice of the petition; and (3) the violator's actions were in willful violation of the automatic stay." *Daya*, 560 B.R. at 859 (internal citations omitted). "A violation of the automatic stay is willful if the party knew the automatic stay was invoked and intended the actions which violated the stay." *Lyubarsky*, 615 B.R. at 929 (citing *Jove Eng'g*, 92 F.3d at 1555). "It does not matter whether the violator specifically intended to violate the stay." *Daya*, 560 B.R. at 859 (citing *Jove Eng'g*, 92 F.3d at 1555) (additional citations omitted)."The requirement that the violator knew of the automatic stay does not mean that the violator need be aware of the provisions of section 362. It is sufficient that the violator had actual knowledge of the bankruptcy case, or 'notice of sufficient facts to cause a reasonably prudent person to make additional inquiry to determine whether a bankruptcy petition has been filed.'" *In re WVF Acquisition, LLC,* 420 B.R. 902, 910 (Bankr. S.D. Fla. 2009) (internal citations omitted).

The Court finds that Balfour Beatty knew on March 23rd that Edgewater had filed bankruptcy. The Court finds that Ulysses Vazquez informed those present at the March 23rd Meeting, which included senior management in South Florida, that Edgewater had filed bankruptcy. It is not relevant that Mr.

10

Sizemore, as he testified, "wasn't clear" about the bankruptcy.[7] The law is very clear that once a party has notice that a bankruptcy has been filed, that party cannot just ignore that information until receiving the information in the form that party would like to have it. *Id.*

Balfour Beatty willfully violated the automatic stay by serving the Default Letters on the Debtor and declaring the Debtor to be in default under the applicable Contracts. The Court understands that Balfour Beatty, among its many other arguments, asserts that the Contracts had been terminated by Edgewater's alleged abandonment of the Projects prepetition[8]. However, this argument is not consistent with the actions taken by Balfour Beatty postpetition, including the March 23rd Meeting, the proposed possible resolution, and the subsequent Default Letters. Balfour Beatty also willfully violated the automatic stay by refusing to turn over the property of the Debtor after receiving the Stay Violation Letter[9], compounded by the ever changing, apparently deliberately false, statements regarding what happened to the scaffolding.

Incredibly, Balfour Beatty argues that nothing it did violated the stay

---

[7] The Debtor has never explained why Balfour Beatty was not scheduled as a creditor nor why Balfour Beatty's contracts were not scheduled as executory contracts. Again, like the Debtor's failure to provide Balfour Beatty notice of the Critical Vendor Motion, the Debtor has never explained these omissions. However, those omissions are not relevant to this Court's finding that Balfour Beatty had knowledge of the bankruptcy and violated the stay.

[8] Balfour Beatty's arguments that the Contracts were terminated, or rejected, or that the Debtor had defaulted may become relevant at the damages phase of this dispute but has nothing to do with whether the automatic stay was violated. Even if, under the Contracts, Balfour Beatty had the absolute right to take any action that it took, those actions could not be taken in the absence of first obtaining from this Court relief from the stay.

[9] This does not apply to the demand for turnover of asserted amounts due, because the Court has not yet heard evidence whether those amounts were "matured, payable on demand, or payable on order." 11 U.S.C. §542(b).

11

because (a) according to the Debtor Balfour Beatty isn't a creditor, and therefore any action it took is not prohibited by section 362; (b) because, under the authority of *City of Chicago, Illinois v. Fulton*, 141 S. Ct. 585 (2021), "mere retention" of a debtor's property is not a violation of the automatic stay, and all Balfour Beatty is doing is "merely retaining" the Debtor's property; and (c) because any act taken in violation of the stay is void *ab nitio* it doesn't matter that the Default Letters were sent because they were void when sent and that there was no reason to rescind them because that would have been a futility.

While Balfour Beatty was not scheduled as a creditor by the Debtor, and, perhaps on the Petition Date neither Balfour Beatty nor the Debtor considered Balfour Beatty as a creditor.[10], section 362 does not just apply to creditors. Section 362 specifically states that it applies "to all entities". Therefore the argument that because Balfour Beatty isn't a creditor section 362 doesn't apply is not well-founded.

Balfour Beatty's reliance on *Fulton* is equally unfounded. It is true that the Supreme Court held in the *Fulton* opinion that the "mere retention" of a debtor's property is not a violation of section 362. However, Balfour Beatty ignores two significant facts. First, Balfour Beatty took possession of the Debtor's property, it exercised control over the Debtor's property, after the Petition Date. Balfour Beatty did not already have possession of the Debtor's property just because the property was located on projects being overseen by

---

[10] The Court notes that the definition of "claim" is very broad, and what Balfour Beatty describes as the prepetition relationship between Edgewater and Balfour Beatty, would fall within that definition, at least as a contingent claim.

12

Balfour Beatty. Second, there is no dispute that Balfour Beatty has allowed another subcontractor to use the stucco material that was delivered by Edgewater to the project. Taking possession of property postpetition is not "mere retention." Use of property is not "mere retention." In *Fulton*, the City of Chicago already had rightful possession of the debtors' property on their respective petition dates. As Justice Sotomayor observed in her concurrence "as used in § 362(a)(3), the phrase 'exercise control over' does not cover a creditor's passive retention of property lawfully seized prebankruptcy." *Id.* at 592 (Sotomayor, J., concurring). The facts of this case do not support any argument that the *Fulton* holding provides shelter to the acts taken by Balfour Beatty with respect to the scaffolding and stucco material.

Balfour Beatty's argument that since any act that violated the stay is void *ab nitio* so therefore not a stay violation, is *at best* circular and illogical.

The Debtor asserts that the willful violation of the stay by Balfour Beatty has caused damage to the Debtor, including (without limitation) the loss of profits, the inability to monetize its scaffolding as a result of Balfour Beatty's wrongful retention; the additional cost of Edgewater retaining personnel on the belief that it would continue to work under the Contracts; the inability to contain and resolve claims against the estate occasioned by Balfour Beatty's unilateral decision to pay Edgewater's suppliers and subcontractors without input from Edgewater; and the incurrence of legal fees and costs, as well as opportunity costs related to the distractions of Debtor's personnel dealing with the stay violations. The Court will address the Debtor's request for sanctions

13

and damages at a future evidentiary hearing.

The Court directs the parties to confer regarding a briefing schedule on the issue of what setoff or recoupment rights, if any, Balfour Beatty may assert with respect to any of the damages the Court awards to the Debtor in connection with the stay violations addressed in this Order.[11]  Once the Court has ruled whether and to what extent Balfour Beatty has any right of setoff or recoupment, the Court will schedule an evidentiary hearing on what damages, if any, Balfour Beatty incurred in connection with such setoff or recoupment rights.

# # #


Copies furnished to:
Jacqueline Calderin, Esq.
Kenneth Mather, Esq.


*Attorney Calderin is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

---

[11] If the only right to setoff or recoupment relates to the unpaid prepetition payments to which the Debtor asserts it is entitled, then that issue shall be dealt with in whatever litigation addresses the Debtor's claims for alleged wrongful non-payment of amounts due under the Contracts.