1          UNITED STATES BANKRUPTCY COURT

             SOUTHERN DISTRICT OF FLORIDA

2                 MIAMI DIVISION

3
                         Case No.:  23-12217-LMI

4                        Chapter 11

                         Subchapter V

5    In Re:

6    EDGEWATER CONSTRUCTION GROUP, INC.,

7         Debtor.

_____/

8

9

10
                    ECF # 15, 172, 173

11

12                  August 9, 2023

13

14

15          The above-entitled cause came on for a

16   hearing before the Honorable LAUREL M. ISICOFF,

17   Chief Judge, in the UNITED STATES BANKRUPTCY COURT,

18   in and for the SOUTHERN DISTRICT OF FLORIDA, on

19   Wednesday, August 9, 2023, commencing at or about

20   1:35 p.m., and the following proceedings were had:

21

22

23

24          Transcribed from a digital recording by:

             Helayne Wills, Court Reporter

25

Page 2

```
 1   APPEARANCES:
 2
         CAROL FOX, Subchapter V Trustee
 3
 4       AGENTIS PLLC, by
         ROBERT P. CHARBONNEAU, ESQ.
 5       JACQUELINE CALDERIN, ESQ.,
         on behalf of the Debtor
 6
 7       GUNSTER YOAKLEY & STEWART, P.A., by
         KENNETH G.M. MATHER, ESQ.,
 8       on behalf of Balfour Beatty
 9
         ADAMS AND REESE, by
10       ANGELA N. GREWAL, ESQ.,
         on behalf of NRQ Construction
11
12       THE BARTHET FIRM, by
         SUNDEEP K. MULLICK, ESQ.,
13       on behalf of Gator Gypsum
14
         OFFICE OF THE UNITED STATES TRUSTEE, by
15       DAN L. GOLD, ESQ., (via Zoom)
         on behalf of the U.S. Trustee
16
17       GERARD M. KOURI, JR., ESQ.,
         on behalf of United Fire Insurance Company
18
19       ALSO PRESENT:
         ECRO:  Electronic Court Reporting Operator
20
21
22
23
24
25
```

1          THE COURT:  We're here this afternoon on

2    Edgewater, Edgewater Construction Group, Inc.,

3    23-12217.  No newbies, so I'm going to skip the

4    shtick.  How's that?

5          MR. CHARBONNEAU:  We can behave as badly

6    as we want, Your Honor.

7          THE COURT:  You behave badly, I've got a

8    Super Soaker and I know how to use it.  How's that?

9          All right.  I'll take appearances,

10   starting in the courtroom.  And yes, I will remember

11   to turn my camera on, even before my law clerk sends

12   me the e-mail.

13          Okay.  Hi.

14          MR. CHARBONNEAU:  Good afternoon, Your

15   Honor.  Robert Charbonneau.  I'm with the law firm

16   of Agentis, and together with Ms. Calderin, we are

17   counsel for the debtor.

18          THE COURT:  All right.

19          MR. GOLD:  Good afternoon.  Dan Gold,

20   G-O-L-D, for the U.S. Trustee.

21          MR. MATHER:  Good afternoon, Your Honor.

22   Ken Mather, M-A-T-H-E-R, of the Tampa office of

23   Gunster, here on behalf of Balfour Beatty.

24          THE COURT:  And in the virtual courtroom,

25   Ms. Fox.

```
 1              MS. FOX:  Good afternoon, Your Honor.
 2   Carol Fox, Subchapter V Trustee.
 3              THE COURT:  All right.  Ms. Grewal.  No,
 4   did I do it right this time?
 5              MS. GREWAL:  Grewal, Your Honor.
 6              THE COURT:  Never going to get it.
 7              MS. GREWAL:  That's okay.  It's not
 8   pronounced how it looks.  That's all right.
 9              G-R-E-W-A-L, on behalf of NRQ
10   Construction.
11              THE COURT:  All right.  Ms. Calderin.
12              MS. CALDERIN:  Good afternoon, Your Honor.
13   Jacqueline Calderin, C-A-L-D-E-R-I-N.  And
14   Mr. Charbonneau is C-H-A-R-B-O-N-N-E-A-U.
15              THE COURT:  Thank you.  We're going to
16   give him some remedial spelling later on.
17              Mr. Kouri.
18              MR. KOURI:  Good afternoon, Your Honor.
19   Gerard Kouri, K-O-U-R-I, on behalf of United Fire
20   Insurance Company.
21              THE COURT:  All right.  And last but not
22   least, Mr. Mullick.
23              MR. MULLICK:  Good afternoon, Your Honor.
24   Sundeep Mullick, S-U-N-D-E-E-P  M-U-L-L-I-C-K, on
25   behalf of Gator Gypsum, G-Y-P-S-U-M.
```

1          THE COURT:  All right.  We're here on a

2    variety of matters, so Mr. Charbonneau, why don't

3    you first give me a status update, and then we can

4    go to the calendared matters.

5          MR. CHARBONNEAU:  Your Honor, as part of

6    that status update is an agreement by the debtor,

7    the SBA, and I believe Ms. Fox, regarding use of

8    cash collateral, which is one of the calendared

9    items.  I believe an agreed order -- further agreed

10   interim order -- will be circulated shortly and

11   uploaded to the Court.

12          In terms of main case and issues arising

13   out of the Court's last order on the debtor's motion

14   to enforce the stay, Mr. Mather and I have a call

15   scheduled for tomorrow to discuss -- initially

16   briefing on issues of setoff and recoupment, and

17   probably within that call, Your Honor, we will

18   tackle scheduling, of course, subject to the Court's

19   availability, a further evidentiary hearing on

20   damages, and a further scheduling order on that with

21   respect to discovery, to the extent there is any.

22          THE COURT:  Okay.  All right.  So let's

23   circle back then, and we'll go then to the final

24   hearing on cash collateral, which is ECF 15, and

25   then at the end we'll revisit the order I just

1    entered to make sure that there's no confusion.  I
2    tried to be clear, but I just want to make sure that
3    there's no confusion about my thoughts on the whole
4    setoff recoupment thing.
5              All right.  So final hearing on cash
6    collateral.  It is your motion.
7              MR. CHARBONNEAU:  It is.
8              THE COURT:  And while you're getting your
9    glasses, I just want to let everybody know we had a
10   judge's retreat last week and -- I'm going to turn
11   this a little bit so I can see this -- we had a
12   judge's retreat last week, and I just wanted
13   everybody to know that I'm going to adopt Judge
14   Grossman's philosophy on interim retention of
15   counsel.  So it's 21 days.  I'm not going to do
16   interim orders anymore.
17             And on discovery disputes, I'm going to do
18   the same thing Judge Grossman does, which is, if
19   it's the, "he won't give me documents," you'll
20   probably get those set within a couple of days, and
21   I'm going to require those to be in person.
22             Let's see.  What else?  I'll think of some
23   more stuff to tell you.  That's the only two I can
24   think of right now.  You really shouldn't let me
25   spend too much time around him.  He's a terrible

1    influence.

2            MR. CHARBONNEAU:  Okay.

3            THE COURT:  So ECF 15.

4            MR. CHARBONNEAU:  Yes, Your Honor.  This

5    was filed back in March, and the specific purpose of

6    the motion, obviously, was to get authorization from

7    the parties having an interest in cash collateral,

8    primarily the SBA, but secondarily, Banesco, and I

9    would say an inchoate interest in cash collateral by

10   the very funding agencies, based on what happens

11   with various disputes between the debtor and its

12   subcontractors.

13           The debtor has been performing pursuant

14   to, first, the budget attached as Exhibit A to ECF

15   15, and then subsequent budgets that have been filed

16   with the approval of the secured creditors, and

17   Ms. Fox, a recent budget was just circulated, and I

18   saw correspondence between Ms. Tasher (phonetic),

19   indicating that the SBA had no objection, in fact,

20   agreed to the budget that was circulated.

21           This money is obviously necessary, Judge,

22   for the debtor's operation.  The debtor is

23   operating.  The debtor is signing up new projects.

24   So that's good.  Use of cash collateral, Judge, will

25   facilitate the debtor's continued operations, as

Page 8

1   well as signing up new jobs.

2          THE COURT:  Okay.  Thank you.

3          In the courtroom, any objection to the

4   agreement regarding continued use?

5          MR. GOLD:  None for me, Your Honor.

6          MR. MATHER:  No, Your Honor.

7          THE COURT:  All right.  In the virtual

8   courtroom, either Ms. Fox or Ms. Grewal or

9   Mr. Kouri?  Ms. Fox.

10         MS. FOX:  Your Honor, I reviewed the fifth

11  interim cash collateral budget filed at ECF 247, and

12  compared it to the debtor's monthly operating

13  reports, and it appears to align, based on my view,

14  and I have no objection.

15         THE COURT:  Okay.  Thank you, Ms. Fox.

16         Ms. Grewal, any position?

17         MS. GREWAL:  No objections, Your Honor.

18         THE COURT:  I just really wanted the

19  opportunity to say your name correctly.

20         MS. GREWAL:  Thank you, Your Honor.

21         THE COURT:  Mr. Kouri.

22         MR. KOURI:  No objection, Your Honor.

23         THE COURT:  And Mr. Mullick, any position

24  with respect to this motion?

