**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

**EDGEWATER CONSTRUCTION GROUP, INC.**

                                                    **Case No.: 23-12217-LMI**

                                                    **Chapter 11**
      **Debtor.**              **/**     **Subchapter V**

## AMENDED PLAN OF REORGANIZATION OF
## EDGEWATER CONSTRUCTION GROUP, INC.

**Submitted on November 3, 2023 by:**

**Edgewater Construction Group, Inc.**
  *Debtor in Possession*

      **Edgewater Construction Group, Inc.,** (the "Debtor" or "Edgewater")[1] as debtor-in-possession, by and through undersigned counsel, submits and proposes this First Amended Plan of Reorganization (the "Plan") pursuant to 11 U.S.C. § 1189, 1190 and 1191. In summary, but subject to the more specific details provided herein, the Plan provides for the emergence of Debtor from this Chapter 11 Case, with Debtor as Reorganized Debtor. Debtor will own its Assets, unless otherwise described herein. The Plan additionally provides for the commitment of non-exempt assets of the Debtor's principals to the Plan in exchange for a bar order in favor of the Debtor's principals. The treatment and satisfaction of all Allowed Claims against Debtor are as set forth in the Plan.

## BACKGROUND

      A.    The Debtor.   The Debtor was formed in February 1999 to provide general contracting services, with a specific concentration on multifamily residential projects. In or around January 2017, Edgewater began to expand its services to include subcontractor services of stucco and drywall installation. While the Debtor is completing some of its prepetition projects, presently and

---

[1] Terms defined within this Plan, along with the location of respective definitions are listed in Appendix 1



**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

upon emergence from Chapter 11, Edgewater is focusing on returning to its roots as a general contractor; doing so will provide greater control and certainty over its cash flow.

A.1    The Debtor experienced a decrease in cash flow due to Covid-19 supply chain disruption and increased cost of materials.  In some cases, the price of materials increased by 300% (increases that are unprecedented in the construction industry and for which Edgewater could have never reasonably predicted in negotiating escalation costs in contracts).  Those price increases were absorbed 100% by Edgewater, as the general contractors and owners of the various projects on which Edgewater worked refused to help in any way (notwithstanding, in the case of the owners, increased value in the real estate in the South Florida market).  In addition to the unprecedented increase in material costs, Edgewater's contracts with its general contractors include "pay when paid" provisions which essentially provide that general contractors are not required to pay Edgewater's invoices until the owners pay them.

A.2    As of the Petition Date, Edgewater had over 3.6 Million Dollars of unpaid receivables that were not paid pending payment by the project owners to the general contractors. To help defray the cost increases and payment delays, Edgewater's shareholders, Ulysses and Dulce Vazquez (when referred to together, the "Debtor's Principals") liquidated a significant portion of their exempt assets (including the proceeds of a refinancing against their home).  Although Edgewater's terms with its own subcontractors also include a "paid when paid" provision, Edgewater believes that its labor force could not wait several months to be paid so the bulk of the Debtor's Principals contribution of their exempt assets went directly to pay for labor costs while Edgewater still remains unpaid by several of its contractors.



B.      This case was commenced on March 2, 2023 (the "Petition Date") by the filing of the Debtor of a voluntary petition under Chapter 11, Subchapter V of the Bankruptcy Code (the "Subchapter V Case").

C.      Liquidation Analysis.  To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to the Plan as **Exhibit A.**

D.      Feasibility. The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business. The Plan Proponent has provided projected financial information as **Exhibit B.** The Plan Proponent's financial projections (the "Projections") are predicated upon a significant contracture in the business that includes, *inter alia*, a reduction in work force, and the Vazquez Exit Contribution.  Absent a significant and material increase in new work, the Debtor cannot commit to continue sustaining its current operations.  The Debtor is hopeful that soon upon emergence from Chapter 11, the Reorganized Debtor will begin to transition from doing stucco and drywall to doing general contractor work.  The Debtor currently estimates that it will have minimal projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2) (36 months from the Effective Date) absent a significant and material recovery of the Project Receivables or recovery from the Retained Causes of Action.  Additionally, the Debtor may seek to sell some of its personal property in order to provide additionally liquidity to the estate.  The final Plan payment is expected to be paid on or before the expiration of 36 months from the Effective Date.  Notwithstanding the foregoing, the Debtor, at its discretion, may opt to seek exit financing from a third party to make an early payment of all obligations under the Plan.



**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections**

## ARTICLE I.   SUMMARY

1.1     This Plan proposes to pay Allowed Claims no less than the value of Edgewater's Net Disposable Income for a period of 36 months (which will necessarily include the Vazquez Exit Contribution) as well as such proceeds from the sale of personal property. The Plan provides for 8 Classes of creditor claims (including priority, secured, and unsecured) and one Class of Equity interests.

1.2     **Debtor's Assets.**   A summary of Debtor's pre-petition assets (including claims encumbering said assets) is listed on the attached **Exhibit "C"**.

1.2.1     As of the Petition Date, the Debtor scheduled a total of $3,392,311.65 of actual earned and unpaid draw requests summarized as follows (the "Project Receivables"):

| | |
|---|---:|
| 2000 Biscayne project | $50,839.20 |
| Society Wynwood | $60,297.07 |
| AER - Stucco | $65,877.26 |
| AER - Drywall | $1,203,929.20 |
| RD Las Olas | $114,318.32 |
| AMLI - Stucco | $126,190.65 |
| AMLI - Drywall | $278,696.80 |
| ~~Aston Martin~~ | ~~$280,099.13~~ |
| Mr. C | $377,071.39 |
| La Clara – Drywall | $427,586.55 |
| Acqualina South Tower | $490,094.69 |
| Acqualina North Tower | $197,410.52 |
| Total | **$3,392,311.65** |

1.2.2     Aston Martin: During the pendency of the Case, the Debtor entered into an agreement with Coastal Construction as general contractor on this project, whereby the parties are honoring their contractual obligations.  All sums billed and due as of the Petition Date have been



collected and used for operations.  Any prospective collections on this project are included in the Debtor's cash flow projections.

1.2.3        RD Las Olas and 2000 Biscayne project (together, the "Balfour Beatty Projects"):  These are projects where the general contractor is Balfour Beatty.

1.2.3.1 Balfour Beatty engaged in behavior that violated the automatic stay, including attempting to terminate its contracts with the Debtor post-petition, rescinding a post-petition agreement with the Debtor, wrongfully retaining and using materials and equipment owned by the Debtor, diverting sums contractually owed to the Debtor to the Debtor's subcontractors (on account of their prepetition unsecured claims) without court order or the Debtor's consent, and refusing to provide an accounting to the Debtor.

1.2.3.2 After a trial on the merits of the Debtor's motion for sanctions against Balfour Beatty for having willfully violated the automatic stay, the Court entered an Order granting the Debtor's motion  [ECF #242] (the "Stay Violation Order").[2]  In the Stay Violation Order, the Court found, *inter alia,*

> that Balfour Beatty violated the automatic stay, that the violation was willful, and that the Debtor is entitled to compensatory damages for reasonable attorney's fees and costs, as well as punitive damages, which sums will be determined by further Order of this Court after an additional evidentiary hearing.

*Id.* at Page 2.

1.2.3.3 The Court has ordered Balfour Beatty and the Debtor to mediation in advance of a final evidentiary hearing on the amount of damages and sanctions.  Scott Shuker, Esq. has agreed to serve as mediator and the mediation is scheduled for November 16, 2023 at Gunster's

---

[2] Published at *See, In Re: Edgewater Construction Group, Inc.*, 653 B.R. 221 (Bankr.S.D. Fla. 2023).



Miami office.  The Debtor hopes that the parties will reach a consensual resolution at mediation, however, in the event that they are unable to do so, then the damages and sanctions portion of the case will proceed to a final evidentiary hearing.  The Debtor believes that Balfour Beatty will be ordered to pay 100% of Debtor's attorney's fees and costs related to the automatic stay violation (including time incurred leading up to and subsequent to trial on liability and trial on damages, a sum which the Debtor believes will be in excess of $250,000). Additionally, the Debtor believes that Balfour Beatty will be required to pay a material sum for punitive damages.

 1.2.3.4  As of the Petition Date, Balfour Beatty was indebted to the Debtor in an amount exceeding $165,000 on account of properly issued draw requests (plus additional sums for prepetition services and goods which Balfour Beatty prevented the Debtor from billing after the Petition Date).  Upon information and belief, the owners of the Balfour Beatty Projects paid Balfour Beatty for the invoices that were actually issued.  However, Balfour Beatty did not remit payment to the Debtor as it was required to do under the relevant contracts.  As a result, the Debtor provided notices to the respective owners of the Balfour Beatty Projects that Balfour Beatty had not paid Edgewater's invoices and thereafter, filed notices of lien against the subject properties as it was entitled to do under applicable Florida Law. Balfour Beatty now argues that it is entitled to assert an administrative claim against the Debtor for wrongfully filing the notice of lien. Balfour Beatty has argued that the Debtor should not have filed the notice of lien because the Debtor was on notice that when Balfour Beatty circumvented payment to the Debtor, paying a portion of the sums due to the Debtor instead to the Debtor's unsecured creditors (that provided materials to the Debtor to be used at the Balfour Beatty Projects), Balfour Beatty no longer owed the Debtor any money.  It is



now law of the case that Balfour Beatty, without relief from the automatic stay, diverted funds due to subcontractors of the Debtor.  As the Debtor had the right to do under applicable Florida law, it filed a claim of line on the Balfour Beatty project.   parties In a particularly blatant case of pot and kettle, Balfour Beatty did not pay amounts due to the Debtor on contracts it unlawfully attempted to terminate post-petition, and in flagrant violation of the automatic stay, but now wants an administrative claim under the so-called *Reading*[3] Doctrine because the Debtor had the temerity to exercise rights afforded to it under Florida law.  . For purposes of resolving the request for an administrative claim, the Debtor has repeatedly requested that Balfour Beatty quantify the amount of their asserted administrative claim, which requests have been declined. Additionally, Balfour Beatty has taken the position that confirmation of this Plan must be postponed (indefinitely) until such time as the State court rules on whether and in what amount Balfour Beatty is entitled to an administrative claim. This Court has already advised Balfour Beatty "that there's a tall hill to climb" with respect to its assertion of an administrative claim.[4]  Moreover, the Debtor believes that said assertion is a strategy meant to leverage the Debtor with the threat of putting off confirmation and its fresh start. Accordingly, the Debtor has filed a motion for summary judgment which it believes will dispose of the administrative claim request in advance of the date currently set for confirmation of this Plan. In the event that the Court denies the Debtor summary

---

[3] *Reading Co. v. Brown*, 391 U.S. 47188 S.Ct. 175920 L.Ed.2d 751 (1968)

[4] See Transcript of Hearing held on August 9, 2023 on ECF ## 15,172, and 173 (Page 59, Line 24).



judgment, the Debtor expects to file an expedited motion to estimate the asserted administrative claim and to establish an appropriate reserve until said claim is adjudicated.

1.2.4    Acqualina Projects:  Suffolk construction is the general contractor on these projects which for which substantially all of the work has been completed.  The Debtor has made demand and intends to pursue the owner's payment bond.  However, given the costs and uncertainty of litigation, the Debtor is unable to quantify the value of this asset. Upon information and belief, Suffolk has also commenced litigation against the project owner for payment.