25         MR. MULLICK:  No, Your Honor.

```
1   (inaudible).

2              THE COURT:  That's fine.

3              MR. MULLICK:  I want to make sure that I

4   got it.  If I'm not taking a position or not really

5   "quote" appearing, I think you said keep the camera

6   off.  That's what I'm trying to do.

7              I have no position.

8              THE COURT:  Got it.  I won't talk to you

9   unless you turn your camera on.  How's that?

10             MR. MULLICK:  Unless you need me.

11             THE COURT:  I'll go ahead and I'll look

12  for that agreed order.

13             Remind me again.  I'm sorry.  It is

14  continued use or final?

15             MS. CALDERIN:  Your Honor, this is Jackie

16  Calderin, if I may, Your Honor.

17             This will likely be -- it's final, because

18  we have confirmation set prior to the expiration of

19  this cash collateral order, budget.  So it would be

20  final.  To the extent that confirmation is pushed

21  further beyond the end of September, we will retalk

22  to the SBA, and if we do have their consent we'll

23  file a notice of consent to extended use.

24             THE COURT:  All right.  Thank you.

25             MS. CALDERIN:  And obviously, if we don't,
```

```
 1    Your Honor, we'll seek a hearing on that.
 2                THE COURT:  All right.  Thank you.
 3                All right.  I'll note that's approved,
 4    and, Mr. Charbonneau, you'll prepare the order.
 5                So then I have, Mr. Mather, your motion
 6    for relief from stay, and the application for
 7    administrative expenses.  So why don't you pull up a
 8    lectern and talk to me.
 9                MS. FOX:  Your Honor, before Mr. Mather
10    starts, may I please be excused?  I have another
11    calendar, another hearing on Judge Grossman's
12    calendar.  I think this is the only matter that
13    requires my attendance.
14                THE COURT:  All right.  Does anyone have
15    an objection?  No?  Okay.  Thank you, Ms. Fox.
16                MS. FOX:  Thank you.  I appreciate it.
17                THE COURT:  Don't tell Judge Grossman what
18    I said about him, though.
19                MS. FOX:  No, no, scout's honor.
20                THE COURT:  All right.  Mr. Mather.
21                MR. MATHER:  Yes, Your Honor.
22                First of all, Your Honor, we have reviewed
23    your order, Docket Entry 242, very closely, and
24    quite frankly are humbled and concerned with what
25    was entered in there.  I'm concerned that the Court
```

1    may have taken our presentation to be somehow

2    flippant or in disregard to the rights of the

3    debtor.

4              I'm not rearguing that in any shape or

5    form today, but it was never our intent to project

6    that kind of an attitude or be flippant or in

7    disregard of the debtor and this estate.  I am

8    concerned that the disconnect, if you will, is when

9    we unhitched the damages portion from the stay

10   portion, we were not -- we did not present the

11   evidence that I'm going to tell you about today.  I

12   hope that when the Court has the opportunity to see

13   the evidence, the Court will understand our

14   position, and quite frankly, some confusion and

15   puzzlement over the whole process.

16             So if I can give the Court just a little

17   bit of background before I get to the actual motions

18   themselves, because things have changed, but I do

19   think it's important that the Court know how we

20   viewed this case at the time that these motions were

21   filed.  So, Your Honor --

22             THE COURT:  "The motions," meaning these

23   two motions today?

24             MR. MATHER:  172 and 173.

25             THE COURT:  Okay.  Go ahead.

1          MR. MATHER:  So, Your Honor, the puzzling

2    thing here is, kind of skipping to the end, the

3    debtor filed in the real estate records two claims

4    of lien relating to two projects it was working on

5    for Balfour Beatty.  Those lien claims contain

6    within them claims for labor for their subs,

7    materials and scaffolding.

8          Your Honor, it is our belief, and we will

9    offer proof at the appropriate time, that Balfour

10   Beatty was paying for the items being submitted to

11   it in accordance with its contract, which is a

12   pay-when-paid, when the owner -- and the Court is

13   well aware -- when the owner blesses the payments,

14   that's when they're paid.

15          So we will present to the Court that we

16   were paying things as they were authorized under the

17   contract, and since the case has been filed, we've

18   paid labor, we've paid materials, we've paid

19   scaffolding, many of the claims -- many of the

20   items, if not all -- and I want to leave a little

21   wiggle room, because maybe the numbers don't match

22   up, but certainly anything that the debtor hadn't

23   paid, we have now paid.

24          To keep the contract going with the owner

25   we had to do it, and we felt like by paying those

1    things, we actually were benefiting the estate.  We

2    were relieving the debtor or the estate from having

3    to pay those items.  So that's how we came in to the

4    motion for sanctions under -- for violating the

5    stay, is believing we hadn't harmed the debtor, we

6    were trying to help.

7             And in that regard, Your Honor, Balfour

8    Beatty, I think, has sort of three buckets to be

9    concerned with.  One bucket are the items I just

10   talked about, which are the obligations that the

11   debtor had to its subs.  That's one.

12            Two is, the reason that Balfour Beatty

13   reached out to the debtor and wanted to keep the

14   debtor on the Las Olas project was so that we

15   wouldn't suffer what has now happened, which is,

16   hundreds of thousands of dollars worth of damages as

17   a result of having to replace the debtor with

18   somebody else.  It would have been in our best

19   interest to keep them in place.

20            Again, I'm not making argument.  I'm just

21   telling the Court the rationalization in the second

22   bucket.  So we have what we've paid bucket, we have

23   our damages bucket, if you will.

24            Then the third bucket, Your Honor, which

25   is perhaps more prospective in nature, although it's

1   a very real issue for us, and that is, what is the

2   consequence of the debtor filing lien claims

3   against -- in rem against the projects, in personam

4   against the owner, and in personam against Balfour

5   Beatty.

6          And, Your Honor, the reason that I viewed

7   it as an admin claim, one, for the buckets of things

8   that were paid post-petition, and two, because we

9   had paid for those things, and because the things

10  that the debtor has now filed a lien claim for

11  appear to us to have been all paid, we viewed that

12  as causing damage to us and to the owner, and

13  potentially a slander of title on the real estate.

14         So are we right, are we wrong?  I don't

15  know, but that was my concern at the time, because

16  to me, when they file a lien saying, "We have a lien

17  because we are owed these things," and we believe

18  those things have all been paid, I need to at least

19  have a placeholder remedy, a potential for an admin

20  claim, because it may be whenever that gets

21  litigated, how it gets litigated, frankly, I am a

22  little confused about where we go from here, because

23  there are multiple things pending, but --

24         THE COURT:  That's what we need to talk

25  about.

1              MR. MATHER:  But that was -- the Court

2    asked me to address the Reading case.  Well, things,

3    of course, have changed somewhat by virtue of the

4    Court's order, but I thought that the Court needed

5    to know what we were thinking when we raised this.

6    We were really trying to address those buckets.

7              And again, Your Honor, I started out

8    saying from our perspective it got confusing,

9    because had we put on evidence of what we had paid

10   and were paying, you know, it might have made some

11   of these -- these motions maybe make more sense to

12   the Court.

13             THE COURT:  Well, let me stop you.

14             MR. MATHER:  Yes.

15             THE COURT:  I'm not quite sure why you

16   think these motions don't make sense to me.  I'm not

17   saying it on a personal basis.

18             MR. MATHER:  No.  I'm sorry.  I didn't

19   mean to project.

20             THE COURT:  I understand completely.

21   Moreover, the issue regarding damages, which you've

22   just described, and the debtor did also in its

23   submission, they said those are all issues,

24   regardless of the stay violation, that will have to

25   be addressed.  But they don't change the fact that

1   the stay was violated.

2          So it could be, as I believe I noted in my

3   opinion, that you have very legitimate contract

4   rights that were properly exercised, except they

5   required stay relief to exercise them.  And that is

6   why I hope you understand, or maybe your client,

7   because I think if your client had called you on day

8   one as opposed to day eight, that it might have been

9   a different result all the way around.

10          But be that as it may, they -- to the

11  extent that you have any concerns that your

12  agreement to bifurcate had any impact on the

13  ultimate result, it does not.  I could have heard

14  three days of this information that you've just

15  described to me, it wouldn't have changed the fact

16  that your client violated the stay.  Okay.  So if

17  that gives you some reassurance.

18          But let's circle back now to the

19  administrative claim and the Reading case.  So my

20  understanding -- it was always my understanding that

21  with respect to the consequence of defending a

22  debtor initiated action, that that was why you were

23  seeking the Reading damages.  What I'm now

24  understanding is in addition to that, it would be

25  your position, not under the Reading case, but under

1   50 --

2           MR. MATHER:  3(b)(1).

3           THE COURT:  Whatever, providing a benefit

4   to the estate, that you would be proceeding with

5   respect to what you described as your first bucket,

6   right, extending the money.  And then with respect

7   to the damages suffered by the breach, I'm not sure

8   that middle bucket would be --

9           MR. MATHER:  That would not be in the

10  administrative claim.

11          THE COURT:  So I understand that.  So with

12  respect to bucket one, contractual obligation,

13  subject to what the debtor said, which is that you

14  probably overpaid people, because you didn't let

15  them look at the numbers first.  But be that as it

16  may, that that would be a 507(b) whatever,

17  administrative claim, if you can demonstrate at the

18  appropriate time that you conferred the benefit, et

19  cetera.

20          With respect to the defense of the lien

21  claim, that that would be a Reading claim; is that

22  right?  Am I understanding your argument?