1.2.5    The contracts governing the balance of the foregoing projects (the "Insured Projects") are secured by performance bonds issued by either QBE Insurance Group ("QBE") or United Fire & Casualty Company ("United Fire", and together with QBE Insurance Group, the "Sureties").  Early on, after the filing of the Subchapter V Case, the Debtor engaged the Sureties to discuss possible financing completion of the projects (a remedy that is available under the relevant bond contracts).

1.2.5.1 QBE Settlement:  The Debtor and QBE have engaged in extensive negotiations which have resulted in a global resolution of QBE's claims against the estate, the Debtor's Principals (as indemnitors of the Debtor) and provided a mechanism for cooperation among QBE, the Debtor/Reorganized Debtor, and the Debtor's Principals and support of this Plan.  A copy of the Settlement Agreement is attached hereto as **Exhibit "D"** and fully incorporated herein by reference (the "QBE Settlement").

1.2.5.2    United Fire:  United Fire declined the Debtor's request to finance completion of the projects. Indeed, United Fire has essentially ignored all requests from the Debtor to meet and confer about a potential resolution and cooperation agreement akin to the QBE Settlement.  Instead, upon information and belief, United Fire has already begun to



finance the completion of its bonded projects (See, e.g., ECF ## 308 and 338) without any input from the Debtor.  The Debtor believes that had the United Fire bridged the gap between payments by the project owners, the exposure to United Fire would have been materially mitigated. For instance, in the case of the projects where John Moriarty & Associates is the general contractor, their proposed cost of completion by using substitute subcontractors in some cases is three times greater than the underlying contracts with Edgewater.[5] United Fire's refusal to work with the Debtor to complete the work (and in the event that they cover the difference with the general contractors' substitute contractors) will undoubtedly increase the cost of completion and eat in to the Debtor's retainage.[6] Given the Debtor's rebuffed overtures to United Fire, the Debtor is left with no option but to object to United Fire's claim in the Subchapter V Case, but remains open to reach a resolution as it did with QBE. As such, the Debtor reserves all rights to contest any claim for indemnification brought by United Fire.

1.3    **Debtor's Liabilities.**    The Debtor's pre-petition liabilities are as detailed in Schedules D, E, F and G of the Bankruptcy Schedules [ECF# 98].

### ARTICLE II.  CLASSIFICATION OF CLAIMS AND INTERESTS

| CLASS | CLASS DESCRIPTION | IMPAIRMENT | VOTE ENTITLEMENT |
|-------|-------------------|------------|------------------|
| N/A | Administrative Claims and Administrative Expense Claims (described in Article 3.2.1) | Unimpaired | Presumed to accept and not entitled to vote |
| 1 | Allowed Priority Claims (claims entitled to priority status under 11 U.S.C. § 507 *et seq.* | Unimpaired | Presumed to accept and not entitled to vote |

---

[5] During the pendency of this case, the Debtor has commenced litigation against John Moriarty & Associates and will reserve causes of action related to the Project Receivables.  However, given the costs and uncertainty of litigation, the Debtor is unable to quantify the value of this asset, particularly since the Sureties hold a security interest in any recoveries from the bonded projects.

[6] The term "Retainage" refers to amounts due to Edgewater under the subject contracts which is customarily held back until completion of the project and represents Edgewater's potential profit.



| CLASS | CLASS DESCRIPTION | IMPAIRMENT | VOTE ENTITLEMENT |
|---|---|---|---|
| 2 | Allowed Secured Claims. | Unimpaired | Presumed to accept and not entitled to vote |
| 3 | Allowed General Unsecured Claims | Impaired | Entitled to vote |
| 4 | Equity | Impaired | Presumed to accept and not entitled to vote |

**All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

### ARTICLE III.<u>TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN</u>

3.1     **General Matter Regarding Classification and Treatment of Claims.**  Except to the extent the holder of an Allowed claim against or Allowed equity interest in the Debtor agree to accept different but lesser treatment, the treatment of Allowed claims and Allowed equity interests shall be as follows:

3.2     **Unclassified Claims**

3.2.1     **<u>Allowed Administrative Claims</u>.**  Administrative Claims include claims for costs or expenses of administering the Subchapter V Case, which are allowed under Section 503(b) of the Bankruptcy Code, fees payable to the clerk of the Bankruptcy Court that were incurred during the course of this Subchapter V Case and claims of estate professionals.  No motion or application is required to fix fees payable to the clerk's office, as those fees are determined by statute.  The Bankruptcy Code requires that Allowed Administrative Claims be paid on the Effective Date, unless a particular creditor agrees to different treatment.

3.2.2     The following chart lists the Debtor's **<u>estimated</u>** Administrative Claims (other than ordinary course of business expenses, which will be assumed and paid by the Reorganized Debtor in the ordinary course of):



| Administrative Claimant | Estimated Amount Owed[7] |
|---|---|
| Agentis PLLC, Counsel for the Debtor[8] | $350,000.00 |
| Carol Fox, Subchapter V Trustee | $ 25,000.00 |
| Frank Touron, P.A., Special Construction Counsel | $  5,000.00 |
| Dulce and Ulysses Vazquez | $ 75,000.00 |
| Potential Administrative Claim of Balfour Beatty | unliquidated |

### 3.3 Classified Claims

3.3.1 **Class 1. Allowed Priority Claims.** Upon information and belief, the Debtor does not have any Priority Claims. However, if a governmental unit files a timely proof of claim that is Allowed, the Debtor will pay said claim in full on the Effective Date or in installments pursuant to 11 U.S.C. § 1129(a)(9). Class 1 is not impaired, conclusively presumed to accept the Plan pursuant to 11 U.S.C. § 1126(f) and not entitled to vote.

3.3.2 **Class 2. Allowed Secured[9] Claims.** Each holder of an Allowed Secured Claim shall receive: (a) payment in full in cash on account of such Allowed Secured claim; (b) the collateral securing such Allowed Secured claim; or (c) such other treatment rendering such Allowed Secured claim unimpaired. Class 2 is unimpaired, conclusively presumed to accept pursuant to 11 U.S.C. § 1126(f), and not entitled to vote.

3.3.3 **Class 3. Allowed General Unsecured Claims.** Absent a net recovery to the

---

[7] (net of retainers as to estate professionals)

[8] (excludes amounts to be awarded by the Court related to the Balfour Beatty automatic stay violation)

[9] "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which the b a n k r u p t c y  estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured claim.



estate from the Project Receivables, it is anticipated that the Reorganized Debtor will have no Net Disposable Income (as defined in Article 5.2.1). However, in the event that the Reorganized Debtor realizes a recovery of any of the Project Receivables or any Retained Causes of Action, including the claims related to Balfour Beatty's violation of the automatic stay (described in Article 1.2.3, above), the Reorganized Debtor will commit 50% of every dollar collected (after payment of fees and costs associated therewith) to Class 3 on a *pro rata* basis. Class 3 is Impaired and entitled to vote.

3.2.1 **Class 4. Equity Interests in the Debtor.** Class 4 consists of (i) Equity Interests of Dulce and Ulysses Vazquez in Edgewater. On the Effective Date, the Equity Interests will be retained in the same amounts and character as they were held prior to the Petition. Class 4 is deemed to accept and not entitled to vote.

## ARTICLE IV.
## ALLOWANCE/DISALLOWANCE OF CLAIMS

4.1 **Disputed Claim:** A *disputed claim* is a claim that has not been allowed or disallowed [by a final non- appealable order], and as to which either:

4.1.2 a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

4.1.3 no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

4.1.4 **Delay of distribution on a disputed claim.** No distribution will be made on account of a disputed claim unless such claim is allowed [by a final non-appealable order].



4.1.5    **Settlement of disputed claims.**  The Reorganized Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure or submission of an agreed order.

4.2    **Allowed Claims:** A claim or interest that is Allowed (other than as determined by a final non-appealable order of this Court] includes:

4.2.2    a proof of claim to which no objection has been filed; or

4.2.3    a claim listed by the Debtor that has not been designated as contingent, disputed, or unliquidated.

4.3    **Claims Bar Date**: The deadline for filing proofs of claim for entities other than governmental entities was May 31, 2023.

**ARTICLE V.**

**FUNDING AND IMPLEMENTATION OF THIS PLAN**

5.1    **Vesting of Property of the Estate.**    On the Effective Date, all property of the Debtor not otherwise disposed of under the Plan, shall vest with the Reorganized Debtor.

5.2    **Sources of Funding Plan Payments.**  The Plan proposes to pay Allowed Claims to be paid under the Plan via a Plan Fund consisting of either, some, or all of the following: (i) Net Disposable Income (as defined in Article 5.2.1, below); and (ii) the commitment of all of the Debtor's Principals nonexempt assets to the Plan with an estimated net value of $422,320.00 (the "Vazquez Exit Contribution"), and any recovery from the Retained Causes of Action.[10]  Attached as **Exhibit "E"** is a schedule of the Debtor's Principals assets and liabilities (excluding their principal residence which is

---

[10] The Vazquez Exit Contribution is conditioned upon the issuance of releases described in Article 8.3.



exempt under Florida law and the mortgage thereon, which was used prepetition to fund Edgewater's operations; primarily labor costs).

5.2.1 **Net Disposable Income.** The Debtor's Net Disposable Income means all excess cash from the Debtor's income after: (i) payment in full of all Allowed Administrative Claims; (ii) payment in full of monthly ordinary course of business operating expenses; and (iii) a set aside of an operational reserve in the amount $150,000.00.

5.2.2 **Exit Financing.** The Reorganized Debtor may, in its discretion, consider obtaining exit financing for the purpose of pre-paying obligations under the Plan.

5.3 **Debtor's Operation Prior to Confirmation.** On or prior to the final hearing to consider confirmation of the Plan ("Confirmation Date"), the Debtor shall continue to operate its business, and pay its current expenses in the ordinary course of business. In addition, the Debtor shall continue to comply with the various other Orders entered by the Bankruptcy Court during the course of the Subchapter V Case.

5.4 **Events Occurring on or after the Effective Date.** The following events shall occur on or after the Effective Date: The Debtor (or Reorganized Debtor) shall tender payments due to creditors holding Allowed Administrative Claims and shall make such other payments on the Effective Date as are provided for in this Plan and other orders of this Court.

5.5 **Post-Effective Date Management of the Reorganized Debtor.** On and after the Effective Date, the business and affairs of the Reorganized Debtor shall be managed by the same managers that existed on the Petition Date. The Reorganized Debtor shall have full control and authority over the Property of the Estate of the Debtor, without the need for Bankruptcy Court approval pursuant to section 363 or 330 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, or United States trustee control or oversight, including but not limited to policy making, day-to-day



operations, financing, transactional, corporate governance, and any and all other corporate activity. As of the Effective Date, all property of the Debtor and its Estate shall be retained by the Reorganized Debtor, and the Reorganized Debtor shall continue operating in the ordinary course of business. Ulysses Vazquez will stay on as Edgewater's president and operations manager at his current salary of $165,000.00 per year and Dulce Vazquez will continue her role as Edgewater's vice-president, controller, and general manager at her current salary of $125,000.00 per year.