23          MR. MATHER:  I've been up a long time

24  today, Your Honor.  Let me make sure.  Can I say it

25  back to you to make sure?

```
 1              THE COURT:  I just want to make sure I'm
 2    understanding your argument.
 3              MR. MATHER:  My argument is, bucket one,
 4    which are all of the items that we have paid --
 5              THE COURT:  Right, post-petition.
 6              MR. MATHER:  Right.
 7              THE COURT:  Okay.
 8              MR. MATHER:  And item two would be, to the
 9    extent the damages caused as a result of the
10    debtor's assertion of lien claims on those same
11    amounts, bucket three.
12              THE COURT:  Got it.  Okay.  So that's your
13    preliminary, or that was your argument on the
14    administrative claim?
15              MR. MATHER:  That is my -- well, that is
16    my argument on the administrative claim.  Can we
17    talk procedure?
18              THE COURT:  Yes.
19              MR. MATHER:  Procedurally, I'm frankly not
20    quite sure what to do, because we have so many
21    moving pieces.  What I would like for the Court to
22    see is an evidentiary hearing where we present all
23    of this, so that I'm not standing up and telling the
24    Court, "Here's what you're going to see."  You will
25    get the chance to see it.  And then deal with admin
```

1    claim, however it all breaks out after that.

2            We have moving pieces here.  We have a

3    plan that addresses some of these issues in some

4    way.  The motion to modify stay relates to these

5    lien claims, which are going to have to be brought

6    in state court.  So I don't know how to jumble all

7    those together, but I really am anxious to get to an

8    evidentiary hearing on the damages.

9            THE COURT:  Okay, but there's two buckets

10   of damages.  The damages that the debtor claims,

11   based on the stay relief -- the stay violation, and

12   then there's the damages that the debtor claims on

13   the turnover action that have to do with whether or

14   not they should have been paid certain amounts and

15   the consequences flowing from them.

16            That's right, right, Mr. Charbonneau?

17            And then your damages that you claim that

18   are or are not subject to setoff or recoupment with

19   respect to that second group, and whether and to

20   what extent -- and that's what I want to make clear,

21   that I tried to make clear in my ruling, is that we

22   don't have to talk about that, setoff and

23   recoupment, today -- meaning before the damages

24   trial.  By damages trial, I'm not talking about the

25   stay damages.  I'm talking about the money, the

```
 1    cross money damages.

 2              If it is not your position -- this is

 3    probably grammatically not the way to say this.

 4              If the parties agree -- and I don't know

 5    the law on this particular issue -- if the parties

 6    agree that damages relating to stay violations are

 7    not damages that would be subject to setoff or

 8    recoupment for the damages that you described in

 9    your three buckets, then I don't need briefing on

10    that issue now.

11              Do you follow what I'm saying?

12              MR. MATHER:  I think, Your Honor, part of

13    my -- maybe part of my puzzlement is twofold.  One,

14    I'm not sure what the debtor is saying the damages

15    are beyond what we have paid.  So I don't have an

16    idea number-wise, theory-wise, what that would be.

17    So I've been, in my mind --

18              THE COURT:  Okay.  I understand what

19    you're saying, is that you don't know what that

20    bucket is.  Obviously, the easy one, the cost of the

21    attorney's fees associated with the litigation

22    relating to stay, that's easy.

23              MR. MATHER:  Understood.

24              THE COURT:  You know that one.  Okay.

25              Well, that's a conversation that you and
```

1    Mr. Charbonneau can have tomorrow.

2              MR. MATHER:  And the other reason that I

3    went into such gory detail was, in the order that

4    we're traveling under, there is a finding that they

5    have lost profits, they had an inability to monetize

6    scaffolding, cost of --

7              THE COURT:  No, I did not make that

8    finding.  I said that's what they've alleged as

9    their damages.

10             MR. MATHER:  Okay.

11             THE COURT:  I very specifically did not

12   make that finding.

13             MR. MATHER:  Well then I misread it, maybe

14   in a panic.

15             THE COURT:  No.  That is what they've

16   alleged as their damages, and that is subject to

17   further evidentiary hearing.

18             MR. MATHER:  Thank you for --

19             THE COURT:  I've not made any finding on

20   damages, other than I'm obviously going to make some

21   finding that the attorney's fees is going to be an

22   element of damages.  That's an easy one.  That's in

23   a conversation I had earlier today with some people

24   who don't speak English as their first language, as

25   we described what low hanging fruit means.  But

1   everything else, no.

2          All damages, both the amount and the

3   nature, other than attorney's fees, is something

4   that will have to be argued by the debtor, and

5   demonstrated as a consequence of a stay violation,

6   as opposed to just mutual or alleged mutual breach

7   of contract.

8          MR. MATHER:  Thank you for the

9   clarification.

10          THE COURT:  I'll go back and look at my

11   opinion again, but to the extent that it's

12   ambiguous, I'll modify it.  But no, there was no

13   finding that those are the buckets of damages to

14   which the debtor is entitled.  That was what the

15   debtor alleged are the bucket of damages.

16          MR. MATHER:  That's what I understood from

17   the first footnote saying that the debtor had split

18   them, and so that's what was causing me confusion,

19   Your Honor.

20          THE COURT:  Okay.  So we have right now

21   what I call three branches, and then we'll go back

22   to discuss your motion for relief from stay.  We

23   have the litigation that was started by the debtor

24   on the lien claim, correct, that the debtor

25   initiated?  Was that the debtor that initiated that

1   litigation?

2              MR. MATHER:  There's not litigation.

3   There's a -- the lien claims were filed in the real

4   estate record.

5              THE COURT:  Okay.  So there hasn't been

6   litigation on that yet?

7              MR. MATHER:  Correct.

8              THE COURT:  Okay.  Got it.  So that makes

9   it a little bit easier in my brain.  I thought there

10  was a pending state court action.  Okay.  So no

11  state court action yet.  The notices of lien have

12  been filed in the state court records.  All right.

13             So we have your claims related to those

14  lien claim notices, and the -- so you're asking for

15  stay relief to go to state court to litigate that

16  issue?

17             MR. MATHER:  That's my concern, because

18  now we have the potential to have two courts hearing

19  the same issues.

20             THE COURT:  And why do you believe that

21  only the state court can adjudicate that issue?

22             MR. MATHER:  Well, maybe it's presumptive

23  on my part, but it is an in rem proceeding, because

24  it involves real estate in those particular

25  counties.  Maybe I'm presuming that the Court

1    wouldn't want to hear them, because they are in rem,

2    one, and two, because they involve the owner, who is

3    not a part of this case in any way, shape and form.

4    And there are claims potentially between the owner

5    and Balfour Beatty, which would also be a

6    jurisdictional issue.

7              THE COURT:  Got it.  Okay.  All right.

8              Well, as far as in rem is concerned, as

9    you know, 99 percent of bankruptcy is based on in

10   rem, not in personam jurisdiction, which is why

11   Bankruptcy Courts have the broader jurisdiction that

12   it does have.  It's not limitless, despite what some

13   of my colleagues think, but it is basically a vast

14   majority of the Bankruptcy Court's jurisdiction is

15   based on in rem, but right, its not this rem, it's

16   other rem.

17             So your concern is whether the Court would

18   have jurisdiction over that litigation.

19             MR. MATHER:  Right now --

20             THE COURT:  But of course, my question to

21   you is, if there's no litigation pending yet, what

22   your concern is, as I understand it, is to get that

23   issue or those issues between Balfour Beatty and the

24   debtor resolved, because you have these notices of

25   lien out there and your owners are getting angry.

1              MR. MATHER:  That's correct.  It puts us

2   -- in base terms, I think it puts us in breach

3   potentially.  If anyone is listening to this later

4   I'll say it would be an argument of the owner, but

5   we're in breach of the contract.

6              THE COURT:  You're not agreeing to it, but

7   you're recognizing it's a possibility.

8              MR. MATHER:  Right.

9              MR. CHARBONNEAU:  Alleged breach.

10             MR. MATHER:  No stipulation.

11             THE COURT:  So -- and then we have the

12  stay violation claims, and then we have the unpaid

13  contract/Balfour Beatty claims of damages

14  litigation.  And then, if I'm understanding you

15  correctly, depending on what baskets of damages the

16  debtor seeks to assert with respect to the stay

17  violation, that might all become connected.

18             MR. MATHER:  Yes.  Again, not projecting,

19  but if, by way of example, if the parties sat down

20  and actually matched up, here are all the things

21  that the debtor has put in those lien claim notices,

22  and now that the debtor's entire period is done, and

23  I believe all of the expenses for that period of

24  time, labor, materials, has all been paid, it may

25  be -- we believe that it's true that all of those

1   things are paid -- so it may be simply a matter of

2   having accountants look at those.

3           Now, if the debtor has claims for damages

4   beyond that, that I don't know.

5           THE COURT:  Like their profit?

6           MR. MATHER:  Right.

7           THE COURT:  Okay.  All right.

8           MR. MATHER:  The list that was in the

9   order, I guess.

10          THE COURT:  Obviously, that's something

11  you and Mr. Charbonneau and Ms. Calderin will have

12  to sit down and work through, because what I don't

13  want is to have two trials on the same thing.  I'd

14  rather have everything done together.  So when you

15  are mute, you can talk about what the elements of

16  your claim for damages are, and Mr. Charbonneau, you

17  and Ms. Calderin can lay out the elements -- the

18  buckets of your claims for damages.

19          Because even if ultimately on a breakdown

20  of what goes into what bucket, that becomes

21  important ultimately when the ruling is made, the

22  judgment is entered, that makes more sense to

23  litigate it all together.  I don't see why we have

24  two trials.  That depends on what the elements of

25  your claims for damages on the stay relief violation

1    is going to be, Mr. Charbonneau.

2              You know what I'm saying?  Because if

3    there's crossover we're going to have to do it all

4    together.  There's just no point in expending the

5    attorney's fees and costs and time to do that more

6    than once.