5.6    **Extinguishment of Guarantees**. On the Effective Date, and in accordance with the terms of the Plan, all guarantees of collection, payment or performance made by the Debtor shall be discharged, released, extinguished and of no further force or effect.

5.7    **Documents**. All necessary documents for the implementation of this Plan shall be executed and delivered by the Debtor, when possible, on or before the Effective Date. To the extent that the Debtor or any party in interest herein is unable to agree on the form or substance of such documents, such unresolved issues shall be submitted to the Court. Upon execution and delivery, all such documents shall be binding on the Debtor and Reorganized Debtor and all other parties subject to such documents.

5.8    **Payments.** On or as soon as practicable after the Effective Date, the Debtor shall commence payment of all amounts required to be paid on the Effective Date and according to the schedules provided in Article III of this Plan.

5.9    **Causes of Action.** Except to the extent any rights, claims, causes of action defenses, and counterclaims are expressly and specifically released in connection with this Plan or in any settlement agreement approved during the Subchapter V Case: (i) any and all causes of action or claims accruing to the Debtor or its estate shall remain assets of the Reorganized Debtor (subject to Article 5.1) whether or not litigation relating thereto is pending on the Effective Date, and whether or not any



such claims or causes of action have been listed or referred to in the Plan, or any other document filed with the Court, and the Debtor does not waive, release, relinquish, forfeit, or abandon (nor shall it be estopped or otherwise precluded or impaired from asserting) any claims, causes of action, or defenses that constitute property of the estates unless expressly provided for in the Plan.

5.10    **Possible Causes of Action after Confirmation**.  The Debtor has reviewed its books and records and is not aware of any potential causes of action other than the following non-exhaustive claims or potential claims (referred to collectively as (the "<u>Retained Causes of Action</u>): (a) a claim under Florida's bad check statute and turnover under section 524 of the Bankruptcy Code against Astoria Management Group, LLC and Marvin Castrillo; (b) a civil theft action against Balfour Beatty related to unlawful retention of the Debtor's equipment; (c) those relating to the Project Receivables and their respective underlying contracts including, without limitation, the performance bond and indemnity contracts to which the Sureties[11] area party, respectively, and related third party contractors with the Debtor's vendors and subcontractors, as well as claims for violations of the automatic stay pursuant to Section 362 of the Bankruptcy Code; and (d) any claims arising under Chapter 5 of the Bankruptcy Code identified by Subchapter V Trustee, Carol Fox, to be treated in accordance with the QBE Settlement.

5.11    The potential adverse party(ies) to Retained Causes of Action arising from the Project Receivables include but are not limited to:

|       |                              |
|-------|------------------------------|
| 5.11.1 | 444 Brickell Two, LLC;      |
| 5.11.2 | 2000 Biscayne Leasehold, LLC; |
| 5.11.3 | A3 Amenities, LLC;          |
| 5.11.4 | A3 Development, LLC;         |
| 5.11.5 | A3 Restaurants, LLC;        |

---

[11] Assuming the Court approves the QBE Settlement, this provision will apply solely to United Fire



| | |
|---|---|
| 5.11.6 | Alter Surety Group, Inc.; |
| 5.11.7 | ALV/Gazit Tampa, LLC; |
| 5.11.8 | Balfour Beatty Construction, LLC; |
| 5.11.9 | Beatty Construction, LLC; |
| 5.11.10 | Berkshire Hathaway Specialty Insurance Co; |
| 5.11.11 | Caribbean Fire & Associates, Inc. |
| 5.11.12 | CG Summer Investments, LP; |
| 5.11.13 | Chubb; |
| 5.11.14 | Coastal Construction; |
| 5.11.15 | Coastal Construction of Central Florida, LLC; |
| 5.11.16 | Coastal Construction of Miami Dade County, Inc.; |
| 5.11.17 | Consultatio Bal Harbour, LLC; |
| 5.11.18 | Federal Insurance Company; |
| 5.11.19 | Fidelity and Deposit Company of Maryland; |
| 5.11.20 | FTLFS Trust Florida, LP, as Trustee of the FTLFS Land Trust Dated November 25, 2019; |
| 5.11.21 | Gator Gypsum, Inc. d/b/a Olympia Building Supplies, Inc.; |
| 5.11.22 | GGT Flagler Limited Partnership; |
| 5.11.23 | John Abell Corporation; |
| 5.11.24 | John Moriarty & Associates, of Florida; |
| 5.11.25 | John Moriarty & Associates; |
| 5.11.26 | Liberty Mutual Insurance Company; |
| 5.11.27 | Moriarty; |
| 5.11.28 | NRQ Construction, Inc.; |
| 5.11.29 | Oceana Bal Harbour Condominium Association, Inc.; |
| 5.11.30 | PPF AMLI 45 Wynwood, LLC; |
| 5.11.31 | PMG-Greybrook Wynwood Trustee, LLC; |
| 5.11.32 | QBE Insurance Corporation;[12] |
| 5.11.33 | QBENA; |
| 5.11.34 | RD East Las Olas, LLC; |
| 5.11.35 | Riverwalk East Developments, LLC; |
| 5.11.36 | SO Global Construction Corp.; |
| 5.11.37 | Suffolk Construction Company, Inc., |
| 5.11.38 | Sunbelt Rentals, Inc., |
| 5.11.39 | Travelers Casualty and Surety Company of America; |
| 5.11.40 | United Fire & Casualty Company; |

---

[12] Assuming the Court approves the QBE Settlement, the terms thereof will govern the relationship between the Reorganized Debtor and QBE.



5.11.41    Zurich American Insurance Company; and

5.11.42    Zurich North America.

However, because all investigations and inquiries have not yet been completed, it is possible that there may be additional causes of action or parties not mentioned herein and no party should assume that any release or discharge provision contained in the Plan or the Confirmation Order will bar or otherwise inhibit the Reorganized Debtor from taking any action to prosecute or enforce such additional causes of action, which the Debtor and Reorganized Debtor reserve the right to pursue, including any causes of action arising under Chapter 5 of the Bankruptcy Code, of which the Debtor believes there are none.

5.12    **Post-Effective Date Fees and Expenses.**    From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of his business, be authorized to pay the reasonable fees and expenses of professionals thereafter incurred, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan without further notice or Order of this Court.

5.13    **Determination of Tax Liability**.    The Debtor or Reorganized Debtor, as the case may be, may seek determination of any tax liabilities pursuant to 11 U.S.C. § 505.    Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of note or equity securities under or in relation to this Plan, or the making or delivery of any instrument under, in furtherance of, or in connection with this Plan, including, without limitation, in connection with a transfer of any sale or transfer of any of the Assets, shall not be taxed under any law imposing a stamp or similar tax. Any sale of any of the Assets occurring after or upon the Effective Date shall be deemed to be in furtherance of this Plan.

**ARTICLE VI.**



## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    **Executory Contracts and Unexpired Leases**.  The Debtor is a party to several executory contracts and unexpired leases (all of which are listed on Schedule G of the Debtors Bankruptcy Petition).

6.2    The Debtor assumes the following executory contracts and unexpired leases as of the Effective Date:

| Contract Party | Nature of Contract | Cure Amount |
|---|---|---|
| Coastal Construction of Central Florida, LLC | Subcontract for Aston Martin Project | None; Assumed as modified per ECF 136 |

6.3    Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section Article 6.2 of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 30 days after the date of the order confirming this Plan.

## ARTICLE VII.
## GENERAL PROVISIONS

7.1    **Definitions and Rules of Construction**.  The definitions and rules of construction set forth in Sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the definitions listed in Appendix 1.

7.2    **Effective Date of Plan**.  The Effective Date of this Plan shall take place as soon as practicable after fifteen (15) days from the entry of a Final Order confirming this Plan (the "Confirmation Order").  If a stay of the Confirmation Order is in effect on that date, the Effective Date



will be the first business day after that date on which no stay of the Confirmation Order is in effect, provided that the Confirmation Order has not been vacated.

7.3    **Substantial Consummation**. Substantial consummation of this Plan shall be deemed to have occurred upon the payment in full of all Allowed Claims of estate professionals.

7.4    **Severability**.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

7.5    **Binding Effect**.  The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

7.6    **Captions**.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

7.7    **Controlling Effect**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Florida govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. In the event of any inconsistency between the Plans, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

7.8    **Non-Negotiated Checks**. If a holder of an Allowed Claim fails to negotiate a check issued to such holder pursuant to the Plan within one hundred-eighty (180) days of the date such check was issued, then the amount of cash attributable to such check shall be deemed to be unclaimed property in respect of such holder's Allowed Claim and shall be vested in, and transferred to, the Reorganized Debtor to be applied toward the funding of the Plan. In such event, such Holder's Claim shall no longer be deemed to be Allowed and such Holder shall be deemed to have waived its rights to



such payments or distributions under the Plan pursuant to Section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

       7.9     **Exoneration, Exculpation and Reliance**. The Debtor, the Reorganized Debtor, and its directors, officers, employees, agents, representatives, attorneys, accountants, and professionals (the foregoing parties are referred to collectively as the "Released Parties") shall not be liable to any party with respect to any action, omission, forbearance from action, decision or exercise of discretion taken during the period from the Petition Date to the Effective Date in connection with: (a) the management or operation of the Debtor; (b) the implementation of any of the transactions provided for, or contemplated in, the Plan or the Plan Documents; or (c) the administration of the Plan or the assets and property to be distributed pursuant to the Plan and the Plan Documents, other than for willful misconduct or gross negligence. Any actions taken hereunder shall be governed, in all respects, by the principles established by the United States Supreme Court in *Barton v. Barbour*, 104 U.S. 126 (1881) as adopted by the Eleventh Circuit and its progeny in *Lawrence v. Goldberg*, 573 F.3d 1265 (11th Cir. 2009). The Debtor and the Reorganized Debtor may rely upon the opinions of counsel, certified public accountants and other experts or professionals employed by the Debtor and the Reorganized Debtor, respectively, and such reliance shall conclusively establish good faith and the absence of willful misconduct. In any action, suit or proceeding by any party in interest contesting any action by, or non-action of, the Debtor, the Reorganized Debtor, and their agents, attorneys, and professionals as not being in good faith, the reasonable attorneys' fees and costs of the prevailing party shall be paid by the losing party. The rights granted under this Article are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that Released Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. This exculpation from liability provision is an integral part



of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article shall not release or be deemed a release of any of the Retained Causes of Action.

## ARTICLE VIII.
## DISCHARGE AND RELEASES

8.1    **Discharge of Debt**.

8.1.1    If this Plan is confirmed under § 1191(a), on the Effective Date of the Plan, Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code. Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.  If this Plan is confirmed under § 1191(b), as soon as practicable after completion by the Debtor of all payments due within the first 3 years of the Plan, or such longer period not to exceed 5 years as the Court may fix, unless the Court approves a written waiver of discharge executed by Debtors after the order for relief under this chapter, the Court shall grant Debtor a discharge of all debts provided in section 1141(d)(1)(A), and all other debts allowed under section 503 and provided for in the Plan, except any debt (1) on which the last payment is due after the first 3 years of the Plan, or such other time not to exceed 5 years fixed by the Court; or (2) of the kind specified in section 523(a).