7              And then my understanding from you,

8    Mr. Mather, is that litigation could inform in whole

9    or in part the issues that you're concerned about

10   with the notice of lien claims that have been filed

11   in the public records, and then that would assist

12   you with respect to your owners, or is that -- are

13   you saying to me that your owners are indispensable

14   parties that have to be brought in or taken out?

15             I'm just trying to understand.  I used to

16   do this type of work, so it's not like I don't

17   understand what you're talking about, but I just

18   don't know the elements here of where you are and

19   whether it has to be done collectively or

20   individually.

21             MR. MATHER:  Understood.  And maybe I

22   could answer with a suggestion.

23             I think, following the procedure that the

24   Court has outlined, if we were able to litigate the

25   issue on those amounts listed in the lien claims in

1   a relatively quick period of time, which I know

2   we've got plan confirmation coming up and all of

3   that, but if that is adjudicated by this Court

4   between the debtor and us in a quick manner, because

5   there isn't litigation pending, I think that can

6   remain parked for a while until we see how that

7   comes out.

8           That, I think, is in everyone's best

9   interest, as opposed to us having to go to state

10  court, which I think is an issue because of the

11  potential owner/Balfour Beatty claims.  I'd rather

12  not get that kicked off and going if at all

13  possible.  But if there's uncertainty in our mind as

14  to how all this is going to play out, which is what

15  the Court is addressing today, then that gives me

16  more comfort on dealing with those claims between

17  Balfour Beatty and the owner.

18          Does that make sense?

19          THE COURT:  So on the 2000 project, that's

20  barely gotten started.

21          MR. MATHER:  No.  The 2000 -- I apologize,

22  Your Honor.

23          THE COURT:  The reason I'm asking is that

24  one of the concerns that you raised was the ability

25  of the owners as the units start being sold -- am I

```
1    understanding that correctly?
2               MR. MATHER:  No.  The testimony was, Your
3    Honor, that the debtor never got started.  The
4    project is in full force and going, and so is Las
5    Olas.
6               THE COURT:  Well, no.  Las Olas I realize.
7    Okay.
8               But the units aren't ready to get sold or
9    the title agent isn't saying that the notice of lien
10   has to be resolved before the units can start being
11   sold -- I mean, not sold, we know they were all sold
12   before the first brick hit the ground -- closed.
13              MR. MATHER:  I have not asked that
14   question.  What I have been told is that by virtue
15   of the lien claim being filed, the owner has a claim
16   that it shouldn't pay-when-paid.  It has default
17   provisions, because technically some may claim
18   Balfour Beatty is now in breach, because of the
19   actions taken by its (inaudible).
20              THE COURT:  Okay, got it.  All right.  I
21   just wanted to get an understanding of what's
22   happening on the other side.  Okay.
23              All right.  So with respect to the motion
24   for relief from stay, if I'm understanding
25   correctly, if you have some -- I don't want to say
```

1    comfort, but some understanding and some framework

2    with respect to how litigation would proceed in the

3    Bankruptcy Court, that that would satisfy the

4    concerns that are expressed in your motion for

5    relief from stay, at least for now.  Is that a fair

6    understanding?

7              MR. MATHER:  Yes, Your Honor.

8              THE COURT:  And then with respect to the

9    application for administrative expenses, you're not

10   expecting to adjudicate that today, but you want

11   that application to be sort of a notice to the

12   debtor that to the extent that ultimately Balfour

13   Beatty has the basis to assert a 507(b) claim or a

14   Reading claim, that you intend to do so.

15             MR. MATHER:  Agreed, Your Honor.  And

16   again, I think if we can get an evidentiary hearing

17   on the damages portion done relatively quick, then I

18   think the dominos start falling.

19             THE COURT:  I love it when you say

20   relatively quick.  Of course, in the old days in

21   Bankruptcy Court that was like the following week.

22             MR. MATHER:  I remember those.

23             THE COURT:  Now it's before the end of the

24   year.

25             All right.  So let me hear from

1    Mr. Charbonneau and see where we are.

2              MR. MATHER:  Thank you, Your Honor.

3              THE COURT:  Thank you very much,

4    Mr. Mather.

5              MR. CHARBONNEAU:  The days of Judge

6    Britton, Your Honor, I can't say that I miss them.

7              THE COURT:  I just remember going to trial

8    in front of Judge Britton before we even got

9    answers.

10             MR. CHARBONNEAU:  It was pretty

11   interesting.

12             THE COURT:  As I said many times, I'm

13   going to guess that 95 percent of the time the

14   results were exactly the same as they would have

15   been if they had months of discovery and all that

16   other stuff.

17             MR. CHARBONNEAU:  He was a brilliant

18   jurist, for sure.

19             THE COURT:  Scary, but brilliant.

20             MR. CHARBONNEAU:  Very scary.

21             Your Honor, I thought Mr. Mather at the

22   beginning of his presentation was going to say my

23   stay relief motion is premature.  I think that's

24   where we're coming out.  I agree that on an in rem

25   basis, to determine validity prior and in extent of

1    liens, the Court has probably at best related to

2    jurisdiction.

3            However, we are going to have a damage

4    phase, which I'm going to talk about in a second,

5    where we're going to determine compensatory damages,

6    and the Court has signaled strong that that's going

7    to definitely involve an attorney's fees component

8    and punitive damages.

9            Let's talk about compensatory for a

10   moment, setting aside fees.  The debtor is going to

11   put on a case of, one, liens that were paid as a

12   result of the violation of the automatic stay,

13   without the cooperation and the consent of the

14   debtor, which in our view significantly inflated

15   those claims.

16           Two -- and I know the Judge has already

17   vacated the order as moot -- the debtor did have an

18   opportunity to finish these projects under an

19   arrangement with Balfour Beatty, that Balfour Beatty

20   decided they didn't want to honor.  That's their

21   business.

22           THE COURT:  Whoa, whoa, whoa, whoa.  The

23   evidence shows that resolution was never finalized.

24           MR. CHARBONNEAU:  Correct.  That's what I

25   just said.  They decided they didn't want to pursue

1  it.

2           THE COURT:  Well, no.  You said honor it.

3  Those are two very different things.

4           MR. CHARBONNEAU:  Okay.  And as a result

5  there's going to be lost opportunity and lost

6  profits.  Generally lost profits are kind of a

7  speculative issue, but not here.  They can be very

8  easily calculated.

9           And, Judge, we may employ the services of

10  an expert to help us on the compensatory aspects of

11  our damage claim.  You can't go into state court and

12  file a lien challenge action, and do that here in

13  Bankruptcy Court at the same time.  You're going to

14  get, as I think Mr. Mather recognized, inconsistent

15  results potentially, and in terms of the speed of

16  resolution, my money is on this court, given the

17  case load that they experience over in circuit

18  court, especially in Broward.

19           So I tend to agree with Mr. Mather that

20  the stay relief motion is premature at this time and

21  that most, if not all of the damage issues will be

22  resolved, and in turn, resolve the debtor's claim of

23  lien.

24           You did talk about damages, and I want to

25  go back on that.  I know Mr. Mather is anxious to

1    get --

2              THE COURT:  I want you to be more specific

3    for purposes of keeping the record and my brain

4    clear.

5              MR. CHARBONNEAU:  Sure.

6              THE COURT:  We're talking about a lot of

7    different damages.  Are we talking about stay

8    violation damages, breach of contract damages by the

9    debtor, breach of contract damages by Balfour

10   Beatty?

11             Just please identify -- it's sort of like

12   the pronoun rule.  We have so many buckets of

13   damages.  Tell me which bucket we're talking about

14   at any particular time.

15             MR. CHARBONNEAU:  What I am referring to

16   right now, Judge, are damages that the debtor

17   suffered as it relates to Balfour Beatty's violation

18   of the automatic stay.

19             THE COURT:  Okay.

20             MR. CHARBONNEAU:  Balfour Beatty may

21   assert damages for the debtor's alleged breach of

22   the contract pre-petition, but what's interesting,

23   as I was listening to the presentation and the back

24   and forth between the Court, the Court was asking

25   about notions of setoff and recoupment.  I don't

```
 1   think they apply here.

 2            The damages that Balfour Beatty may have

 3   suffered as a result of debtor's alleged

 4   pre-petition breach are one thing.  The damages that

 5   the debtor suffered post-petition as a result of

 6   Balfour Beatty's violation of the automatic stay

 7   don't flow from that pre-petition breach.

 8            In other words, there's no mutuality for

 9   purposes of setoff.  They are two separate and

10   distinct transactions.  One is a contract, one is a

11   statutory --

12            THE COURT:  We're not discussing

13   recoupment and setoff today.

14            MR. CHARBONNEAU:  Okay.  I thought you

15   talked about it with Mr. Mather a little bit.

16            THE COURT:  I just said that when you're

17   having your discussion, determine whether there's an

18   agreement or not regarding what is subject to what.

19            MR. CHARBONNEAU:  Okay.  Then my last word

20   on damages, Judge --

21            THE COURT:  Which one?

22            MR. CHARBONNEAU:  In general, I'm going to

23   get to the specifics -- is what -- we'll discuss

24   punitives.  My understanding from doing some

25   preliminary research, Judge -- by the way, I agree
```

1    we should do this all in one hearing.

2          My understanding from the preliminary

3    research is that punitives are intended to deter

4    certain conduct, and that a punitive damage award

5    against me is going to be very different in terms of

6    size, as a punitive damage award against Balfour

7    Beatty, which I understand is one of the largest

8    construction companies in the world, and we plan on

9    bringing that to the Court's attention.