8.2    **General Releases and Injunctions.  As of the Effective Date, except for the Debtor's express obligations under the Plan, (including guaranties, pledges, and security agreements to be executed post-confirmation), and causes of action that do not arise until the Petition Date, the Debtor and the Reorganized Debtor, and their respective present and former**



affiliates, successors, professionals, and their respective heirs, executors, administrators, and assigns, are hereby released and discharged from any and all claims, causes of action, demands, liabilities, losses, damages, whether known or unknown, under federal, state or other law, that arose after the Petition Date and prior to the Effective Date in connection with any matter arising from or relating to the Debtor, excepts for any acts or omissions resulting from fraud or gross negligence.

8.3    **Bar Order pursuant to *In re Seaside Engineering & Surveying, Inc.*[13] THIS ARTICLE 8.3 APPLIES SOLELY TO PARTIES THAT HAVE OR ARE ENTITLED TO BRING CLAIMS AGAINST THE DEBTOR'S PRINCIPALS IN THEIR CAPACITIES AS INDEMNITORS, OBLIGORS OR GUARANTORS.  As such, the Debtor believes that only those parties with such claims have standing to object to the relief set forth in this Article 8.3.   As long as the Reorganized Debtor is not in default under the Plan (and with respect to QBE, under the QBE Settlement), the holders of Allowed Claims shall be permanently enjoined and forever barred from taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Debtor's Principals of such obligations; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor's Principals; and (c) creating, perfecting or enforcing any lien or encumbrance against the Debtor's Principals. The Debtor's Principals shall have the right to independently seek enforcement of this injunction provision.**

8.3.1    The Sureties.  Under the Plan, the Sureties retain their first priority interest in any receipts related to their respective Insured Projects and are entitled to payment of proceeds

---

[13] **780 F.3d 1070 (11th Cir.2015)**



thereon to the extent that either of the Sureties have incurred any costs related thereto, subject to the rights of the Debtor and Reorganized Debtor to object to the application by United Fire of the Project Receivables. **Because the Debtor's Principals are committing 100% of their non-exempt assets to the Plan and as long as the Reorganized Debtor is not in default under the terms of the Plan (and with respect to QBE, the terms of the QBE Settlement), the Sureties shall be enjoined from pursuing the guarantors or indemnitors under the respective bonds of any such obligations as provided in this Section 8.3.**The foregoing injunctions and bars are justified in this case based on the following non-exclusive factors:

> 8.3.1.1 An identity of interests between the Debtor and the Debtor's Principals, such that a suit against the Debtor's Principals is, in essence, a suit against the Debtor or will deplete the assets of the estate. In this case, the Debtor's Principals are obligated to indemnify the Sureties (which have filed claims totaling over $17 million) and have personally guaranteed or are the primary borrowers of credit cards used solely for the Debtor's business operations.

> 8.3.1.2 The Debtor's Principals are committing 100% of the value of their non-exempt assets to this Plan, in addition to their commitment of labor and time to the reorganization of the Debtor.

> 8.3.1.3 The instant injunction is essential to reorganization; namely, the reorganization hinges on the Debtor being free from indirect suits against parties who would have indemnity or contribution claims against the Debtor.

*See, Id.*

8.4     **Term of Injunctions and the Automatic Stay**. Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, the injunctions described in Article 8 herein shall remain in full force and effect following the Effective Date. All other injunctions or automatic stays provided for in the Reorganization Case pursuant to Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

<h2 style="text-align:center">ARTICLE IX.</h2>
<h2 style="text-align:center">RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT.</h2>



9.1     The Bankruptcy Court shall retain jurisdiction of these proceedings after the Confirmation Date of this Plan until the entry of a final decree pursuant to Bankruptcy Rule 3022 for the following purposes:

9.1.1     To enable the Debtor and the Reorganized Debtor to consummate the Plan and any amended or modified Plan and to resolve any disputes arising with respect thereto;

9.1.2     To enable the Debtor and the Reorganized Debtor to consummate any and all proceedings that it may bring prior to the entry of the Confirmation Order;

9.1.3     To determine all controversies relating to or concerning the classification, subordination, allowance, valuation, or satisfaction of Claims;

9.1.4     To liquidate or estimate for purposes of allowance all contested, contingent, or unliquidated Claims;

9.1.5     To determine the validity, extent, and priority of all liens, if any, against property of the estate;

9.1.6     To determine all assertions or an ownership interest in, the value of, or title to, any property of the estate;

9.1.7     To determine all applications for compensation and reimbursement and objections to Administrative Claims;

9.1.8     To determine all (1) adversary proceedings, contested or litigation matters brought before the Bankruptcy Court; and, (2) any and all claims or Causes of Action asserted by the Debtor, either by and through the Debtor or Reorganized Debtor;

9.1.9     Without limiting the generality of the preceding paragraph, to determine any Avoidance Action brought by the Debtor or the Reorganized Debtor;



9.1.10    To determine all controversies arising out of any purchase, sale, or contract made or undertaken by the Debtor prior to the Confirmation Date;

9.1.11    To enforce all agreements assumed, if any, and to recover all property of the estate, wherever located;

9.1.12    To determine any tax liability of the estate in connection with the Plan, actions taken, distributions, or transfers made thereunder;

9.1.13    To enforce the terms of the Plan including any and all releases and injunctions created pursuant to the terms of the Plan;

9.1.14    To modify the Plan or to remedy any defect or omission or reconcile any inconsistencies in the Plan either before or after the entry of the Confirmation Order;

9.1.15    To hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation or enforcement of the Plan;

9.1.16    To make such orders as are necessary or appropriate to carry out the provisions of the Plan.

## ARTICLE X.
## <u>MODIFICATIONS TO THE PLAN</u>

The Debtor may propose amendments or modifications to the Plan at any time prior to the Confirmation Date without leave of the Bankruptcy Court. After the Confirmation Date, parties in interest may, with Bankruptcy Court approval and so long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in



the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan.

## ARTICLE XI
## AMENDMENT OF CLAIMS

Claimants shall not be permitted to amend or otherwise modify any Claim after the Confirmation Date without leave of the Bankruptcy Court.

## ARTICLE XII
## VOTING DEADLINE, AND RECOMMENDATION FOR ACCEPTANCE OF THE PLAN

12.1    Under the Plan, all creditors and interest holders of Debtor will participate in some manner in the distribution to be made thereunder and receive more than they would otherwise be entitled to receive if the case converted to a case under Chapter 7.  The Debtor believes that the treatment to Allowed Claims contemplated in this Plan is fair and affords all claimants and interest holders equitable treatment.

12.2    The deadline established by this Court pursuant to Local Rule 3018-1(B) to file a ballot accepting or rejecting the Plan is **December 6, 2023.**  The Debtor will provide a copy of a ballot to all holders of Allowed Claims in Class 3 contemporaneously herewith.  If you have not received a ballot and believe you are entitled to vote to accept or reject the Plan, please contact the undersigned counsel at jc@agentislaw.com.

12.3    Accordingly, the Debtor recommends that all holders of Allowed claims vote to accept the Plan.

### --- REMAINDER OF PAGE LEFT INTENTIONALLY BLANK ---



Respectfully submitted on November 3, 2023 by:

**Edgewater Construction Group, Inc.**

_____

Ulysses Vazquez, its President

_/s/ Jacqueline Calderin_____
   Jacqueline Calderin
    jc@agentislaw.com
    Florida Bar Number 134414
    Agentis PLLC
    Attorneys for the Debtor in Possession
    45 Almeria Avenue
    Coral Gables, FL 33134
    T. 305.722.2002



**Appendix 1**

The following is a list of terms defined within this Plan, along with the location of respective definitions:

| Defined Term | Location |
|---|---|
| 6962 Office Condo | Article 3.3.4 |
| Administrative Claims | Article 3.2.1 |
| Allowed | Article 4.2 |
| Balfour Beatty Projects | Article 1.2.3 |
| Claims Bar Date | Article 4.3 |
| Confirmation Date | Article 5.4 |
| Confirmation Order | Article 7.2 |
| Debtor | Preamble |
| Debtor's Principals | Background § A |
| Effective Date | Article 7.2 |
| Equity Interests | Article II |
| Final Order | Article 6.4 |
| General Unsecured Claims | Article II |
| Insured Projects | Article 1.2.5 |
| Liquidation Value | Article 1.9 |
| Net Disposable Income | Article 5.2.1 |
| Petition Date | Background § B |
| Plan | Preamble |
| Priority Claims | Article II |
| Project Receivables | Article 1.2.1 |
| Projections | Background § D |
| QBE | Article 1.2.5 |
| QBE Settlement | Article 1.2.5.1 |
| Released Parties | Article 7.9 |
| Reorganized Debtor | Article 3.2.1 |
| Retained Causes of Action | Article 5.10 |
| Secured | Article 3.3.2 |
| Subchapter V Case | Background |
| Substantial Consummation | Article 7.3 |
| Sureties | Article 1.2.5 |
| United Fire | Article 1.2.5 |
| Vazquez Exit Contribution | Article 5.2 |



**Exhibit "A"**

## Liquidation Analysis*

| | | |
|---|---|---:|
| Total value of all assets | $ | 198,534.50 |
| Less secured claims (excluding claims of Sureties) | $ | (167,134.50) |
| **Unencumbered value** | $ | **31,400.00** |
| Less hypothetical Chapter 7 trustee fees | $ | (40,000.00) |
| Less hypothetical costs of sale (commission & marketing expenses) | $ | (29,780.18) |
| Less hypothetical Chapter 7 professional fees/exp | $ | (15,000.00) |
| Less Chapter 11 Administrative Claims | $ | (375,000.00) |
| **NET LIQUIDATION VALUE TO ESTATE** | $ | **(459,780.18)** |