10          THE COURT:  Okay.  Before you do, I would

11    suggest -- I've written several opinions regarding

12    punitive damages.  I understand that that is not the

13    only element.  There are many different elements for

14    punitive damages.  But I do have some questions for

15    you that may assist in your conversation with

16    Mr. Mather.

17          What I'm hearing you say is, number one,

18    that it's your position that somehow the payment of

19    the liens without the cooperation and consent of the

20    debtor is compensatory on the stay violation, and

21    I'm trying to understand -- we may have to have a

22    hearing on this ahead of time, because I'm not going

23    to put on evidence of that, or maybe since it's part

24    of one thing you can argue at the end why it's part

25    of the stay violation, as opposed to just breach of

1    contract or reduction of any administrative expense

2    claim.

3              But I'm trying to understand why that

4    would be damages that flowed from the stay

5    violation.  I just -- I don't want you to argue it

6    now.  I'm just sharing with you that I'm having a

7    problem -- I'm not saying ultimately when it's

8    actually before me, and I've had time to really

9    think about it, but I just want you to know, you're

10   going to have to explain to me how that -- those are

11   damages that flow from the stay violation as opposed

12   to something else.  I'm just sharing that with you.

13             The same with this failure to enter into

14   the agreement that was discussed at the March 23rd

15   meeting.  That's not a stay violation.  I never

16   found that their failure to enter into that

17   agreement was a stay violation.  So since the

18   failure to enter into the agreement wasn't a stay

19   violation, you're going to have to explain to me how

20   the damages flowing from the failure to enter into

21   that agreement was a stay violation -- were damages

22   flowing from the stay violation.

23             If your argument is that that was done in

24   bad faith, there might be a legitimate basis for

25   seeking damages, but again, you'll have to explain

1   to me why that would be a stay violation as opposed

2   to part of your breach of -- your alleged breach of

3   contract damages, because I never found that the

4   failure to enter into that agreement was a stay

5   violation.  So I'm just sharing that with you now,

6   so that you are aware of what's going on here.

7            Again, I'm not saying you're not entitled

8   to those damages, if you can make the proper proof

9   under the applicable law.  All I'm saying is,

10  sitting here today, I literally have no idea why

11  that would be compensatory damages associated with a

12  stay violation.  So you're going to have to be ready

13  to explain to me at whatever point it is appropriate

14  to explain that to me, how that could possibly be

15  compensatory damages flowing from a stay violation.

16            MR. CHARBONNEAU:  Can I just address that

17  point?

18            THE COURT:  You can do it very briefly, so

19  Ms. Calderin, who's your colleague, can write it

20  down, so neither of you forget at the appropriate

21  time.

22            MR. CHARBONNEAU:  I was not suggesting for

23  a moment that not honoring or entering into the

24  agreement that was post-petition, I'm not suggesting

25  that at all.  What I'm suggesting is that the

Case 23-12217-LMI   Doc 265   Filed 08/29/23   Page 39 of 71

Page 39

```
 1   violation of the automatic stay created a cascading
 2   affect of certain things that the debtor was not
 3   able to do.
 4           For example, complete its contracts and
 5   get its profit.  For example, pay its vendors in the
 6   correct amount.  And perhaps other flowing
 7   consequential damages.  That's all I'm suggesting,
 8   Your Honor, from a compensatory standpoint.
 9           THE COURT:  Okay.  Again, since we're
10   going to do it all in one trial, it seems like both
11   you and Mr. Mather agree, and we can sort out later
12   what bucket of damages those things flow into.  It's
13   not something that we have to talk about now.
14           But before we get to the point where you
15   are trying to tell me what bucket it goes into, I
16   suggest that you reread my opinion, so that you
17   focus and make sure that any damages that you ask
18   for relating to the stay violation as opposed to
19   something else flow from what I held were the
20   violation of the stay.
21           MR. CHARBONNEAU:  I'm clear on the order,
22   Your Honor.  I read it this morning.
23           THE COURT:  Okay.  So the good news is, we
24   all agree, one, that we need to have -- we're going
25   to have a combined trial on all this stuff.  So that
```

**OUELLETTE & MAULDIN  COURT REPORTERS, INC.**
(305) 358-8875

```
 1    makes your conversation easier.  Okay.  Let's talk
 2    about all the damages you claim and you talk about
 3    all the damages that Balfour Beatty claims.
 4               MR. CHARBONNEAU:  Right.
 5               THE COURT:  And then to the extent that
 6    you can come to a resolution on any of that ahead of
 7    time, fabulous.  Okay.  That always makes me happy.
 8               MR. CHARBONNEAU:  I know.
 9               THE COURT:  Then you can also discuss
10    whether and to what extent any of this argument
11    regarding setoff, recoupment, et cetera, is anything
12    that has to be dealt with beforehand.  Because it
13    could be, based on what we've been discussing here,
14    that that argument is going to be based on the
15    buckets, right?
16               And if we do the bucket ruling first, in
17    other words, you make your arguments why these
18    damages are based on the stay violation as opposed
19    to something else -- well, anyway, all I'm saying
20    is, it sounds to me like we can do the recoupment
21    setoff argument on the back end of the damages
22    trial, not the front end of the damages trial.
23    Because you have your damages, you have your
24    damages, and then how they talk to each other or
25    don't.
```

```
1              And again, we're not making that decision
2     today.  I'm throwing it out there for you guys to
3     discuss -- and by "you guys" I'm including
4     Ms. Calderin.  I know it doesn't seem fair, but when
5     we say "you gals", it doesn't include men, but "you
6     guys" includes women.
7              Ms. Calderin, we can deal with that at
8     another time, and Ms. Grewal.  We're going --
9     according to the television this morning, the women
10    are taking over the world, because between Taylor
11    Swift and Barbie, the entire economy of the world
12    has changed.
13             MR. CHARBONNEAU:  End times, Judge, end
14    times.
15             THE COURT:  Maybe an agenda for another I
16    work leadership.
17             So I'm just sharing this with you, so that
18    the three of you, or however many more people
19    participate in this conference that you guys are
20    going to have, that you talk about these different
21    things, and whether it's in one session or it's two
22    sessions, but decide amongst yourselves what you
23    think logically is the proper flow for the evidence
24    arguments, the legal arguments, so that we don't
25    waste time.
```

Page 42

1           And I don't mean -- I think maybe "waste

2    time" is not a good word -- that you don't spend

3    time, energy and money on things on the front end

4    that really should be on the back end.

5           MR. CHARBONNEAU:  I understand completely,

6    Your Honor.  And Mr. Mather and I worked pretty well

7    on that for the last trial.

8           THE COURT:  No, no.  And I appreciate

9    that, I really do.

10          The other thing is, at some point -- and I

11   think it's premature now, I'm going to tell you

12   both, but if you believe that having mediation --

13   did you guys have mediation already?

14          MR. CHARBONNEAU:  We did not.

15          THE COURT:  You might want to consider

16   having mediation.  I would not suggest a judicial

17   settlement conference, and I'll tell you why.

18   Number one -- well, unless the money is an issue,

19   and I know for the debtor money might be tight.

20   Because I think that maybe you want a mediator that

21   has some knowledge of construction law, and I am not

22   sure that any of my colleagues do.  They may, but

23   I'm not sure that they do.

24          And I'm more than happy to direct you all

25   to choose a mediator and get a date -- let's put it

Page 43

1  this way:  I think if we're going to have a trial,

2  we're talking about -- late October?  I'm looking at

3  my boss here.  Late October, boss?  Late October,

4  because of the holidays and travel and various other

5  things.

6          So if you tried to get a mediation

7  scheduled some time in mid-September, even late

8  September, you would still be doing your trial prep,

9  you'd be doing enough discovery that maybe you'd

10  have an effective mediation.  I'm just throwing all

11  that out there to try to help you all decide when

12  you meet what makes sense.

13          So those are just my thoughts.  I'll hear

14  from you and then I'll hear from Mr. Mather.

15          MR. CHARBONNEAU:  Okay.  Judge, I think

16  we've pretty much covered the waterfront on stay

17  relief.  It's premature.

18          The Court did ask us to be ready to argue

19  Reading and NP Mining, and I took a fairly deep dive

20  into those cases and its progenies the Court

21  directed.  I know that now, based on a conversation

22  with Mr. Mather -- that the Court had with

23  Mr. Mather -- that some of the claim may be asserted

24  as falling under 503(b).  We're obviously going to

25  take issue with that.

```
 1              THE COURT:  Oh, clearly.  I would be
 2   disappointed if you said anything else.
 3              MR. CHARBONNEAU:  I emphatically believe
 4   and will argue to the Court that there is no leading
 5   exception to 503(b) here at all.
 6              THE COURT:  Well, that wasn't my question
 7   with respect to Reading.  Reading I review -- the
 8   way I looked at it when I entered the opinion that I
 9   entered so many thousands of years ago, it seems,
10   was that there was a recognition by the Supreme
11   Court and the 11th Circuit that under certain
12   circumstances, when the debtor chooses to take a
13   position adversarial to another party, that there
14   may be an administrative claim.
15              Now, I will say this:  My fault.  I take
16   full responsibility.  Until today for some reason I
17   thought there was a pending state action that the
18   debtor was pursuing.  My fault.  But let's -- but
19   you knew that.  You knew that there was no state
20   court pending.
21              So explain to me why Reading and -- I keep
22   calling it Aluminum, but I know that's not the name
23   of it.
24              MR. CHARBONNEAU:  NP Mining.
25              THE COURT:  Right.  Aluminum is easier to
```

1  say.  That's why I keep saying aluminum.