*Refer to Exhibit C for breakdown of assets and claims/encumbrances

Exhibit 18

## Small Business Cash Flow Projection

**Edgewater Year 1**

Starting date | Jan-24

| | Beginning | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash on hand (beginning of month)** | 150,000 | 150,000 | 120,018 | 16,614 | 10,335 | 4,056 | 216,277 | 213,998 | 211,719 | 209,440 | 207,161 | 204,882 | 202,603 | |
| **CASH RECEIPTS** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| Receipts | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 600,000 |
| Sale of Insiders 39 ft boat | | | | | | 300,000 | | | | | | | | 300,000 |
| Sale of Insiders 25 ft boat | | | | | | 80,000 | | | | | | | | 80,000 |
| Sale of scaffolding | | | | | | 100,000 | | | | | | | | |
| Sale of Office Condo | | | | | | 500,000 | | | | | | | | 500,000 |
| Non Exempt Insider Cash | | 50,000 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | | 50,000 |
| | | | | | | | | | | | | | | 0 |
| **TOTAL CASH RECEIPTS** | | 100,000 | 50,000 | 50,000 | 50,000 | 1,030,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 1,530,000 |
| **Total cash available** | 150,000 | 250,000 | 170,018 | 66,614 | 60,335 | 1,034,056 | 266,277 | 263,998 | 261,719 | 259,440 | 257,161 | 254,882 | 252,603 | |
| **CASH PAID OUT** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| Materials | | 6,750 | 6,750 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 63,500 |
| Labor | | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Payroll | | 32,500 | 32,500 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 227,500 |
| Payroll tax | | 3,250 | 3,250 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 22,750 |
| Insurance (other than health) | | 5,000 | 5,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,000 |
| Office expense | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Vehicle expense | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Utilities | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Triple Net Rent | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| De Lage Financial Services | | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 10,200 |
| SBA | | 5,000 | 5,000 | 5,000 | 5,000 | 71,500 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 98,500 |
| Tax reserve (NOTE 1) | | | | | | | | | | | | 4,500 | | 4,500 |
| Miami Dade County Tax Collector | | 1,578 | | | | | | | | | | | | 1,578 |
| Ally Bank | | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 648 |
| La Victoire Finance | | | | | | 220,000 | | | | | | | | 220,000 |
| Allowed Administrative Claims | | 50,000 | | | | 400,000 | | | | | | | | 450,000 |
| Post-confirmation professional fees | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **SUBTOTAL** | | 129,982 | 78,404 | 56,279 | 56,279 | 742,779 | 52,279 | 52,279 | 52,279 | 52,279 | 52,279 | 56,779 | | 1,434,176 |
| **CASH PAID OUT** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| operating cash | | | 75,000 | | | 75,000 | | | | | | | | 150,000 |
| | | | | | | | | | | | | | | 0 |
| **TOTAL CASH OUTLAY** | | 129,982 | 153,404 | 56,279 | 56,279 | 817,779 | 52,279 | 52,279 | 52,279 | 52,279 | 52,279 | 56,779 | | 1,584,176 |
| **Cash on hand (end of month)** | 150,000 | 120,018 | 16,614 | 10,335 | 4,056 | 216,277 | 213,998 | 211,719 | 209,440 | 207,161 | 204,882 | 202,603 | 195,824 | |
| **OTHER OPERATING DATA** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Note 1: (.0075% of revenue) | | | | | | | | | | | | | | |
| Note 2: average operating costs for 60 days = approx. $150,000) | | | | | | | | | | | | | | |

Exhibit "B"

## Small Business Cash Flow Projection

### Edgewater Year 2

Starting date | Jan-25

| | Beginning | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash on hand (beginning of month)** | 195,824 | 195,824 | 175,120 | 154,416 | 155,837 | 157,258 | 158,679 | 160,100 | 161,521 | 162,942 | 164,363 | 165,784 | 167,205 | |

| **CASH RECEIPTS** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 600,000 |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | 0 |
| **TOTAL CASH RECEIPTS** | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 600,000 |
| **Total cash available** | 195,824 | 245,824 | 225,120 | 204,416 | 205,837 | 207,258 | 208,679 | 210,100 | 211,521 | 212,942 | 214,363 | 215,784 | 217,205 | |

| **CASH PAID OUT** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Materials | | 6,750 | 6,750 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 63,500 |
| Labor | | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Payroll | | 32,500 | 32,500 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 227,500 |
| Payroll tax | | 3,250 | 3,250 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 22,750 |
| Insurance (other than health) | | 5,000 | 5,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,000 |
| Office expense | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Vehicle expense | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Utilities | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Triple Net Rent | | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 123,600 |
| De Lage Financial Services | | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 10,200 |
| SBA | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Tax reserve (NOTE 1) | | | | | | | | | | | | | 4,500 | 4,500 |
| Post-Confirmation Prof Fees | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Ally Bank | | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 648 |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **SUBTOTAL** | | 70,704 | 70,704 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 53,079 | 631,698 |

| **CASH PAID OUT** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| operating cash | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | 0 |
| **TOTAL CASH  OUTLAY** | | 70,704 | 70,704 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 48,579 | 53,079 | 631,698 |
| **Cash on hand (end of month)** | 195,824 | 175,120 | 154,416 | 155,837 | 157,258 | 158,679 | 160,100 | 161,521 | 162,942 | 164,363 | 165,784 | 167,205 | 164,126 | |

| **OTHER OPERATING DATA** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Note 1: (.0075% of revenue) | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

## Small Business Cash Flow Projection

**Edgewater Year 3**

Starting date | Jan-26

| | Beginning | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash on hand (beginning of month)** | 164,126 | 164,126 | 144,113 | 124,100 | 126,212 | 128,324 | 130,436 | 133,548 | 136,660 | 139,772 | 142,884 | 145,996 | 149,108 | |
| | | | | | | | | | | | | | | |
| **CASH RECEIPTS** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| Receipts | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 600,000 |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | 0 |
| **TOTAL CASH RECEIPTS** | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 600,000 |
| **Total cash available** | 164,126 | 214,126 | 194,113 | 174,100 | 176,212 | 178,324 | 180,436 | 183,548 | 186,660 | 189,772 | 192,884 | 195,996 | 199,108 | |
| | | | | | | | | | | | | | | |
| **CASH PAID OUT** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| Materials | | 6,750 | 6,750 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 63,500 |
| Labor | | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Payroll | | 32,500 | 32,500 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 227,500 |
| Payroll tax | | 3,250 | 3,250 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 22,750 |
| Insurance (other than health) | | 5,000 | 5,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,000 |
| Office expense | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Vehicle expense | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Utilities | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 11,000 |
| Triple Net Rent | | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 10,609 | 127,308 |
| De Lage Financial Services | | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 10,200 |
| SBA | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Tax reserve (NOTE 1) | | | | | | | | | | | | | 4,500 | 4,500 |
| | | | | | | | | | | | | | | |
| Ally Bank | | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 648 |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **SUBTOTAL** | | 70,013 | 70,013 | 47,888 | 47,888 | 47,888 | 46,888 | 46,888 | 46,888 | 46,888 | 46,888 | 46,888 | 51,388 | 616,406 |
| **CASH PAID OUT** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| operating cash | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | 0 |
| **TOTAL CASH OUTLAY** | | 70,013 | 70,013 | 47,888 | 47,888 | 47,888 | 46,888 | 46,888 | 46,888 | 46,888 | 46,888 | 46,888 | 51,388 | 616,406 |
| **Cash on hand (end of month)** | 164,126 | 144,113 | 124,100 | 126,212 | 128,324 | 130,436 | 133,548 | 136,660 | 139,772 | 142,884 | 145,996 | 149,108 | 147,720 | |
| | | | | | | | | | | | | | | |
| **OTHER OPERATING DA** | | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | Column12 | Total |
| | | | | | | | | | | | | | | |
| Note 1: (.0075% of revenue) | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

**Exhibit "C"**

### Edgewater Assets and Encumbrances

| Lobby  Room Description of Property | Value Amount | 1st Priority Claimant | Value securing Claim | 2nd Priority Claimant | Value securing Claim | Net value to estate |
|---|---|---|---|---|---|---|
| 3-Wooden Chairs | $          50.00 | | | | | |
| 1-decorative table | $          15.00 | | | | | |
| 2-Candle Sticks | $          10.00 | | | | | |
| 1- Plastic plant | $           5.00 | | | | | |
| 1- Call bell | $           1.00 | | | | | |
| **Reception Description of  Property** | | | | | | |
| 1- Desk | $          65.00 | | | | | |
| 1- labtop | $         150.00 | | | | | |
| 1-Misc Stationony | $          25.00 | | | | | |
| 1-Small Sofa | $          50.00 | | | | | |
| 3-Four drawer file cabinet | $         150.00 | | | | | |
| 2-Accent Chair | $          40.00 | | | | | |
| 1-small coffee table | $          15.00 | | | | | |
| 1-2 drawer file cabinet | $          25.00 | | | | | |
| 1-HP small printer | $          50.00 | | | | | |
| 1-Plastic plant | $           5.00 | | | | | |
| **Kitchen Description of Property** | | | | | | |
| 1-Refrigerator | $         150.00 | | | | | |
| 1-toaster oven | $          20.00 | | | | | |
| 1-Hot Plate | $          20.00 | | | | | |
| 1-Keurig coffee machine | $          30.00 | | | | | |
| 1-Tea pot | $          10.00 | | | | | |
| 1-round lunch table | $          25.00 | | | | | |
| 4-Metal/Plastic chairs | $          10.00 | | | | | |
| 1- Portable coffee cabinet | $          20.00 | | | | | |
| 22-coffee mugs | $          15.00 | | | | | |
| 1-set utinzels | $          10.00 | | | | | |
| 4- wall art kitchen | $           5.00 | | | | | |
| **Bathroom Description of Property** | | | | | | |
| decorative metal stand | $          25.00 | | | | | |
| papertowel holder | $           2.00 | | | | | |
| waste basket | $           2.00 | | | | | |
| rug | $           2.00 | | | | | |
| **Broom Closet Description of Property** | | | | | | |
| 2-brooms | $           1.00 | | | | | |
| 1-vacuum | $          25.00 | | | | | |
| 2-mops heads | $           2.50 | | | | | |
| 1-bucket | $           5.00 | | | | | |
| 1-Assorted Cleaning Products | $          15.00 | | | | | |
| 1-Box christmas decorations | $          25.00 | | | | | |
| 1- Plastic Christmas tree small | $          10.00 | | | | | |
| **Conference Room Description of Property** | | | | | | |
| conference table | $         225.00 | | | | | |
| 8-Metal& imitaion leather chairs | $         200.00 | | | | | |