2          Why those cases would not possibly support

3  an administrative claim if -- because remember, part

4  of Reading and NP Mining is that it doesn't create a

5  new source for attorney's fees or cost shifting.  It

6  just recognizes how that cost shifting would be

7  treated in the bankruptcy case, right?

8          MR. CHARBONNEAU:  Sort of.

9          THE COURT:  Talk to me.  Talk to me.

10          MR. CHARBONNEAU:  Before I do that, Judge,

11  I just need to --

12          THE COURT:  All right, don't talk to me.

13          MR. CHARBONNEAU:  I just need to get a

14  couple of facts out that I don't think are in

15  dispute.

16          THE COURT:  Okay.

17          MR. CHARBONNEAU:  The debtor filed its

18  claim of lien in the county records when it wasn't

19  paid and its subs were paid and did a search.

20          THE COURT:  That was post-petition or

21  pre-petition?

22          MR. CHARBONNEAU:  Post-petition.

23          THE COURT:  Okay.  That's what I thought.

24  At least I got something right.

25          MR. CHARBONNEAU:  There is -- I think we

1    filed it at 225 -- there is a notice of lien.

2                THE COURT:  Okay.

3                MR. CHARBONNEAU:  There was an argument, I

4    want to say several weeks ago, that we were

5    slandering title, because the notice of lien was not

6    properly served on the owner.  We did the notice of

7    filing with the delivery slip showing that it was.

8                THE COURT:  I thought the issue was that

9    the notice to owner wasn't served prior to the

10   filing of the claim of lien.

11               MR. CHARBONNEAU:  It was.

12               THE COURT:  But I'm saying that was the

13   argument, and then Ms. Calderin had already appended

14   or put on the record that a notice to owner had been

15   recorded.

16               MR. CHARBONNEAU:  Right.  And there was a

17   hearing on the 19th of last month -- Ms. Calderin

18   covered it, I couldn't speak, because we were both

19   in the throws of COVID -- where I think there was a

20   recognition that the notice to owner was properly

21   served and timely served.

22               The issue for -- the remaining issue for

23   Balfour Beatty was language in the notice to owner

24   where, in a couple of lines down in the notice, it

25   had N/A, N/A, not applicable, not applicable.

Page 47

```
 1                    Actually, Your Honor, if I may, I'm going
 2     to look at this.
 3                    THE COURT:  Go ahead.
 4                    MR. MATHER:  Your Honor --
 5                    THE COURT:  Yes, Mr. Mather?
 6                    MR. MATHER:  Excuse me for not standing
 7     up, Your Honor.
 8                    If you have the exhibits from the
 9     June 26th trial, they are Exhibits 25 and 26, the
10     two lien claims.
11                    THE COURT:  All right.  Am I looking at
12     the lien claims or the notice to owner?
13                    MR. CHARBONNEAU:  I think they're the
14     same.  We did a notice of filing.
15                    THE COURT:  I have it at 225.
16                    MR. CHARBONNEAU:  That's right.
17                    And I think the remaining question by
18     Balfour Beatty was, not that it was not served, not
19     that it was not timely served, but that if you see
20     under important information for your protection --
21     I'm sorry.
22                    THE COURT:  Hold on.
23                    MR. CHARBONNEAU:  Under the claim of lien,
24     in the last full paragraph it says --
25                    THE COURT:  Oh, yeah, I see it.
```

1            MR. CHARBONNEAU:  That the lienor served

2    his or her notice to owner on N/A, by N/A, and if

3    required that the lienor serve copies of the notice

4    on the contractor on N/A.

5            THE COURT:  Got it.

6            MR. CHARBONNEAU:  And that on that basis,

7    the lien is defective and it's a slander of title.

8            We don't need to argue this today, Judge,

9    but it's an important fact for the Court's

10   consideration on the admin claim.  You'll understand

11   why in a moment.

12           THE COURT:  Okay.

13           MR. CHARBONNEAU:  Florida Statute 713.06,

14   specifically (2)(f) says -- and I'm going to quote

15   for a moment, "If a lienor has substantially

16   complied with the provisions of Paragraphs A, B and

17   C, errors or omissions do not prevent the

18   enforcement of a claim against a person that has not

19   been adversely affected by such omission or error."

20           THE COURT:  Okay.

21           MR. CHARBONNEAU:  Everyone knows who

22   everyone is here and what's been claimed.  I haven't

23   heard any argument, maybe we will, as to how the

24   owner or Balfour Beatty is adversely affected by

25   what may be admissions, as I just read into the

1    record.

2            So the debtor, Judge, has done everything

3    it's supposed to do, frankly, required to do, as a

4    Chapter 11 fiduciary under Florida law.

5            THE COURT:  Okay.

6            MR. CHARBONNEAU:  And that's important,

7    because the facts are important, especially when

8    we're talking about administrative claims.

9            And Reading is interesting.  It's

10   pre-petition receiver is appointed, and if I'm

11   reading it correctly, I think the receiver was --

12   stayed in place after the petition under, by the

13   acts equivalent version of 543.

14           While the receiver is administering the

15   property, it catches on fire, and apparently there

16   was a huge conflagration, and it burns down a number

17   of buildings around it, including the building of

18   Reading & Company.  And so Reading & Company and

19   other damaged parties come to the Supreme -- come to

20   the Bankruptcy Court and say, "We want compensation

21   on an administrative basis, because this happened

22   after the filing of the petition."

23           The Bankruptcy Court -- actually, at that

24   time bankruptcy referee -- says, "No, I think the

25   District Court and Circuit Courts agree," and the

1    Supreme Court says, "No, we're going to give them

2    the administrative claim," and looked at Section 64,

3    which is 503(b)'s predecessor, and held that damages

4    resulting from the negligence of a receiver acting

5    within the scope of their authority give rise to

6    actual and necessary costs of administering the

7    estate.

8           What's interesting is that the Supreme

9    Court said, this applies in -- and I'm using air

10   quotes because it's a quote -- "some cases."

11          And in overruling the Trustee's argument

12   on this said, and it's very important, "In our view

13   the Trustee has overlooked one important and here

14   decisive statutory objective, fairness to all

15   persons having claims against an insolvent

16   petitioner which suffered great financial injury

17   from what is here agreed to have been the negligence

18   of the receiver and the workmen."

19          So the Reading court dropped a footnote

20   about 28 U.S.C. 9 -- I think it's 959 or 969, but it

21   wasn't the primary basis on which they held that

22   Reading and the other damage claimants were entitled

23   to an administrative claim.  Fast forward in 1992.

24   Or probably 1990, by the time it got to the 11th

25   Circuit.

1           A debtor by the name of NP Mining is

2    engaging in surface mining, which apparently is a

3    polite way of saying strip mining.  Luckily for all

4    of us strip mining, at least in the State of

5    Alabama, is highly regulated.

6           So the debtor filed.  The debtor operated

7    for a while.  A Chapter 11 Trustee was appointed,

8    and then the case converted.

9           So during the operations of both the

10   debtor-in-possession and the Trustee, an entity

11   known as the Alabama Surface Mining Commission --

12   I'll just call them the commission -- said, "Hey,

13   you engaged in certain statutory violations.  We're

14   assessing fines and penalties."  And they did this

15   post-petition.  Both the -- well, they converted,

16   and then the Chapter 7 Trustee objected to the

17   claims.

18           Both the Bankruptcy Court and the District

19   Court said, "No, no, these administrative claims,

20   yes, they were incurred post-petition, but they did

21   not benefit the estate.  They only served to deplete

22   it."

23           Not unlike Reading, the 11th Circuit said,

24   "No, no, that's not right," and we broadly read into

25   503(b)(1) certain public policy issues, including

1    environmental protection and costs ordinarily

2    incident to the operation of the estate.

3              But they took it a step further.  Instead

4    of just saying, "It's fair, because the debtor

5    incurred these fines," the 11th Circuit said, "Not

6    only is it fair to the State of Alabama and the

7    people that these statutory fines be enforced as a

8    cost of doing business when you're a strip mining

9    operation," they really hung their hat on the

10   reference that the Reading court made to 28 U.S.C.

11   959(b).  And it requires that trustees -- well, it's

12   very short.  Let me read it into the record.

13             THE COURT:  Go ahead.

14             MR. CHARBONNEAU:  It says --

15             THE COURT:  Slowly, though, slowly.

16             MR. CHARBONNEAU:  "A Trustee appointed in

17   any cause pending in any court of the United States,

18   including a debtor-in-possession, shall manage and

19   operate the property in his possession as such

20   Trustee, according to the requirements of the valid

21   laws of the state in which such property is

22   situated, in the same manner that the owner or

23   possessor would be bound to do if in possession

24   thereof."

25             So the 11th Circuit said, "Yeah, in

Page 53

1    fairness, we're going to say that fairness is

2    important.  We're going to say that these expenses

3    are compensatory when they're done in the course of

4    doing business post-petition, but really, what we're

5    hanging our hat on is that you, Trustee,

6    debtor-in-possession and Trustee, were obligated

7    under 28 U.S.C. 959(b) to observe all state laws in

8    your operation, and you didn't, and you didn't do it

9    post-petition.  So administrative expenses get

10   awarded to you."

11            At least in 2020, or by 2020, there are a

12   number of cases that have addressed the modern

13   application of Reading.  They're split into two

14   camps, but the vast majority say that in order to

15   get administrative liability of the type we've been

16   talking about in NP and Reading, there has to be --

17   if not tortious, a wrongful action taken by the

18   Trustee or the debtor that gives rise to the

19   administrative claim.