| Description | Amount | | | | |
|---|---|---|---|---|---|
| 3- Corner L shaped desk | $ 450.00 | | | | |
| 3- desk mesh chairs | $ 75.00 | | | | |
| 2-hp printers | $ 200.00 | | | | |
| 3- desktop computer/with screen | $ 600.00 | | | | |
| 2-Project plans holder | $ 50.00 | | | | |
| 1-misc stationing | $ 100.00 | | | | |
| 3- desk top calculator | $ 30.00 | | | | |
| 2- electric pencil sharpeners | $ 10.00 | | | | |
| 2- Large plans stapler | $ 15.00 | | | | |
| 1 Flat screen tv 58" | $ 200.00 | | | | |
| 3-waste basket | $ 6.00 | | | | |
| 1-dry eraser board | $ 10.00 | | | | |
| 3-3  hole puncher | $ 20.00 | | | | |
| **Project Mgr's Office Description of Property** | | | | | |
| 2- height adjustable desk | $ 150.00 | | | | |
| desktop computer/w screens | $ 225.00 | | | | |
| Plan file cabinet | $ 50.00 | | | | |
| Assorted stationary | $ 20.00 | | | | |
| flat screen TV 27" | $ 40.00 | | | | |
| 1- waste basket | $ 5.00 | | | | |
| 1-wooden chair | $ 10.00 | | | | |
| 1-black rolling chair | $ 25.00 | | | | |
| HP printer | $ 100.00 | | | | |
| **Ulysses's Office Description of Property** | | | | | |
| 1-Credenza U-desk bridge& Hutch | $ 300.00 | | | | |
| 1-Credenza | $ 100.00 | | | | |
| 1- waste basket | $ 5.00 | | | | |
| 1-shedder | $ 25.00 | | | | |
| 1-rolling black chair | $ 125.00 | | | | |
| 2-bamboo chairs | $ 15.00 | | | | |
| 1-phone (leased) | | | | | |
| 2-monitors | $ 60.00 | | | | |
| 1-computer | $ 125.00 | | | | |
| 1-webcam | $ 25.00 | | | | |
| HP printer | $ 100.00 | | | | |
| **Accounting Office Description of Property** | | | | | |
| 7- height adjustable desks | $ 700.00 | | | | |
| 6- desktop screens(monitors) | $ 240.00 | | | | |
| 3-Computers | $ 300.00 | | | | |
| 3-Black rolling chairs | $ 100.00 | | | | |
| 1-wooden chair | $ 25.00 | | | | |
| 1-shedder | $ 25.00 | | | | |
| 1-scanners Brothers | $ 50.00 | | | | |
| 2-printers | $ 100.00 | | | | |
| 1-black 5 drawer filing cabinet | $ 100.00 | | | | |
| 2-green 5 drawer filing cabinet | $ 200.00 | | | | |
| 2-Black 2 drawer filing cabinet | $ 60.00 | | | | |
| 1-safe - 2 drawer | $ 50.00 | | | | |
| 2- small 2 drawer filing cabinet | $ 50.00 | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2- phones (leased) | | | | | | |
| 3-waste baskets | $ | 15.00 | | | | |
| **Supply Storage Room - Description of Property** | | | | | | |
| 2- 4 drawer filing cabinets | $ | 75.00 | | | | |
| 1-5 drawer filing cabinet | $ | 100.00 | | | | |
| 1-floatingg 5 shelves | $ | 40.00 | | | | |
| 1-5 metal shelf rack | $ | 25.00 | | | | |
| 1-5 wood shelf rack | $ | 25.00 | | | | |
| L Gloves 5 bags | $ | 45.00 | | | | |
| M gloves 4 bags | $ | 45.00 | | | | |
| Masks 7 boxes 50 masks | $ | 60.00 | | | | |
| 3M masks 9 boxes 10 masks | $ | 70.00 | | | | |
| 18 boxes-Radians Clear glasses18 boxes 12 pairs each box | $ | 40.00 | | | | |
| 22 boxes-Radians smoke glasses 12 pairs | $ | 50.00 | | | | |
| 7-box Red Tags | $ | 50.00 | | | | |
| 1 box 12 glasses | $ | 3.00 | | | | |
| 1 sharp EL-1750V calulator | $ | 25.00 | | | | |
| 100 pck of shoe covers | $ | 35.00 | | | | |
| 21pck 6 lanyards-Squids hard hat lanyards | $ | 250.00 | | | | |
| 7- bags Frontline Fall Protection | $ | 100.00 | | | | |
| 1-Full body protection | $ | 100.00 | | | | |
| Contract Receivables (NOTE 1) | $ | - | | | | |
| **TOTAL OF ALL ASSETS LISTED ABOVE** | $ | 7,934.50 | US SBA | | Banesco | 0.00 | 0.00 |
| **Field Equipment-Description of Property** | | | | | | |
| Scaffolding | $ | 125,000.00 | US SBA | | Banesco | 0.00 | 0.00 |
| Misc. hand tools | $ | 600.00 | US SBA | | Banesco | 0.00 | 0.00 |
| **TOTAL ENCUMBERED ASSETS (NOTE 2)** | **$** | **133,534.50** | **US SBA** | **$** | **133,534.50** | **Banesco** | **0.00** | **0.00** |
| **Purchase Money Secured Assets** | | | | | | |
| Truck Mounted Forklift | $ | 33,600.00 | De Lage Landen | $ | 33,600.00 | | 0.00 |
| | | | | | | |
| | | | | | | |
| **Assets owned free and clear** | | | | | | |

**Note 1** Collectibility of contract receivables is speculative and contingent; subject to claims of setoff and/or recoupment. Accordingly, Debtor ascribes no value to the receivable

**Note 2  Balances due as of Petition Date:**
    US SBA $150,000;  Banesco $411,000

**Exhibit "D"**

## GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement ("Settlement Agreement") is entered into as of November --, 2023, by and among (i) Ulysses Vazquez and Dulce Vazquez (each an "Edgewater Individual" and, collectively, the "Edgewater Individuals"), (ii) Edgewater Construction Group, Inc. (the "Debtor,") and, (iii) QBE Insurance Group, Inc. ("QBE", and collectively with the Debtor and the Edgewater Individuals, the "Parties", and each individually a "Party").

## RECITALS

WHEREAS, on March 22, 2023, the Debtor filed a voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy Code (the "Petition Date") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), Case No. **23-12217-LMI** (the "SubV Case");

WHEREAS, the Edgewater Individuals are the sole shareholders and principals of the Debtor;

WHEREAS, QBE timely filed Proof of Claim No. 24 in the SubV Case in the amount of $10,007,382.24 (the "QBE Claim");

WHEREAS, prior to the Petition Date, QBE issued surety bonds on behalf of or at the request of the Debtor to secure the Debtor's performance and payment, which bonds include an indemnity agreement, are attached as exhibits to the QBE Claim, are incorporated herein by reference, and are collectively referred to as the "Bond Documents";

WHEREAS, on June 20, 2023, the Debtor filed its Plan of Reorganization [ECF# 177] (the "Plan", which term includes amendments(s) subsequent to the execution of the Settlement Agreement incorporating the terms herein and in conformity herewith);

WHEREAS, the Plan provides for the post-confirmation retention of the Edgewater Individuals in their current management and operational roles;

WHEREAS, QBE asserts certain rights against the Debtor, assets of the Debtor's estate, and the Edgewater Individuals, respectively, stemming from the QBE Claim;

WHEREAS, the Plan includes broad releases of Edgewater Individuals as partial consideration for their commitment of all of their non-exempt assets (the "Vazquez Exit Contribution");

WHEREAS, the Vazquez Exit Contribution is a material source of funding under the Plan;

WHEREAS, the Debtor believes grounds exist to dispute the allowance of the QBE Claim as filed in the SubV Case;

WHEREAS, QBE believes that the Debtor may have claims against the Edgewater Individuals under Chapter 5 of the Bankruptcy Code, which, if recovered, could benefit the Debtor's estate (the "Potential Insider Claims");

WHEREAS, the Edgewater Individuals deny liability for the Potential Insider Claims;

WHEREAS, the QBE Claims arise, in material part, from claims of third parties related to contracts for goods or services with the Debtor for which they seek payment from QBE (collectively, the "Bond Claims", and each a "Bond Claim");

WHEREAS, QBE requires cooperation from the Debtor and the Edgewater Individuals to assess and potentially defend the Bond Claims;

WHEREAS, the Debtor requires the Edgewater Individuals' services post-confirmation in order to operate the business, preserve enterprise value, and pursue any claims or causes of action reserved in the Plan; and

WHEREAS, the Parties now seek to reach a consensual resolution of the potential claims and causes of actions set forth herein in order to avoid costly and time-consuming litigation and to attempt to maximize the value of the Debtor's estate.

NOW, THEREFORE, in consideration of the mutual promises and releases contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1) **Approval Process.** As soon as practicable after the execution of this Settlement Agreement, the Debtor shall file a motion seeking the Bankruptcy Court's approval of this Settlement Agreement (the "9019 Motion").

2) **Bankruptcy Court Approval Required.** The Parties agree and acknowledge that this Settlement Agreement is contingent upon and shall be binding on the Parties only after the issuance of an order by the Bankruptcy Court approving this Settlement Agreement (the "9019 Approval Order").

3) **Cooperation with the Estate and QBE.** The Edgewater Individuals agree to cooperate and assist the Debtor and QBE before and for a period of 24 months (subject to reasonable extensions upon agreement by the Parties) following the effective date of the Plan with any dispute or litigation relating to the Bond Claims; (the "Cooperation Requirement"), as set forth herein.

(a) The Parties agree to convene a prescheduled call for a period of ninety (90) minutes every other week, which time and place may be rescheduled among agreement of the Parties to accommodate the Parties' respective schedules. The Parties will coordinate to ensure that the Debtor and QBE receive the cooperation they need

2

consistent with the schedules of the Edgewater Individuals. The Parties will take reasonable steps to accommodate each other's respective schedules.

(b)  Specifically, the Edgewater Individuals agree to provide up to 8 hours per month cooperating with QBE and the Debtor's estate without any further compensation beyond the terms described in the Plan and this Settlement Agreement.  Any time spent actually testifying (at deposition or trial) or formally preparing for such testimony shall not count toward the foregoing number of hours of cooperation.

(c)  At the request of the Debtor or QBE, each Edgewater Individual shall provide a log of hours such Edgewater Individual has spent towards the Cooperation Requirement on at least a monthly basis. Such information may be provided in any written format, including an informal email. If there is a dispute concerning the hours reported by any Edgewater Individual, including a claim by the Debtor or QBE that an Edgewater Individual has not provided the required reporting, the Debtor and that Edgewater Individual shall confer in good faith to attempt to resolve such dispute. To the extent they are unable to resolve such dispute, the issue may be raised with the Bankruptcy Court for resolution.

(d)  If any Edgewater Individual completes the required number of hours of cooperation, the Debtor, QBE, and that Edgewater Individual may agree for that Edgewater Individual to provide further cooperation on terms mutually agreed to. The Bankruptcy Court shall retain jurisdiction to resolve any dispute if the Parties cannot reach agreement on modified terms.

(c)  For the avoidance of doubt, the Cooperation Requirement shall not preclude the Edgewater Individuals from taking alternative full-time employment post-confirmation of the Plan and during the time the Cooperation Requirement is effective.

(d)  To the extent the Debtor or any Edgewater Individual incurs reasonable and documented out-of-pocket expenses in the course of their respective cooperation with QBE related to the Bond Claims, such reasonable costs will be reimbursed by QBE. For avoidance of doubt, the foregoing costs include, without limitation, court costs, legal fees and costs, and litigation-related incurrences.

(e)  The Debtor and Edgewater Individuals agree to confer with and consult with QBE in good faith regarding the resolution of any and all Bond Claims, including, without limitation, litigation, prosecution, strategy, resolution, assignment, abandonment, defenses, and counterclaims.  For avoidance of doubt, the Bond Documents confer unto QBE the right to succeed to all of the power and rights of the Debtor with respect to the Bond Claims and nothing herein is intended to or shall alter such provisions of the Bond Documents.

(f)  For purposes of clarity, the Debtor and the Edgewater Individuals, including their counsel, have been and are cooperating with QBE due to their common interest in, among other things, investigating, litigating, arbitrating, mediating, settling, defending,

and/or prosecuting the Bond Claims and potential, current, and/or former litigation, mediation, arbitration, settlement, investigation arising therefrom and therefore QBE, the Debtor, the Edgewater Individuals agree that any and all communications by and between QBE, the Debtor, the Edgewater Individuals, and their respective counsel have been and are subject to the joint-defense and/or common interest privilege and therefore are also subject to the attorney-client privilege and/or attorney work product doctrine.

4.    **QBE Claim**.

(a)  Estimated Claims for Voting Purposes:  The QBE Claim shall be allowed, for Plan voting purposes only, a secured claim in the amount of $427,586.55 and a general unsecured claim in the amount of $9,579,705.69.

(b)  Allowance of Claim for Distribution Purposes:  QBE shall retain a first-lien security interest in the nature and character of its prepetition claim liens that existed on the Petition Date against any sums recovered by the Debtor (or QBE as successor thereto) arising from the Bond Claims up to the extent of such recovery. The balance remaining after payment to QBE from any such recovery shall be entitled to participate as a general unsecured claim in Class 3.

(c)  Notwithstanding anything to the contrary, and for avoidance of doubt, QBE shall retain all rights reserved thereto under the Bond Documents, except as specifically altered by this Settlement Agreement.