20            And by the way, Judge, if the Court is

21   interested, a very nice survey of these cases can be

22   found at In re:  Keast, K-E-A-S-T.  It's 2020

23   Westlaw 27646898.  It's in Footnote 4.

24            And frankly, other cases, including a case

25   out of the Ninth Circuit BAT, Tipperman versus IRS,

Page 54

1    a 2013 case, said that the IRS was not entitled to

2    an administrative claim for penalties incurred by

3    the failure of a Chapter 7 Trustee to not file a tax

4    return.  The Ninth Circuit said the Trustee was

5    wrong.  Had to file a tax return, didn't do it, was

6    entitled to the assessment of the penalties.

7              Those penalties, even though the Trustee's

8    action occurred post-petition, were more properly

9    pre-petition claims and not administrative, because

10   there was -- even though the Trustee's conduct was

11   incorrect, it was not wrongful and it was not

12   negligent and it was not tortious.

13             THE COURT:  Okay.  So are you telling me

14   that there's -- because you're asking me to make a

15   very limited reading of Reading, and NP Mining.  So

16   let me ask you a question.

17             MR. CHARBONNEAU:  Sure.

18             THE COURT:  Post-petition, a debtor files

19   a lawsuit against a party to collect a debt, and the

20   contract under which the debtor sees has an

21   attorney's fee provision, prevailing party

22   attorney's fee provision, and the debtor loses.

23   This is all done post-petition, pre-confirmation,

24   post-petition.  And the debtor loses.

25             So you're telling me that in that

1    situation, the prevailing party in the lawsuit,

2    notwithstanding that the contract under which the

3    debtor has filed the lawsuit -- not wrongfully,

4    there's no Rule 11 sanctions, it's a legitimate

5    lawsuit, the debtor loses -- that the creditor or

6    the litigation target is SOL when it comes to the

7    attorney's fees provision?

8             MR. CHARBONNEAU:  Judge, not only do I

9    believe that, but the court ruled that way in ER

10   Urgent Care Holdings, where the Trustee brought

11   fraudulent transfer and unjust enrichment cases.

12            THE COURT:  Right.  But those -- yes, and

13   that was a brilliantly written opinion.

14            MR. CHARBONNEAU:  It was amazing.

15            THE COURT:  But those cases, the issue,

16   there was no attorney's fee provision.  There was a

17   request for attorney's fees just based on the

18   Reading case; isn't that correct?

19            MR. CHARBONNEAU:  I don't --

20            THE COURT:  I will tell you, I did not

21   reread the opinion before today.  I reread Reading

22   and I reread NP Surface Mining -- NP Mining -- but I

23   did not reread ER Urgent Care.

24            MR. CHARBONNEAU:  Judge, I was reading it

25   last night.  I'm not sure about whether there was an

Page 56

1    agreement or not.  But what's interesting is that

2    the Court -- this Court -- I'm not going to recite

3    the facts of ER Urgent Care unless you want me to --

4    you relied on two primary decisions.

5              One was Ybarra, Y-B-A-R-R-A, Ninth

6    Circuit, and the Court there -- I'm going to refer

7    here to my notes -- noted there that the debtor's

8    liability for attorney's fees -- and that there was

9    liability for attorney's fees in that case --

10   doesn't equate to administrative priority, because

11   administrative claims are charged against the

12   bankruptcy estate.

13             And here's where the Ninth Circuit --

14   court of the Ninth Circuit.  The central question in

15   determining whether a claim is granted

16   administrative expense priority is whether the third

17   party should be paid at the expense of the debtor's

18   existing unsecured creditors.  There we have again

19   that same fairness notion.

20             The Court also relied on a Northern

21   District of Florida case, Park National Bank versus

22   University Center Hotel.  And there again the

23   District Court held that a post-petition litigant

24   wasn't entitled to administrative priority,

25   interpreting Reading, and focusing again on

```
 1   fundamental fairness.  It didn't dictate an
 2   administrative priority treatment for what I believe
 3   were contractually available fees to the winning
 4   litigant.
 5              Your Honor ultimately took the fork in the
 6   road.  What you said was, "I find that the Trustee's
 7   conduct was not unreasonable, not unlawful, not
 8   negligent, and therefore, I am not going to assess
 9   fees against the Trustee and the estate --" and then
10   you said -- because it wouldn't be fair, based on
11   the body of case law that's been interpreted."
12              So the answer, Your Honor, is yes, if an
13   estate representative brings an action, and even if
14   they're contractually obligated to pay for fees if
15   they lose, those fees, unless the plaintiff has
16   brought something ridiculously frivolous or is
17   engaged as the Court said in a Rule 11 violation,
18   those fees are not accorded administrative priority,
19   based on the reasoning of NP Mining and Reading,
20   which you adopted in the ER case.
21              THE COURT:  ER Urgent Care.
22              MR. CHARBONNEAU:  ER Urgent Care, Your
23   Honor.
24              THE COURT:  Okay.  Well, I will look at it
25   again.  But again, based on -- that does not
```

1    foreclose, assuming that I don't change my mind --

2    I've only done it once, but I'm allowed to do it --

3    that does not foreclose Balfour Beatty, assuming

4    that they have a good faith basis for arguing it,

5    the strictures of the framework that is articulated

6    in ER Urgent Care, correct?

7            MR. CHARBONNEAU:  Oh, of course, unless

8    the Court is just going to rule now that the

9    debtor's conduct was not willful or negligent.

10           THE COURT:  How do I know until I hear the

11   evidence?

12           MR. CHARBONNEAU:  I just told you that the

13   lien complied with Florida law, but I guess you need

14   some evidence.

15           That's all I have, Your Honor.  Thank you.

16           THE COURT:  All right.  Thank you.

17           Mr. Mather.

18           MR. MATHER:  Yes, Your Honor.  I needed to

19   clarify something, because we've dealt with this

20   issue before, and I thought I touched on it earlier

21   today, and that is, the Court asked, I think it was

22   at the June 26th hearing, if the problem we had with

23   the lien was the notification issue, the N/A on the

24   notice of lien.

25           And I told the Court at that time, I said,

1  "No, our issue is that the lien was filed saying
2  that they are owed X amount of dollars, and those
3  dollars have all been paid."
4          So we're saying, because the debtor filed
5  these, I believe, around May 19th, different days,
6  but we were way post-petition.  We were in a period
7  of time where the debtor should have known those had
8  been paid, and the debtor initiated these claims
9  against the owner and the real estate, based on
10 amounts that we believe have been paid.
11         I'm not arguing facts.  I'm just saying it
12 is not the N/A, it is not the notice.  We talked
13 about that before, and I informed the Court, "No,
14 that isn't our claim anymore."  I wanted to make
15 sure that you knew that's not what we're traveling
16 under today.
17         THE COURT:  Okay.
18         MR. MATHER:  Sorry to beat a dead horse.
19 Thank you, Your Honor.
20         THE COURT:  Well, as I said, I wasn't
21 going to rule today.  I wanted to hear the argument
22 and I appreciate the argument.  So Mr. Mather knows,
23 and unless he changes my mind from my ER Urgent Care
24 case, that there's a tall hill to climb, mountain --
25 we don't have mountains in Florida, so I'm saying

1    hill -- tall hill to climb before you'll be able to

2    demonstrate that that doesn't foreclose the

3    opportunity to be able to meet that burden, unless,

4    of course, I change my mind.

5                I thought in ER Urgent Care I said there

6    is a framework in which a prevailing party would be

7    able to achieve attorney's fees.  I didn't realize

8    that I was that -- of course, I haven't read the

9    case in a month, so --

10               MR. CHARBONNEAU:  I can leave my copy with

11   the Court.

12               THE COURT:  It's okay.  I've got several.

13               All right.  So that hasn't changed.  So

14   when and at such time as we circle back to the

15   administrative claims, which I don't think we ever

16   get to until the litigation on the damages is

17   concluded, and then the buckets identified, because

18   any litigation that I did ultimately find was

19   associated with the stay violation would clearly not

20   trigger any type of consideration of administrative

21   claim treatment, because that's a different issue.

22   It would be the issue regarding the wrongfulness of

23   the -- the alleged wrongfulness of the filing of the

24   notice of lien, and whether that rises to the level

25   that the case law dictates, or you get me to change

1   my mind.

2              As I said, I've only done it once in 17

3   years, but I'm never afraid to admit that I'm wrong,

4   except maybe that 43 years of marriage, but no.

5   Just kidding.

6              MR. CHARBONNEAU:  Judge, it was bothering

7   me, so I looked, and apparently the prevailing party

8   in ER Urgent Care was relying on an indemnity clause

9   for attorney's fees under a sale agreement, which

10  was part of the Trustee's actions.  So it was

11  contractual.

12             THE COURT:  Okay.  Now we can both sleep

13  better tonight.

14             All right.  So here's what I'm going to

15  do:  With the motion for relief from stay I'm going

16  to deny without prejudice, because I agree it is

17  premature.  Even if a pending state court action

18  existed I would still not have granted the relief

19  today, only because at least at this point it seems

20  like we need to finish up what we have going on here

21  before it's dealt with, if it has to be dealt with

22  in state court.

23             And I agree with what you said,

24  Mr. Charbonneau, which is just a different way, I

25  think, also of saying what Mr. Mather was talking

1    about, as well, is that my ability to make any type

2    of in rem adjudication of a property that is not

3    property of the estate would at best be related to

4    jurisdiction, and that's not necessarily the best

5    way -- highest and best use of everybody else's

6    time, unless everybody consents to my jurisdiction.

7              And then, of course, as we all know, you

8    can consent all you want, but if I don't have

9    jurisdiction it doesn't matter.  It would just be an

10   educational footnote to somebody's actually binding

11   opinion on a particular issue.  So that's denied

12   without prejudice.  And, Mr. Mather, I'm going to

13   ask you -- no, I'm going to ask Mr. Charbonneau to

14   prepare that order.