5.    **Chapter 5 Causes of Action**.  The Plan shall be revised to include a provision for retention of the subchapter V trustee, Carol Fox (the "Trustee"), to conduct an investigation of potential causes of action arising under Chapter 5 of the Bankruptcy Code (the "Chapter 5 Analysis").

(a)    Fraudulent Transfer Review of the Debtor:

(i)    The Chapter 5 Analysis of the Debtor shall include a review of any payments or transfers made by the Debtor for the period of two (2) years prior to the Petition Date where such payment or transfer is greater than $20,000 (each a "Potential Fraudulent Transfer Claim").

(ii)   In the event that the Trustee identifies a Potential Fraudulent Claim by the Debtor that is recoverable under 11 U.S.C. §§ 544 and 548, the Trustee may request that the Reorganized Debtor[1] pursue recovery of said Potential Fraudulent Transfer Claim or, in the event that the Reorganized Debtor cannot or will not pursue such Potential Fraudulent Transfer Claim, the Trustee shall be authorized, in her business judgment, to pursue such Potential Fraudulent Transfer Claim and to seek compensation from the recovery thereof.

---

[1] The term "Reorganized Debtor" refers to the Debtor in its reorganized form post-confirmation of the Plan.

4

      (iii) The net proceeds of any recovery of a Potential Fraudulent Transfer Claim (after payment of the Trustee's fees and costs) shall be distributed *pro rata* to creditors in Class 3 of the Plan.

(b) Fraudulent Transfer Review of Insiders:

      (i) The Edgewater Individuals shall provide income tax returns to QBE and Trustee under cover of confidentiality for the income tax years 2021 and 2022. The Trustee shall review the income tax returns and any other supporting documents to determine if the Edgewater Individuals were insolvent in 2021 or 2022. If the Trustee determines that the Edgewater Individuals' aggregate non-contingent liquidated liabilities exceeded the aggregate value of their assets in any of the foregoing years, then the Trustee shall identify any Potential Fraudulent Claim by an Edgewater Individual (or an entity owned by one or more of the Edgewater Individuals) that could have been recovered by a judgment creditor of said Edgewater Individual that exceeds $20,000.00 (an "Insider Transfer") and said Edgewater Individual agrees to the entry of a consent judgment in favor of QBE in the amount of said Potential Fraudulent Transfer Claim solely for the purpose, an no other purpose, of seeking recovery of said judgment pursuant to Florida Statute 726.105. For avoidance of doubt the foregoing consent judgment shall be limited to recovery from third parties that received the Insider Transfer, however, the Edgewater Individuals may opt to discharge the consent judgment for the sum of 50% of the Potential Fraudulent Transfer Claim to QBE.

(c) Preference Payment Review:

      (i) Review of payments greater than $20,000 made by the Debtor on account of antecedent debt (i.e., 90 days prior to the Petition Date for non-insiders of the Debtor pursuant to 11 U.S.C. §§ 544 and 547) ("Potential Preference Claims")[2] shall not initially include analysis of defenses to such claims.

      (ii) As and when the Trustee identifies payments that may be deemed recoverable under 11 U.S.C. §§ 544 and 547, the Trustee shall be authorized to conduct further analysis, in her business judgment, pursue recovery thereof, and seek compensation for the costs of such recovery from the proceeds of such recovery.

      (iii) The net proceeds of any recovery of a Potential Preference Claim (after payment of the Trustee's fees and costs) shall be distributed pro rata to creditors in Class 3 of the Plan.

---

[2] The Preference Payment Review shall not include payments made to the Edgewater Individuals as the Edgewater Individuals are already committing the value of their non-exempt assets to the Plan.

5

6.     **Plan Support**. As consideration for the Cooperation Agreement and the Vazquez Exit Contribution, QBE agrees to support and accept the Plan so long as said Plan includes the material terms of this Settlement Agreement and is consistent herewith. For avoidance of doubt, QBE will be deemed to have voted in favor of the Plan (regardless of whether a ballot is filed) so long as the Plan adopts this Settlement Agreement in its entirety.

7.     **Releases**. In return for the agreements set forth in this Settlement Agreement (and except for the obligations set forth in this Settlement Agreement), the Debtor shall include each of the Edgewater Individuals and QBE as a "Released Party" for purposes of the Debtor' Plan (the "Release") in which all claims and causes of action by the Debtor against the Edgewater Individuals and QBE shall be released. Similarly, QBE shall be deemed to have released the Debtor and the Edgewater Individuals, except for any obligations preserved under this Settlement Agreement.

8.     **Termination**. Any of the Parties may serve written notice of the termination of this Settlement Agreement upon the occurrence of any of the following events:

(a)  The entry of an order by the Bankruptcy Court denying approval of the 9019 Motion without leave to re-file or modify the Motion; or

(b)  The entry of an order by the Bankruptcy Court purporting to modify the terms of settlement or ordering modifications to the Plan that alter the releases contemplated by the Settlement Agreement or otherwise materially impact the terms of this Settlement Agreement adversely to QBE or the Edgewater Individuals.

9.     **Access to Documents**. The Debtor will provide QBE (through their counsel) with reasonable access to Edgewater documents, consistent with their confidentiality obligations to Edgewater, in connection with any Bond Claim.

10.    **Retained Jurisdiction.** The Parties agree that the Bankruptcy Court shall retain jurisdiction to interpret and enforce the terms of this Settlement Agreement as well as any obligation arising hereunder.

11.    **Conflict with Orders**. To the extent there is any conflict between the terms of this Settlement Agreement and the terms of the 9019 Approval Order, the terms of the 9019 Approval Order shall control.

12.    **No Admission of Liability.** This Settlement Agreement constitutes a compromise of disputed claims. This Settlement Agreement is not an indication of misconduct of any kind having been committed by any of the Edgewater Individuals. Nothing herein shall be construed or used as evidence of any admission of liability or responsibility by any of the Parties hereto or any waiver of any privilege or defense. Each of the Parties also acknowledges, understands, and agrees that liability for any claim, demand, or cause of action is specifically denied.

13.    **Warranties and Representations.** Each of the Parties represents and warrants to the other Parties that: (a) it has not heretofore or otherwise transferred to any persons any claim or potential claim which it may have against the other Parties, (b) it has full power, right, and authority to execute this Settlement Agreement and to take all steps necessary to implement its terms and conditions and take the actions contemplated hereby, (c) this Settlement Agreement has been duly and validly executed and delivered by it and constitutes the legal, valid, and binding obligation of such Parties enforceable against such Parties in accordance with its terms, and (d) other than from the Bankruptcy Court, no consent of any person or entity not a party to this Settlement Agreement is necessary for this Settlement Agreement to be fully and completely binding upon each of the Parties.

14.    **Costs, Fees, and Expenses**. Each of the Parties shall bear its own attorneys' fees, costs, and expenses incurred in connection with this Settlement Agreement.

15.    **Governing Law and Forum Selection.**  This Settlement Agreement is made under and shall be governed, construed, and enforced in accordance with the laws of the State of Florida.  The Parties agree that any litigation arising out of or relating to this Settlement Agreement shall be brought solely and exclusively in the Bankruptcy Court, and, for purposes of any such litigation, the Parties consent to the jurisdiction and venue of said court.

16.    **Entire Agreement.**  This Settlement Agreement constitutes and contains the entire agreement and understanding between the Parties with respect to the above referenced disputes and supersedes and replaces all prior negotiations, representations, agreements, judgments, or orders, proposed or otherwise, whether written or oral, concerning the matters covered in the Settlement Agreement. No representations have been made to induce any of the Parties to enter into this Settlement Agreement except for the representations expressly stated herein. No covenant or condition not expressed in this Settlement Agreement shall affect or be effective to interpret, change, or restrict this Settlement  Agreement.

17.    **No Oral Modification or Waiver.** No modification of any provision of this Settlement Agreement shall be binding unless in writing signed by the Parties. No provision of this Settlement Agreement may be waived except by a writing signed by the Party that expressly refers to this Paragraph of this Settlement Agreement and makes such waiver, and such waiver shall be limited to the terms of such writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or of any other provision hereof, nor shall any such waiver by any Party be deemed to be a continuing waiver. No delay or omission by any Party in exercising any right hereunder, at law, in equity, or otherwise, shall impair any such right or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any right preclude other or further exercise of such right or the exercise of any other right.

18.    **Successors and Assigns.** Every covenant, term, and provision of this Settlement Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns, heirs, legal representatives, and transferees.

19.    **Counterparts.** This Settlement Agreement may be executed by the Parties hereto in several counterparts, each of which shall be deemed to be an original but all of which shall constitute together one and the same agreement. This Settlement Agreement may be executed by facsimile or .pdf signature, and a facsimile or .pdf signature shall constitute an original for all purposes.

IN WITNESS WHEREOF, the Parties hereto have agreed to the terms set forth herein.

**EDGEWATER CONSTRUCTION GROUP, INC.**

Date: _____, 2023

Name: _____
Title: _____

**ULYSSES VAZQUEZ, INDIVIDUALLY**

Date: _____, 2023

Name: _____

**DULCE VAZQUEZ, INDIVIDUALLY**

Date: _____, 2023

Name: _____

**QBE INSURANCE GROUP, INC.**

Date: _____, 2023

Name: _____
Title: _____

8

**"Exhibit "E"**

## Vazquez Personal Assets and Liabilities

| Living  Room Description of Property | Value Amount | Exempt amount | Claim of Lien | Purchase Money Claimant | Net Value |
|---|---|---|---|---|---|
| Sectional sofa/fabric | $ 1,500.00 | | $ 1,265.00 | Crate & Crate | $ - |
| console table/storage | $ 200.00 | . | . | | $ 200.00 |
| Coral Hurricane Candle Holder set 3 | $ 30.00 | | | | $ 30.00 |
| Chair(s) | $ 25.00 | | | | $ 25.00 |
| Table(s) | $ 35.00 | | | | $ 35.00 |
| Lamp -tripod lamp | $ 25.00 | | | | $ 25.00 |
| sound bar for TV | $ 100.00 | | | | $ 100.00 |
| Television(s) | $ 300.00 | | | | $ 300.00 |
| Area Rugs | $ 150.00 | | | | $ 150.00 |
| Wall décor | $ 15.00 | | | | $ 15.00 |
| entry console table | $ 50.00 | | | | $ 50.00 |
| Shoe basket | $ 5.00 | | | | $ 5.00 |
| Curtains | $ 25.00 | | | | $ 25.00 |
| | | | | | $ - |
| **Kitchen Description of Property** | | | | | $ - |
| Microwave(s) | $ - | | | | $ - |
| Refrigerator(s) | $ - | | | | $ - |
| counter toaster/oven | $ 25.00 | | | | $ 25.00 |
| Dishwasher(s) | $ - | | | | $ - |
| Washing Machine(s) | $ 125.00 | | | | $ 125.00 |
| Dryer(s) | $ 125.00 | | | | $ 125.00 |
| Stove(s) | $ - | | | | $ - |
| Dishes - Set 12 | $ 40.00 | | | | $ 40.00 |
| Cookware | $ 50.00 | | | | $ 50.00 |
| Food processor | $ 25.00 | | | | $ 25.00 |
| Blender | $ 20.00 | | | | $ 20.00 |
| Other: wall art décor | $ 40.00 | | | | $ 40.00 |
| Counter stool - 4 | $ 150.00 | | | | $ 150.00 |
| wine cooler | $ 250.00 | | | | $ 250.00 |
| wine glass set 12 | $ 25.00 | | | | $ 25.00 |
| Drinkware set 12 | $ 20.00 | | | | $ 20.00 |
| cocktail glasses set 12 | $ 25.00 | | | | $ 25.00 |
| Serving platers 6 | $ 50.00 | | | | $ 50.00 |
| Coffee Machine - 3 | $ 75.00 | | | | $ 75.00 |
| coffee mugs - 12 | $ 25.00 | | | | $ 25.00 |
| kitchen rug | $ 40.00 | | | | $ 40.00 |
| **Dining  Room Description of Property** | | | | | $ - |
| Table - Dinning | $ 700.00 | | | | $ 700.00 |
| Chair(s) | $ 150.00 | | | | $ 150.00 |
| Lamp(s) chandelier | $ 50.00 | | | | $ 50.00 |