15             And then with respect to the application

16   for administrative expenses, that's going to be

17   continued until the conclusion of the trial on

18   damages, or the parties have otherwise reached

19   resolution.

20             So let's go back over the homework.  You

21   guys are going to meet -- I'm sorry -- you guys and

22   gal, or you attorneys -- that's what I'm going to

23   say, you counsel are going to meet, and you are

24   going to discuss the usual evidentiary hearing

25   discussions.  You're also going to discuss, or at

1   least think about when you need to discuss, when the

2   legal arguments should be made, and whether that

3   should wait until afterwards.  And then --

4   afterwards, after the trial on the damages.

5          And then you will also talk about

6   mediation, and maybe try to schedule that for some

7   time in late September, after you've had a chance to

8   do some discovery and have some discussions.  But if

9   you identify a mediator and get on his or her

10  calendar, that way you at least have a date on the

11  books.  Because if you don't reach out to a mediator

12  until after you all finished your initial round of

13  discovery, then you're not going to get a mediation

14  date until December or January.  I will do my best.

15         Once you've all met and you've figured out

16  how much discovery you need, then circle back to

17  Ms. Sanabria.  And if it is going to be an adversary

18  proceeding, then obviously you need to actually file

19  the adversary proceeding first.  If it's not going

20  to be an adversary proceeding, it's just going to be

21  in the context of something else of a contested

22  matter, again, I'm not going to dictate to you what

23  you need to do procedurally, but you'll be able to

24  figure out what you need to do to bring the issue

25  before me in the proper framework.

1          In any event, I will -- once you've had

2    those discussions, reach out to Ms. Sanabria so we

3    can block out dates, whether -- the earliest it

4    would be would be late October.  That's the

5    earliest.  So if it's November or even early

6    December, that's fine.  I'm only out of the office

7    the first week of December in meetings in

8    Washington, and other than that, as far as I know,

9    I'm in town the whole rest of the month.

10          In November I have View from the Bench,

11   but now that I'm not Chief Judge anymore as of

12   October 1, I won't be in Tampa, so I actually have

13   that day.  Pretty much until Thanksgiving, I think

14   I'm around.

15          Again, you all -- and if that doesn't work

16   for all of you and you want a trial the beginning of

17   next year, that's fine, also.  I'm trying to

18   accommodate everybody's concerns, but again, if

19   procedures, it needs to be brought before me, an

20   adversary proceeding, first you need to file the

21   adversary proceeding.  Okay?

22          Is that helpful, unhelpful?

23          MR. CHARBONNEAU:  Very much so, Your

24   Honor.

25          THE COURT:  Worth a trip from Tampa?  Did

1   you drive or fly?

2          MR. MATHER:  I drove.

3          THE COURT:  Probably better, based on what

4   the airlines look like right now.

5          MR. MATHER:  It's bad anywhere you go.

6          Your Honor, the only other thing I might

7   add to the list is, I believe the plan confirmation

8   is September 20th.  So we're going to need as part

9   of our discussion to figure out how we deal with

10  these issues.  Because I don't want -- it doesn't

11  make any sense to object to the plan, because these

12  things haven't been resolved.

13         THE COURT:  I understand.  It could be

14  that -- I haven't reread the plan lately, but it

15  seems to me a lot of times when you have pending

16  litigation, if the plan is flexible enough to

17  address the ultimate outcomes of that litigation,

18  that sometimes takes care of that issue.

19         MR. CHARBONNEAU:  I'd like to address

20  that, Your Honor.  At 177 is the plan that was

21  filed, and it goes into pretty exhaustive detail

22  about the debtor's assets, including claims against

23  Balfour Beatty, and that they are all preserved

24  post-confirmation.

25         THE COURT:  And does it talks about

1   Balfour Beatty's asserted claims against the debtor,

2   and how that litigation, if successful by Balfour

3   Beatty, would impact the debtor's ability in terms

4   of feasibility?

5              MR. CHARBONNEAU:  I'm looking, Judge.

6              THE COURT:  You don't have to answer the

7   question.  I'm just throwing it out there.  I mean,

8   I've said this to debtors many times.  Sometimes you

9   can't have litigation resolved before confirmation,

10  and all you have to do is address in the

11  plan/disclosure statement, depending on whether

12  there is a disclosure statement, "This is what

13  happens if you lose."

14             That's all.  That's it.  "This is what

15  happens if we win, this is what happens if we lose."

16             I mean, there's sometimes in litigation,

17  it just says, "Well, if we lose, you'll get paid

18  slower, or you'll be paid less."

19             I can't use the phrase, because it's not

20  polite and it's not judicial.  We would be in a

21  whole hot mess of trouble.  How's that?  That's a

22  very nice ladylike way of saying what I was going to

23  say.

24             All right.  So the bottom line is, I hear

25  what you're saying, Mr. Mather, but I don't want to

Page 67

1   delay confirmation if it doesn't need to be delayed.

2          MR. MATHER:  That's why --

3          THE COURT:  And if the plan gives us

4   flexibility about, "Here's what happens if we win,

5   here's what happens if we lose," then --

6          MR. CHARBONNEAU:  And I think that

7   scenario arises, Your Honor, only if there's an

8   administrative claim adjudicated.  Then it becomes

9   problematic, and I'm pretty confident --

10         THE COURT:  And the bottom line is -- it's

11  a Subchapter V plan.  So admins get paid over the

12  life of the plan, number one, right?

13         Number two, you can even discuss in the

14  plan that there's been a claim for administrative

15  claims that you -- that the Court has at least

16  preliminarily ruled as this, and you either do or

17  don't -- whatever.  I don't care.

18         I disagree with Mr. Mather, that if you

19  can input enough flexibility in the plan so that

20  there doesn't have to be an objection based on, "We

21  have to resolve these issues first," that's great.

22  Because who wants to spend your time and money

23  litigating that in a plan, when you already know

24  you're going to be litigating it outside of the

25  plan?

```
 1              MR. CHARBONNEAU:  Right.
 2              THE COURT:  But again, if you want to do
 3  it in the plan for confirmation, that's totally up
 4  to you, as well.  It's your plan, not mine.
 5              MR. CHARBONNEAU:  We don't want to delay
 6  confirmation, Judge.
 7              THE COURT:  No.  I totally get that.  I
 8  totally get that.  Although in Subchapter V, the
 9  deadline is to file the plan, not get confirmed.
10  Not that I'm encouraging that.  Please, don't think
11  that's the case.
12              MR. CHARBONNEAU:  Our plan is filed,
13  Judge.
14              THE COURT:  Yes, I know that.  I know your
15  plan is filed.
16              MR. CHARBONNEAU:  That is one thing of
17  Judge Grossman that maybe the Court should not
18  adopt, but I'll leave that to the Court.
19              THE COURT:  What?  Subchapter V has its
20  own deadline.  I can't --
21              MR. CHARBONNEAU:  It does, but there's a
22  -- Seven Stars on the Hudson is a case that says
23  that there's no extension, or the extension is
24  extraordinarily -- the burden to get extended
25  exclusivity is extraordinarily high, because it's
```

Page 69

1    based -- taken from Chapter 12.

2              THE COURT:  Yeah, but in that case,

3    correct me if I'm wrong, that case was converted

4    from a regular Chapter 11 to a Sub V.

5              MR. CHARBONNEAU:  You are not wrong.

6              THE COURT:  So that's a very different

7    issue.  This was started out as a Sub V, wasn't it?

8              MR. CHARBONNEAU:  It was, Your Honor.

9              THE COURT:  And you filed the plan when

10   you were supposed to anyway.

11             MR. CHARBONNEAU:  We did.

12             THE COURT:  So that case doesn't apply.

13             MR. CHARBONNEAU:  It doesn't.

14             THE COURT:  And the other -- it came up in

15   another case it only applies if you're going from a

16   regular 11 to a Sub V 11, and it doesn't apply if

17   you're converting from another chapter.

18             Remember that, Mr. Gold?  That came up in

19   Mr. Hoffman's case, because he had a Chapter 13, and

20   then he converted it to a Subchapter V case.  And

21   the statute specifically says from the order for

22   relief, when you change chapters a new order for

23   relief is entered.  So you avoid the Seven Stars --

24   what is it, Seven Stars --

25             MR. CHARBONNEAU:  Seven Stars on the

Page 70

1    Hudson.

2              THE COURT:  You avoid that problem,

3    because it runs from the order for relief, not the

4    petition date.  There you go.  File all your cases

5    as Chapter 13s and you won't have a problem.

6              MR. CHARBONNEAU:  That might be tough.

7              THE COURT:  Okay.  Court is concluded.

8              (Thereupon, the hearing was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

1                        CERTIFICATION

2

3   STATE OF FLORIDA:

4   COUNTY  OF  DADE:

5

6              I, HELAYNE F. WILLS, Shorthand

7   Reporter and Notary Public in and for the State of

8   Florida at Large, do hereby certify that the

9   foregoing proceedings were taken by electronic

10  recording at the date and place as stated in the

11  caption hereto on Page 1; that the foregoing

12  computer-aided transcription is a true record of my

13  stenographic notes taken from said electronic

14  recording.

15              WITNESS my hand this 22nd day of

16  August, 2023.

17

18

19      _____

                    HELAYNE F. WILLS

20             Court Reporter and Notary Public

             In and For the State of Florida at Large

21           Commission No:  HH157788   Expires 8/2/2025

22

23

24

25