| | | | | | |
|---|---|---|---|---|---|
| bench small | $ | 100.00 | | $ | 100.00 |
| Area Rugs | $ | 100.00 | | $ | 100.00 |
| Wall décor | $ | 50.00 | | $ | 50.00 |
| | | | | $ | - |
| **Bedroom-1 Description of Property** | | | | $ | - |
| Bed-Queen bed & Headboard | $ | 100.00 | | $ | 100.00 |
| Decorative throw pillows | $ | 25.00 | | $ | 25.00 |
| Nightstands | $ | 25.00 | | $ | 25.00 |
| Wall Art décor | $ | 40.00 | | $ | 40.00 |
| Lamp(s) | $ | 15.00 | | $ | 15.00 |
| Television - 42" | $ | 50.00 | | $ | 50.00 |
| ceiling fan | $ | 25.00 | | $ | 25.00 |
| Area Rugs | $ | 50.00 | | $ | 50.00 |
| Bathroom- items, rug, toothbrush holder | $ | 15.00 | | $ | 15.00 |
| **Bedroom-2 Description of Property** | | | | $ | - |
| Bed-King Bed Headboard | $ | 120.00 | | $ | 120.00 |
| Decorative throw pillows | $ | 25.00 | | $ | 25.00 |
| Towel wicker baskets | $ | 15.00 | | $ | 15.00 |
| Nightstands -2 | $ | 40.00 | | $ | 40.00 |
| Lamp(s) -2 | $ | 20.00 | | $ | 20.00 |
| Decorative Wall Art | $ | 25.00 | | $ | 25.00 |
| Television 55" | $ | 125.00 | | $ | 125.00 |
| ceiling fan | $ | 25.00 | | $ | 25.00 |
| Area Rugs | $ | 50.00 | | $ | 50.00 |
| Bathroom- items, rug, toothbrush holder | $ | 15.00 | | $ | 15.00 |
| **Bedroom-3 Description of Property** | | | | $ | - |
| Bed - King Bed | $ | 150.00 | | $ | 150.00 |
| Chair(s) - 1 | $ | 15.00 | | $ | 15.00 |
| Dresser(s) - 1 | $ | 50.00 | | $ | 50.00 |
| Nightstand(s) - 2 | $ | 40.00 | | $ | 40.00 |
| Desk(s) -1 | $ | 25.00 | | $ | 25.00 |
| Lamp(s) - 2 | $ | 30.00 | | $ | 30.00 |
| Ottoman/bench Fabric - 2 | $ | 40.00 | | $ | 40.00 |
| Television 55" | $ | 125.00 | | $ | 125.00 |
| Wall Art | $ | 50.00 | | $ | 50.00 |
| Computer(s)- Laptop | $ | 50.00 | | $ | 50.00 |
| ceiling fan | $ | 25.00 | | $ | 25.00 |
| Area Rugs | $ | 50.00 | | $ | 50.00 |
| Bathroom- items, rug, toothbrush holder | $ | 15.00 | | $ | 15.00 |
| | | | | $ | - |
| **Primary Bedroom- Description of Property** | | | | $ | - |
| Bed - King Bed | $ | 750.00 | | $ | 750.00 |
| Chair(s) - fabric - 2 | $ | 200.00 | | $ | 200.00 |
| Dresser(s) -1 | $ | 250.00 | | $ | 250.00 |
| Nightstand(s) - 2 | $ | 150.00 | | $ | 150.00 |
| keurig coffee maker | $ | 30.00 | | $ | 30.00 |

| Description | $ | Amount | | $ | Amount |
|---|---|---|---|---|---|
| Mirror(s) - 1 | $ | 40.00 | | $ | 40.00 |
| Lamp(s) - 2 | $ | 30.00 | | $ | 30.00 |
| Ottoman/bench - 1 | $ | 25.00 | | $ | 25.00 |
| Sound Bar TV | $ | 100.00 | | $ | 100.00 |
| Television 65" | $ | 200.00 | | $ | 200.00 |
| Wall Art | $ | 50.00 | | $ | 50.00 |
| Computer(s) | $ | 75.00 | | $ | 75.00 |
| ceiling fans - 2 | $ | 75.00 | | $ | 75.00 |
| Area Rugs | $ | 125.00 | | $ | 125.00 |
| Master Bath - wall art | $ | 50.00 | | $ | 50.00 |
| **Master Bathroom** | | | | $ | - |
| stool chair | $ | 35.00 | | $ | 35.00 |
| teak shower stool | $ | 30.00 | | $ | 30.00 |
| bathroom accessories set - 2 | $ | 50.00 | | $ | 50.00 |
| towel warmer rack | $ | 50.00 | | $ | 50.00 |
| | | | | $ | - |
| **Other Rooms (Hallways,Garage, etc.)** | | | | $ | - |
| **Description of Property** | | | | $ | - |
| Computer(s) - 2nd Floor | $ | 100.00 | | $ | 100.00 |
| file cabinet | $ | 25.00 | | $ | 25.00 |
| Desk(s)-1 | $ | 25.00 | | $ | 25.00 |
| Chair(s)-1 | $ | 15.00 | | $ | 15.00 |
| printer - 1 | $ | 15.00 | | $ | 15.00 |
| Scanner machine | $ | 25.00 | | $ | 25.00 |
| Vacuum Cleaner(s) | $ | 30.00 | | $ | 30.00 |
| Iron(s) | $ | 10.00 | | $ | 10.00 |
| ironing table | $ | 5.00 | | $ | 5.00 |
| Camera(s) | $ | 25.00 | | $ | 25.00 |
| Console Table 2nd floor | $ | 50.00 | | $ | 50.00 |
| Tool(s) Box | $ | 75.00 | | $ | 75.00 |
| Power Tool(s) | $ | 250.00 | | $ | 250.00 |
| Lawn Mower -Electric | $ | 75.00 | | $ | 75.00 |
| Wall Art | $ | 75.00 | | $ | 75.00 |
| BBQ/Smoker | $ | 250.00 | | $ | 250.00 |
| Ice Maker | $ | 250.00 | | $ | 250.00 |
| Holiday decorations (Christmas, Thanksgving etc.) | $ | 225.00 | | $ | 225.00 |
| Plastic Christmas tree small | $ | 100.00 | | $ | 100.00 |
| Bikes - 2 | $ | 50.00 | | $ | 50.00 |
| **Back Yard furniture:** | | | | $ | - |
| 2 love seats | $ | 25.00 | | $ | 25.00 |
| 4 chairs | $ | 125.00 | | $ | 125.00 |
| Outdoor area rug | $ | 25.00 | | $ | 25.00 |
| dinning set 6 chairs 1 table | $ | 20.00 | | $ | 20.00 |
| 2 poolside lounge chair | $ | 100.00 | | $ | 100.00 |
| coolers - 2 | $ | 75.00 | | $ | 75.00 |
| storage cabinets -4 | $ | 125.00 | | $ | 125.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Balcony furniture - 2nd floor** | | | | $ | - |
| small sectional | $ | 125.00 | | $ | 125.00 |
| coffee table | $ | 25.00 | | $ | 25.00 |
| Outdoor area rug | $ | 20.00 | | $ | 20.00 |
| dinning set 4 chairs 1 table -small | $ | 75.00 | | $ | 75.00 |
| Fishing Rods & Tackle | $ | 1,000.00 | | $ | 1,000.00 |
| Garmin men watch | $ | 100.00 | | $ | 100.00 |
| Apple watch 42mm 1st Generation | $ | 25.00 | | $ | 25.00 |
| Men cufflink | $ | 100.00 | | $ | 100.00 |
| Wedding rings | $ | 1,000.00 | | $ | 1,000.00 |
| David Yurman - Necklace Madison | $ | 100.00 | | $ | 100.00 |
| David Yurman - Bracelet  Madison | $ | 50.00 | | $ | 50.00 |
| Datejust 36mm woman - Rolex | $ | 5,000.00 | | $ | 5,000.00 |
| **Boats and vehicles** | | | | $ | - |
| Tidewater 25' | $ | 80,000.00 | | $ | 80,000.00 |
| Release 39' | $ | 300,000.00 | $ 220,000.00 La Victoire Finance | $ | 80,000.00 |
| Chevy Truck - 2011 Silverado | $ | 3,000.00 | 2000 | $ | 1,000.00 |
| **Banks - Cash on Hand** | **Assets** | | | | |
| US Century Bank - Personal Checking | $ | 350.00 | 2000 | $ | 33,000.00 |
| Banesco - Personal Checking | $ | 15,000.00 | | $ | 15,000.00 |
| Banesco - Personal Savings | $ | 100,000.00 | | $ | 100,000.00 |
| | | | | | |
| **Business Entities** | **Assets** | | | | |
| Edgewater 6962, LLC | $ | 500,000.00 | 411000 Banesco | $ | 89,000.00 |
| Edgewater Construction Group, LLC | $ | 7,000.00 | 2500 Ally Bank | $ | 4,500.00 |
| Seaside Construction & Development, LLC | $ | - | | $ | - |
| Seaside 5620, LLC | 0 | | | | |
| **Total Value of all Personal Property** | $ | 1,023,645.00 | | $ | 419,295.00 |
| | | | | | |
| **Credit Cards/Loans - Unsecured** | | **Liabilities** | **Liabilities** | | |
| American Express - Personal -  Ulysses | | $ 27,773.46 | $ 27,773.46 | | |
| Bank of Amercia - (Used for ECG) -- Dulce | | $ 10,515.80 | $ 10,515.80 | | |
| BJ's MC -  (Used for ECG) | | $ 29,928.60 | $ 29,928.60 | | |
| Capital One | | $ 2,301.17 | $ 2,301.17 | | |
| FNBO - -  (Used for ECG) | | $ 29,952.33 | $ 29,952.33 | | |
| Target | | $ 1,136.22 | $ 1,136.22 | | |
| TJMaxx | | $ 6,252.13 | $ 6,252.13 | | |
| **Credit Cards - under ECG & personally guaranteed** | | | | | |
| American Express - Business  & DPV | | $ 296,937.04 | $ 296,937.04 | | |
| Capital One Spark - Business & UV | | $ 20,355.86 | $ 20,355.86 | | |
| US CENTURY CC - Business & DPV | | $ 18,064.12 | $ 18,064.12 | | |
| | | $ 443,216.73 | | | |