## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

IN RE:

EDGEWATER CONSTRUCTION                          Chapter 11
GROUP, INC.,                                    Subchapter V

                                                Case No. 23-bk-12217-LMI

           Debtor.

_____/

### BALFOUR BEATTY CONSTRUCTION, LLC'S OBJECTION TO
### DEBTOR'S AMENDED PLAN OF REORGANIZATION

      BALFOUR BEATTY CONSTRUCTION, LLC ("Balfour Beatty"), by its undersigned

counsel, hereby files its Objection to the Debtor, EDGEWATER CONSTRUCTION GROUP,

INC.'s, *Amended Plan of Reorganization* [ECF #346]. In support, Balfour Beatty states as follows:

### INTRODUCTION

      The purpose of a Chapter 11 bankruptcy is to allow a distressed debtor to rehabilitate its

business rather than liquidate its assets. As the late Judge Paskay said:

> Chapter 11 of the Bankruptcy Code was designed to provide a single forum to
> resolve disputes between a debtor and its creditors. **A clear purpose of Chapter
> 11 is to benefit all parties, including the debtor and its creditors**, by providing
> a breathing space to enable a debtor to reorganize. Some of the fundamental
> principles of Chapter 11 include **the desire to maximize the value of the estate
> for the benefit of all creditors**, to promote equal distribution among creditors, and
> to avoid piecemeal, preferential dismemberment of a debtor's assets.

*In re Lykes Bros. S.S. Co., Inc.*, 207 B.R. 282, 284 (Bankr. M.D. Fla. 1997).

      Recently, the United States legislature enacted the Small Business Reorganization Act of

2019 ("SBRA"), which added subchapter V to chapter 11 of the Bankruptcy Code. Subchapter V

"provides a new avenue for small business debtors to reorganize outside of the more costly

traditional chapter 11 framework." *In re 218 Jackson LLC*, 631 B.R. 937, 946 (Bankr. M.D. Fla.

2021). "The statutory hope is that by encouraging small business reorganizations more creditors will receive greater distributions and more small businesses will survive and prosper." *In re Ellingsworth Residential Cmty. Ass'n, Inc.*, 619 B.R. 519, 520 (Bankr. M.D. Fla. 2020).

This bankruptcy can be characterized as anything but that. Since the filing of the Voluntary Petition on March 22, 2023, the Debtor, through its principals, has engaged in actions that contravene the purpose of Chapter 11, such as misrepresenting material facts to the Court and initiating disputes with multiple creditors. In reality, this Chapter 11 bankruptcy was filed to benefit neither the Debtor (as the Debtor is a highly distressed business that projects to lose several hundreds of thousands of dollars throughout the Amended Plan) nor its creditors (who will receive little to no distributions from the Debtor over the course of the Amended Plan). Nor was this Chapter 11 bankruptcy filed with the view of allowing the Debtor to reorganize with lowered costs in mind (as shown by the Debtor's counsel's having expounded almost $350,000 in legal fees solely on matters surrounding the Debtor's reorganization).

Rather, the Chapter 11 bankruptcy was filed only to benefit the Debtor's two principals—Mr. Ulysses Vazquez and Mrs. Dulce Vazquez. The overwhelming purpose of this Chapter 11 bankruptcy proceeding has been to benefit Ulysses Vazquez and Dulce Vazquez by confirming a plan that will bar any third-party creditor who may have a claim against them from suing them individually.[1] In doing so, Mr. and Mrs. Vazquez have proposed the "Vazquez Exit Contribution." The "Vazquez Exit Contribution" seeks to have Mr. and Mrs. Vazquez commit all of their non-exempt assets to the Amended Plan in exchange for these third-party releases. Yet the "Vazquez Exit Contribution" is nothing but a fabrication made of whole cloth. Ulysses Vazquez and Dulce

---

[1] On December 4, 2023, the United States Supreme Court heard oral arguments on whether the Bankruptcy Code gives a court the power to approve a release that extinguishes claims against third parties, without the consent of the individuals or entities holding the claims.

Vazquez are not committing "all of their non-exempt assets," for example they have withdrawn the office building that they own through a separate entity and for which they would benefit post-confirmation because they propose to have the Debtor pay them rent on the office. The Vazquez's also sold a significant non-exempt asset post-petition (worth approximately $1.1 million) and converted the proceeds from the sale to their personal benefit.

Upholding the principles of Chapter 11 of the Bankruptcy Code is important. The Debtor and its principals have ignored their fiduciary obligations to the Debtor's creditors. As a result, this Court should deny the Debtor's Amended Plan of Reorganization for two reasons. First, the Amended Plan of Reorganization was filed in bad faith and does not meet the requirements of 11 U.S.C. § 1129(a)(3). Second, the Amended Plan of Reorganization is not feasible under 11 U.S.C. § 1129(a)(11).

## FACTUAL AND PROCEDURAL BACKGROUND

1.      As the Court knows, the Debtor was a general contractor in business since 1999. [ECF #1, p. 6], attached as **Exhibit "A."** In January 2017, "the Debtor expanded its services to provide stucco and drywall work on a subcontractor basis to general contractors" [*Id.*].

2.      On March 22, 2023 ("Petition Date"), the Debtor filed its Voluntary Petition for Non-Individuals Filing for Bankruptcy. [*Id.*]. The Voluntary Petition was signed under penalty of perjury by Ulysses Vazquez, II, as the Debtor's President. [*Id.*].

3.      In its Voluntary Petition, the Debtor asserted that it had between "$0 – $50,000" in estimated assets and between "1,001,000 – $10 million" in estimated liabilities. [*Id.* at 3–4]. Yet the Debtor somehow estimated that "[f]unds will be available for distribution to unsecured creditors." [*Id.* at 3]. As elaborated below, this was not a true statement.

4.      The Debtor also filed a Statement of Operations for the 2022 fiscal year concurrently with Voluntary Petition. [ECF #4], attached as **Exhibit "B."**

5.      While the Debtor had annual gross revenues of $16,822,356, its costs of goods sold were a whopping $19,695,260.50. [*Id.*]. Factoring in expenses, the Debtor has a net ordinary income of ($3,956,346.54) in 2022—a business model that is simply unsustainable for any business, let alone one in the construction industry where the contracts with subcontractors have "pay if paid" or "pay when paid" terms. [*Id.*].

6.      As the Court has already noted, the Debtor omitted Balfour Beatty from its initial Creditor Matrix at the time of filing, [**Exhibit "A,"** p. 11–20], which resulted in Balfour Beatty not receiving notice of the filing of the Voluntary Petition. [ECF #242, p. 11 n.7] ("The Debtor has never explained why Balfour Beatty was not scheduled as a creditor nor why Balfour Beatty's contracts were not scheduled as executory contracts. Again, like the Debtor's failure to provide Balfour Beatty notice of the Critical Vendor Motion, the Debtor has never explained these omissions.").

I.      **The Debtor's Post-Petition Actions.**

    A.      The Debtor Makes a Material Misrepresentation to the Court.

7.      As this Court knows, the day after the Debtor filed the Voluntary Petition, on March 23, 2023, a meeting between the representatives of Balfour Beatty and the Debtor took place to discuss the status of the Debtor's work on the RD East Las Olas and 2000 Biscayne Projects ("March 23, 2023, Meeting"). **Exhibit "C."** The Court found the terms of any agreement between the Parties was never finalized.

8.      The next day, on March 24, 2023, without Balfour Beatty's knowledge, the Debtor filed an *Emergency Motion for Entry of an Order Authorizing the Debtor to Pay Critical Vendor*

*Claims in the Ordinary Course of Business* [ECF #14] ("Critical Vendor Motion").[2] **Exhibit "D."** As this Court has already noted, Balfour Beatty did <u>not</u> receive notice of the filing of the Critical Vendor Motion. [ECF #242, p. 11 n.7].

9.     Although called a critical vendor motion, in truth it was not one. The Debtor's Critical Vendor Motion did not ask the Court to allow the Debtor to pay its critical vendors in the ordinary course of business. Rather, the Debtor asked the Court to use its equitable powers under 11 U.S.C. § 105 to materially alter the contractual relationship between the Debtor and Balfour Beatty because the Debtor could not comply with the existing terms, conditions, and obligations of such contracts.

10.     The prepetition contractual relationship between the Debtor and Balfour Beatty, specifically as to billing, on the Projects can be summarized as follows:

   a.  The critical vendors would bill the Debtor for work performed during the preceding month;

   b.  The Debtor would then invoice Balfour Beatty through its applications for payment;

   c.  Balfour Beatty would approve the Debtor's application for payment;

   d.  Balfour Beatty would submit the Debtor's application for payment to the owner;

   e.  The owner would approve the Debtor's application for payment;

   f.  The owner would pay Balfour Beatty funds, including those approved on the Debtor's application for payment;

   g.  Balfour Beatty would promptly pay the Debtor once those funds were received; and

   h.  The Debtor would have seven days to pay its critical vendors upon receipt of those funds.

---

[2] As the Court found in the Stay Violation Order, the Debtor did not provide Balfour Beatty with notice of the Critical Vendor Motion, the Emergency Hearing thereon, or the resulting Order. (ECF #242), n.5, 7.

11. The Critical Vendor Motion sought to materially alter the contractual relationship between the Debtor and Balfour Beatty, specifically as to billing, on the Projects as follows:

    a. The Critical Vendors would bill the Debtor for work performed during the preceding month;

    b. The Debtor would then invoice Balfour Beatty through its applications for payment;

    c. Balfour Beatty would approve the Debtor's application for payment;

    d. Balfour Beatty would issue joint checks to pay the Debtor and its Critical Vendors;

    e. Balfour Beatty would then submit the Debtor's application for payment to the owner;

    f. The owner would approve the Debtor's application for payment; and

    g. The owner would pay Balfour Beatty funds, including those approved on the Debtor's application for payment.[3]

12. The Debtor's attempt to materially change the terms of its pre-petition contracts with Edgewater is evidenced by the March 27, 2023, hearing before this Court. Attached as **Exhibit "E"** is an excerpt of the hearing transcript from March 27, 2023, when the Court heard the Critical Vendor Motion. At the Critical Vendor Motion hearing, Ms. Calderin (Debtor's counsel) and the Court, when discussing the Critical Vendor Motion, stated:

> MS. CALDERIN:  That is correct. **<u>And this general contractor saw the wisdom of paying</u>**, notwithstanding that some of those benchmarks may not be due, because the work could be completed. If the work is completed the liens are released. If the liens are released the owner will pay the general contractor, even though the general contractor may not have all the moneys from the owner.

**Exhibit "E,"** 32:21–33:4 (emphasis added).

---

[3] Balfour Beatty never consented to these changes, and the Debtor's filing of the Critical Vendor Motion constitutes a repudiation of the pre-petition Contracts on their existing terms.

> THE COURT: Ms. Calderin, as I said, **I'm not sure if it's really a critical vendor motion, but I do believe it is a motion that seeks relief under 105 that I am permitted to grant under the provisions of Section 105**. So I will go ahead and I will grant the motion as proposed.

**Exhibit "E,"** 35:10–25 (emphasis added).

13.     The reality is, however, that the Debtor's proposed contract modifications were never agreed to by Balfour Beatty. The Debtor's filings with the Court, as well as the representations made to the Court in support of the Critical Vendor Motion, were total fabrications. The Debtor's representations contained in the Critical Vendor pleadings and those made in open Court do constitute an admission that the Debtor was unable to perform under the existing terms of the contracts, which necessarily constituted a rejection of the contracts.

14.     As an example, between the time that the Debtor filed the Critical Vendor Motion (on March 24, 2023) and the Emergency Hearing without notice to, or the participation of Balfour Beatty (March 27, 2023), Mr. Vazquez sent multiple text messages from Mr. Jason Sizemore. **Exhibit "F."**  In those texts, Mr. Vazquez was "following up" on whether Balfour Beatty had the approval to move forward with the Debtor's proposed modification of the contracts. *Id.* To that point, Mr. Vazquez stated that "[he] has attorneys asking [him] if [they] have a deal and [his] guys are now also calling [him]." *Id.* In his responses, Mr. Sizemore made clear that he "ha[s] not received the word yet," but will call "as soon as [he] get[s] the word" on whether the Parties have an agreement. *Id.*

15.     Even though the Debtor knew it did not have a memorialized deal with Balfour Beatty, it nevertheless filed the Critical Vendor Motion and misrepresented to the Court that it had a deal.

II.    <u>**The Debtor's Amended Plan of Reorganization**</u>.

16.    On June 20, 2023, the Debtor filed the *Plan of Reorganization of Edgewater Construction Group, Inc.* [ECF #177] ("**Original Plan**"). **Exhibit "G."** The *Amended Plan of Reorganization of Edgewater Construction Group, Inc.* [ECF #346] ("**Amended Plan**") was filed on November 3, 2023. **Exhibit "H."**

17.    In the Amended Plan, the Debtor stated that while it "is completing some of its prepetition projects, presently and upon emergence from Chapter 11, Edgewater is focusing on returning to its roots as a general contractor." **Exhibit "H,"** p. 1, 2.

18.    The Debtor also asserts that "[t]o help defray the cost increases and payment delays, Edgewater's shareholders, Ulysses and Dulce Vazquez (when referred to together, the "Debtor's Principals") liquidated a significant portion of their exempt assets (including the proceeds of a refinancing against their home)." **Exhibit "H,"** p. 2. That said, for the reasons outlined above, this statement is partially true and partially false. While it is true the Vazquez's took a mortgage on their homestead, that mortgage also covered a separate tract of real estate owned by Seaside 5620, LLC, a limited liability company wholly owned by the Principals. The Seaside 5620 property was sold on May 8, 2023, and the Principals used the proceeds to pay off the only mortgage, leaving the Debtor's with a homestead free and clear of all liens and/or encumbrances. **Exhibit "R."**[4]

19.    The Debtor, under Section 5.2 of the Amended Plan, states that "[t]he Plan proposes to pay Allowed Claims to be paid under the Plan via a Plan Fund consisting of either, some, or all of the following: (i) Net Disposable Income (as defined in Article 5.2.1, below); and (ii) the commitment of all of the Debtor's Principals nonexempt assets to the Plan with an estimated net

---

[4] **Exhibit "R"** is a copy of the Monroe County records searches relating to Ulysses and Dulce Vazquez pulled from the public records of Monroe County. There is no current encumbrance on the Vazquez's homestead.

value of $422,320.00 (the "Vazquez Exit Contribution"), and any recovery from the Retained Causes of Action." **Exhibit "H,"** p. 13. That said, Section 3.3.3 of the Amended Plan makes it clear that "[a]bsent a net recovery to the estate from the Project Receivables, it is anticipated that the Reorganized Debtor will have no Net Disposable Income." **Exhibit "H,"** p. 11. Thus, the Debtor's entire proposal to pay its creditors hinges on (1) the "Vazquez Exit Contribution" (which will only benefit the Debtor's counsel and Mr. and Mrs. Vazquez, and (2) the Debtor's "causes of action" against parties in interest.

III.    **The Debtor's Small Business Cash Flow Projection**.

20.    In terms of Feasibility, the Amended Plan provides that:

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business . . . The Plan Proponent's financial projections (the "Projections") are predicated upon a significant contracture in the business that includes, inter alia, a reduction in work force, and the Vazquez Exit Contribution. Absent a significant and material increase in new work, the Debtor cannot commit to continue sustaining its current operations. The Debtor is **hopeful** that soon upon emergence from Chapter 11, the Reorganized Debtor **will begin to transition from doing stucco and drywall to doing general contractor work**. (Emphasis Added).

**Exhibit "H,"** p. 3.

21.    Exhibit "B" of the Plan ("Original SBCFP"), **Exhibit "G,"** p. 30–32, and the Amended Plan ("First Amended SBCFP"), **Exhibit "H,"** p. 31–33, contains the Debtor's Small Business Cash Flow Projection for the 2024 through 2026 fiscal years.

22.    An amended Small Business Cash Flow Projection was subsequently filed on November 8, 2023 ("Second Amended SBCFP") [ECF #351] **Exhibit "I."**

23.    A review of both the Original SBCFP, the First Amended SBCFP, and the Second Amended SBCFP demonstrates that the Debtor's Amended Plan is purely speculative and not feasible.

A.    <u>The Debtor's Speculative Monthly Revenues</u>.

24.    In the Original SBCFP, the Debtor projected that it would have monthly gross operating revenues of $30,000 in year one post-confirmation, which would increase to $35,000 per month for years two and three post-confirmation. **Exhibit "G,"** p. 30–32.

25.    In the First Amended SBCFP and the Second Amended SBCFP, the Debtor now projects that it would have monthly operating revenues of $50,000 for all three years post-confirmation. **Exhibits "H,"** p. 31–33, **"I."**

26.    The Debtor did not explain how it went from projecting $30-35,000 in monthly revenues in the Original SBCFP to $50,000 in monthly revenues in the First Amended SBCFP and the Second Amended SBCFP. When Mrs. Vazquez was asked how the Debtor calculated $50,000 in monthly revenues, Mrs. Vazquez's response was:

> I am calculating that at a minimum -- and, again, these are projections. We're only projecting -- that I'm going to have at a minimum $50,000 of um -- of receipts. **We are bidding work and we anticipate that we will get some projects. Will it be $50,000 a month? I'm not sure**. I just needed to start with a number and I felt comfortable with the $50,000."

**Exhibit "J,"** Dulce Vazquez Dep. Tr. 85:4–50 (emphasis added).

27.    When asked if Ms. Vazquez could identify whether the Debtor had any contracts that would be in place to justify the $50,000 monthly revenues starting as of January 2024, Ms. Vazquez answered that she could not. **Exhibit "J,"** Dulce Vazquez Dep. Tr. 86:7–11.

28.    As of the filing of this Objection, the Debtor has produced no contracts or evidence to establish it has sufficient contracts in be in place to justify the $50,000/month revenues starting as of January 2024.

B.    The "Vazquez Exit Contribution."

29.    The Amended Plan notes that "[t]he Plan Proponent's financial projections (the 'Projections') are predicated upon a significant contracture in the business that includes . . . the Vazquez Exit Contribution." **Exhibit "H,"** p. 3.

30.    According to the Amended Plan, the Debtor shall commit Mr. and Mrs. Vazquez's "nonexempt assets . . . with an estimated net value of $422,320.00."**Exhibit "H,"** p. 13.

i.    **Discrepancies in SBCFPs**.

31.    A review of the changes made from the Original SBCFP to the First Amended SBCFP to the Second Amended SBCFP demonstrates that the Vazquez's do not intend to provide all of their non-exempt assets to the Estate. The changes are summarized as follows:

32.    In the Original SBCFP, Mr. and Mrs. Vazquez proposed to contribute: (1) a Tidewater 25' worth approximately $80,000; (2) a Release 39' worth approximately $300,000 with a $220,000 PMSI due to La Victoire Finance; (3) their office condo, held by Edgewater 6962, LLC worth approximately $500,000 with a $411,000 mortgage held by Banesco; and (4) $115,000 from Mr. and Mrs. Vazquez's personal bank accounts, with the majority of the non-exempt assets to be turned over in September 2023. **Exhibit "G,"** p. 30. To account for the sale of the office condominium, the Original SBCFP provided that the Debtor would rent a virtual office for $1,000 per month, beginning in January 2024. **Exhibit "G,"** p. 30.

33.    In the First Amended SBCFP, while Mr. and Mrs. Vazquez still proposed to contribute the Tidewater 25', the Release 39', their non-exempt cash, and the office condominium (to allegedly be sold by May 2024), the Debtor removed the $411,000 Banesco mortgage on the office condominium under its operating expenses. **Exhibit "H,"** p. 31. The Debtor provided no reason the $411,000 Banesco mortgage was removed.

34.    In the Second Amended SBCFP, while Mr. and Mrs. Vazquez proposed to contribute the Tidewater 25', the Release 39', and some cash, but the sale of the office condominium was removed entirely. **Exhibit "I."** When asked why the sale of the office condominium was removed, Mrs. Vazquez answered by saying:

> <u>**Because we are giving ourselves six months to see how we, you know, restructure, how business is going, um, and rather than go sell this for, um, you know, whatever amount, a liquidated amount, and have to go and rent a place, um, we -- it's less money what we pay here in rent or a mortgage**</u>. Um, rent is very expensive. And so, we decided to see if we could make it, um, and, you know, continue here rather than go and rent.

**Exhibit "J,"** Dulce Vazquez Dep. Tr. 26:17–24 (emphasis added).

ii.    **Mr. and Mrs. Vazquez Sell a Significant Non-Exempt Asset.**

35.    Both the Original Plan and the Amended Plan list Mr. and Mrs. Vazquez's non-exempt assets that they allegedly intend to commit to the Estate under Exhibit "E."

36.    The Amended Plan states "[a]ttached as Exhibit "E" is a schedule of the Debtor's Principals assets and liabilities (excluding their principal residence which is exempt under Florida law and <u>the mortgage thereon, which was used prepetition to fund Edgewater's operations;</u> <u>primarily labor costs</u>)." **Exhibit "H,"** p. 14. As explained below, this is a material misrepresentation made by the Debtor to attempt to hide the fact that they sold a million-dollar asset during this Chapter 11 proceeding which, in turn, benefited the Vazquez's personally.

37.    Under Exhibit "E" to both the Original Plan and the Amended Plan, "Seaside 5620, LLC" is listed with an asset value of $0. This is because Mr. and Mrs. Vazquez sold Seaside 5620, LLC's assets post-petition, which provided them with a homestead—an asset not committed to the Estate—that is free and clear of any liens and/or encumbrances.

38.    Seaside 5620, LLC purchased real property located at 5620 SW 67th Ave, Miami, FL 33143, on November 18, 2021, from All In Investment Group, LLC ("Seaside 5620 Property").

**Exhibit "K."** The Seaside 5620 Property was encumbered by a first mortgage with a value of $400,000, held by All In Investment Group, LLC. **Exhibit "L."**

39.    On January 17, 2023, a little over two months before the Debtor filed for bankruptcy, Mr. and Mrs. Vazquez executed a Second Mortgage and Security Agreement with Unicorns Publishing Company LLC. **Exhibit "M."** The Second Mortgage and Security Agreement encompasses both the Seaside 5620 Property and the Vazquez's homestead property, located at 332 S. Coconut Palm Blvd., Tavernier, FL 33070, to the tune of $700,000.

40.    On May 8, 2023, Seaside 5620, LLC sold the Seaside 5620 Property to Gumbo Limbo Enterprises, LLC for $1,100,000. **Exhibit "N."**

41.    Knowing that the Debtor's entire plan hinged on the alleged "Vazquez Exit Contribution," neither the Debtor nor Mr. and Mrs. Vazquez disclosed to the creditors, parties in interest, or the Court that they owned this property and that they were selling it for their benefit. This is because the sale of the Seaside 5620 Property was not meant to benefit the Estate, but Mr. and Mrs. Vazquez. On May 9, 2023, Unicorns Publishing Company LLC filed a Satisfaction of Mortgage. **Exhibit "O."** This Satisfaction of Mortgage not only satisfied the second mortgage on the Seaside 5620 Property, but also the sole mortgage on the Vazquez's homestead property—an exempt asset the Vazquez's are not contributing to the "Vazquez Exit Contribution."

42.    As such, Mr. and Mrs. Vazquez deprived the Estate of any significant contribution by converting what was a non-exempt asset into a claimed exempt asset,

iii.    **The Entire "Vazquez Exit Contribution" Will Only Benefit the Debtor's Counsel and Mr. and Mrs. Vazquez.**

43.     Section 5.2 of the Amended Plan provides that the value of Mr. and Mrs. Vazquez's non-exempt assets that they will commit under the "Vazquez Exit Contribution" is $422,320.00. **Exhibit "H,"** p. 13.

44.     The Principals of the Debtor testified that they do **not** view all of their non-exempt assets as being **required** to be transferred to the Debtor. *E.g.*, **Exhibit "J,"** Dulce Vazquez Dep. Tr. 26:17–24. Additionally, whatever non-exempt assets are contributed will be consumed by the administrative claims of (1) the Debtor's counsel and (2) the Debtor's principals – Mr. and Mrs. Vazquez. Section 3.2.2 of the Amended Plan lists the Administrative Claims as follows:

| Administrative Claimant | Estimated Amount Owed |
|---|---|
| Agentis PLLC, Counsel for the Debtor | $350,000.00[5] |
| Carol Fox, Subchapter V Trustee | $25,000.00 |
| Frank Touron, P.A., Special Construction Counsel | $5,000 |
| Dulce and Ulysses Vazquez | $75,000 |
| Potential Administrative Claim of Balfour Beatty | Unliquidated |
| **Total** | **$455,000[6]** |

45.     Even if Mr. and Mrs. Vazquez did contribute their non-exempt assets to the estate, not only will the "Vazquez Exit Contribution" not cover the entirety of the Debtor's administrative claim, the Debtor's counsel and the Debtor's principals will consume close to, if not all, of the "Vazquez Exit Contribution" by themselves.

---

[5] This number goes up to $386,544.19 per the Fee App. **Exhibit "Q."**

[6] This number goes up to $491,544.19 including the $36,

46.    The "Vazquez Exit Contribution" was spun off as this proposal that would benefit the estate's creditors. Instead, the "Vazquez Exit Contribution" only benefits the Debtor's insiders. This is simply not what third-party releases are intended to be used for.

iv.    **Summary**.

47.    In sum, the "Vazquez Exit Contribution" provides no real certainty that Mr. and Mrs. Vazquez intend to contribute <u>any</u> assets to the estate. The Debtor also concealed the fact that the Principals sold a million-dollar non-exempt asset post-petition and converted it into an exempt asset. Even if it were not a fabrication made of whole cloth, the "commitment" of the non-exempt assets is solely going to benefit insiders—the Debtor's counsel and principals. As such, "Vazquez Exit Contribution" is a fabrication made of whole cloth that benefits no one but Mr. and Mrs. Vazquez—a theme throughout this Bankruptcy case.

C.    <u>The Debtor's Fluctuating Monthly Operating Expenses</u>.

48.    Even though the Debtor projects that monthly revenues shall "increase" by $15,000 per month from the Original SBCFP to the First/Second Amended SBCFP, a review of the changes made from the Original SBCFP to the First Amended SBCFP to the Second Amended SBCFP demonstrates the Debtor's expenses increase far beyond that. The changes are summarized as follows:

i.    **"Decrease" in Labor/Materials.**

49.    In both the Original SBCFP and the First Amended SBCFP, the Debtor accounts for expenses associated with its materials and labor, varying between $42,000 and $63,500 (for materials) and $63,00 and $90,000 (for labor). **Exhibits "G," "H."** In the Second Amended SBCFP, the Debtor removed these expenses altogether. **Exhibit "I."** When asked about this, Mrs. Vasquez answered:

> As a general contractor, the responsibility of the material and the labor, both are assumed by the subcontractor and they are paid when paid. Therefore, that is removed because it's no longer on us. As a subcontractor, we had that responsibility regardless of paid or not.

**Exhibit "J,"** Dulce Vazquez Dep. Tr. 87:23–88:3.

50.     Such an explanation only makes sense if the Debtor listed its payments to its subcontractors as an expense. These expenses need to be accounted for, whether paid directly or paid through the subcontractor. Yet Debtor did not do so. These expenses need to be considered when determining the feasibility of the Amended Plan, yet the Debtor attempts to hide such a fact because it also evidences the Amended Plan is not feasible.

i.     **Increase in Payroll.**

51.     In both the Original SBCFP and the First Amended SBCFP, the Debtor accounts for payroll between $16,250 (in the First Amended SBCFP) and $16,750 (in the Original SBCFP) per month. That number drastically jumps to $34,000 per month in the Second Amended SBCFP. When asked about why the payroll jumped by over $15,000 per month, Mrs. Vazquez's response was:

> Q.     Okay. Are there any other differences between this cash flow and the one that we were looking at previously?
> A.     Yes.
> Q.     Can you tell me what those are?
> A.     Payroll.
> Q.     Okay. So, we're talking about this line item here. What changed?
> A.     The amount of payroll was incorrect.
> Q.     Okay. And so, it's been corrected to reflect what?
> A.     **To include our salaries, Ulysses and Dulce**.

**Exhibit "J,"** Dulce Vazquez Dep. Tr. 28:8–19 (emphasis added).

52.     Even though the Debtor is projecting to have a negative cash flow over the next three years (see below), Mr. and Mrs. Vazquez intend on taking $300,000 in salary per year from the company.

D.      Summary.

53.      Under the Debtor's Original SBCFP, the Debtor was projecting to earn the following revenues and expenses throughout the Original Plan:

| Year | Annual Projected Revenue | Annual Projected Expenses | Annual Projected Net Income |
|---|---|---|---|
| 1 (Sep 23 – Aug 24) | $1,380,375 | $1,569,967 | ($189,592) |
| 2 (Sep 24 – Aug 25) | $485,000 | $565,398 | ($80,398) |
| 3 (Sep 25 – Aug 26) | $420,000 | $365,898 | $54,102 |
| Total | $2,285,375 | $2,501,263 | ($215,888) |

54.      Under the Debtor's First Amended SBCFP and Second Amended SBCFP, the Debtor is projecting to earn the following revenues and expenses throughout the Amended Plan:

| First Amended SBCFP | | | |
|---|---|---|---|
| Year | Annual Projected Revenue | Annual Projected Expenses | Annual Projected Net Income |
| 2024 | $1,530,000[7] | $1,434,176[8] | $95,824[9] |
| 2025 | $600,000 | $631,698 | ($31,698) |
| 2026 | $600,000 | $616,406 | ($16,406) |
| Total | $2,730,000 | $2,682,280 | $47,720 |

| Second Amended SBCFP | | | |
|---|---|---|---|
| Year | Annual Projected Revenue | Annual Projected Expenses | Annual Projected Net Income |
| 2024 | $1,030,000 | $1,206,430 | ($176,430) |
| 2025 | $600,000 | $720,430 | ($120,430) |
| 2026 | $600,000 | $593,430 | $6,570 |
| Total | $2,230,000 | $2,520,290 | ($290,290) |

---

[7] Includes the $500,000 for the sale of the office condominium.

[8] Does not include the $411,000 owed to Banesco for the sale of the office condominium.

[9] Including the $411,000 expense, the actual annual projected net income is ($315,176).

55.    Including the discrepancies and material omissions (such as the sale of the office condominium and the inclusion of materials and labor to subcontractors) from the Second SBCFP, the Debtor would project to earn these revenues and expenses throughout the Amended Plan:

| Year | Annual Projected Revenue | Annual Projected Expenses | Annual Projected Net Income |
|---|---|---|---|
| 2024 | $1,530,000[10] | $1,770,000[11] | ($240,000) |
| 2025 | $600,000 | $873,930[12] | ($273,930) |
| 2026 | $600,000 | $746,930[13] | ($146,930) |
| Total | $2,730,000 | $3,390,860 | ($660,860) |

56.    The above-referenced number does not include, among other things, the $150,000 annual "operating cash" expense to be taken out of the Debtor's annual revenue. In any event, and under any scenario, the Debtor will be running a substantial monthly deficit should its Amended Plan be confirmed.

57.    Even though Mr. Vazquez has stated that he and his wife are "committed" to keeping the company afloat, when asked if Mr. and Mrs. Vazquez have a plan to place more funds into the Debtor if it cannot meet its financial obligations (which it cannot, based on its Small Business Cash Flow Projections), Mr. Vazquez's response was:

**We don't have a specific plan. If you think -- you know, if you're asking me if we've sat down and drafted some type of plan, we have not done that**.

**Exhibit "P,"** Ulysses Vazquez Dep. Tr. 74: 24–75:1 (emphasis added).

---

[10] Includes $500,000 for sale of the office condominium.

[11] Includes $411,000 paid to Banesco for office condominium and expenses for Materials ($63,500/year) and Labor ($90,000/year)

[12] Includes Materials ($63,500/year) and Labor ($90,000/year).

[13] Includes Materials ($63,500/year) and Labor ($90,000/year).

**VI.** **The Debtor Spends Hundreds of Thousands of Dollars in Attorney's Fees in Connection with this Bankruptcy.**

58.     On December 4, 2023, the Debtor filed its *Summary Third and Final Application of Jacqueline Calderin and Agentis PLLC for Allowance of Compensation and Reimbursement of Expenses as Counsel to the Debtor for the Period From March 22, 2023, through Confirmation* [ECF #392] ("Fee Application"). An excerpted portion is attached as **Exhibit "Q."**

59.     In its Fee Application, the Debtor's counsel admits having spent a whopping $386,544.19[14] in attorney's fees over less than nine months in this Bankruptcy. The breakdown can be characterized as follows:

a.  **Main Case (23-12217-LMI)**: $212,441.50 in attorney's fees and $15,572.83 in expenses, for a total of $228,014.33.

b.  **Adversary Case v. John Moriarty & Associates of Florida, Inc. et al. (23-01092-LMI**: $131,548.50 in attorney's fees and $9,937.87 in expenses, for a total of $141,486.37. The Adversary Proceeding commenced in mid-April 2023 and was abated on May 15, 2023. Thus, the Debtor's counsel is asking to be compensated $141,486.37 for around one month's worth of work.

c.  **Balfour Beatty Construction Stay Relief Litigation**: $253,980.00 in attorney's fees and $8,422.73 in expenses, for a total of $262,402.73. Unlike the John Moriarty Adversary Proceeding, the Debtor's counsel is not asking for these fees to be paid as part of its Fee Application.

60.     As explained above, the purpose of Subchapter V is to "provide[] a new avenue for small business debtors to reorganize outside of the more costly traditional chapter 11 framework."

---

[14] While the total compensation sought is $616,731.00, the Debtor nonsensically believes it will recovery over $253,980 from Balfour Beatty in the stay violation matter.

*In re 218 Jackson LLC*, 631 B.R. at 946. The Debtor has entirely disregarded such a purpose and has allowed its counsel to spend hundreds of thousands of dollars in fees when it has been insolvent since, at the latest, January 1, 2023. The Fee Application is even more egregious when one considers that close to 90% of the "Vazquez Exit Contribution" will go towards paying the Debtor's counsel's fees.

## ARGUMENT

The Court should deny the Debtor's Amended Plan of Reorganization for two reasons. First, the Amended Plan of Reorganization was filed in bad faith and does not meet the requirements of 11 U.S.C. § 1129(a)(3). Second, the Amended Plan of Reorganization is not feasible under 11 U.S.C. § 1129(a)(11).

**A.     The Debtor's Amended Plan of Reorganization was filed in bad faith and does not meet the requirements of 11 U.S.C. § 1129(a)(3)**.

Under 11 U.S.C. § 1129(a)(3), "a Chapter 11 reorganization plan must be submitted in good faith and not by any means forbidden by law." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995). "While the Bankruptcy Code does not define the term, courts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *Id.* (citations omitted). "Those purposes include preserving jobs in the community, allowing the business to continue to operate instead of liquidation, and achieving a consensual resolution between debtors and creditors." *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1082 (11th Cir. 2015) (citing *In re United Marine, Inc.,* 197 B.R. 942, 947 (Bankr. S.D. Fla. 1996)).

Courts look to the totality of the circumstances surrounding the plan to determine whether it was filed in good faith, *In re McCormick*, 49 F.3d at 1526, including the post-petition actions of

the plan proponent. *In re Georgetown Ltd. P'ship*, 209 B.R. 763, 769 (Bankr. M.D. Ga. 1997) (citing *Matter of Fiesta Homes of Georgia, Inc.,* 125 B.R. 321, 325 (Bankr.S.D.Ga.1990)).

There is not an exhaustive list or any single factor that, by itself, "will necessarily lead to a finding of bad faith" under 11 U.S.C. § 1129(a)(3). *Id.* (citing *In re Levinsky,* 23 B.R. 210, 217 (Bankr. E.D.N.Y. 1982)). That said, factors bankruptcy courts consider in finding bad faith include, but are not limited to, (1) the lack of a "realistic possibility of an effective reorganization," *id.* (citing *Albany Partners, Ltd.*, 749 F.2d at 674), (2) "whether the debtor is seeking to use the bankruptcy provisions 'to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business,'" *id.* (citing *In re Victory Constr. Co.,* 9 B.R. 549, 564 (Bankr.C.D.Cal.1981)); (3) "the timing of the debtor's relevant actions," *id.* (citing *In re 299 Jack-Hemp Assocs.,* 20 B.R. at 413), and (4) "[t]he failure to disclose relevant information in a bankruptcy case.'" *In re Georgetown Ltd. P'ship*, 209 B.R. at 769 (citing *Big Shanty Land Corp. v. Comer Properties, Inc.,* 61 B.R. 272, 281 (N.D.Ga.1985)).

"In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions." *In re Nat. Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987) (citing *Albany Partners, Ltd. v. Westbrook* (*In re Albany Partners, Ltd.*), 749 F.2d 670, 674 (11th Cir.1984); *In re 299 Jack-Hemp Assocs.,* 20 B.R. 412, 413 (Bankr. S.D.N.Y. 1982)). "Plans proposed as a scheme for delay have been found not to be good faith." *In re Diplomat Constr., Inc.*, 09-68613-MGD, 2009 WL 6498180, at *4 (Bankr. N.D. Ga. Nov. 20, 2009) (citing several).

Finally, "[w]hen a corporation becomes insolvent, . . . the officer or director's fiduciary duties shift to the creditors of the corporation." *In re Toy King Distributors, Inc.*, 256 B.R. 1, 166 (Bankr. M.D. Fla. 2000) (citations omitted).

21

The Court should find the Debtor's Amended Plan of Reorganization was filed in bad faith and does not meet the requirements of 11 U.S.C. § 1129(a)(3). Several factors indicate that the Amended Plan was filed in bad faith.

First, as elaborated on in Section B, the Debtor's Plan is simply not feasible. The Debtor's projected monthly revenues, as found in the Small Business Cash Flow Projections, are speculative. Even further, the Debtor cherry-picked its expenses and omitted certain key expenses from its Small Business Cash Flow Projections to attempt to establish feasibility. Even by doing so, the Small Business Cash Flow Projections all indicate that the Debtor will lose several hundreds of thousands of dollars throughout the Amended Plan. This is simply not a "realistic possibility of an effective reorganization" based on the Debtor's projections and is a factor reflecting the Amended Plan was filed in bad faith.

Second, the Debtor is seeking to use this Chapter 11 bankruptcy not to reorganize or rehabilitate its existing enterprise, but to create and organize a new business model. The Debtor has expressed several times that while it "is completing some of its prepetition projects, presently and upon emergence from Chapter 11, Edgewater is focusing on returning to its roots as a general contractor." **Exhibit "H,"** p. 1, 2. Because the Debtor is attempting to use this Chapter 11 to create a new business model (or one that it has operated under since 2017), this is yet another factor reflecting the Amended Plan was filed in bad faith.

Third, the Debtor made material misrepresentations and omissions post-petition. To begin, while the Debtor alleged at the time of its Voluntary Petition that it would have distributions for unsecured creditors, the Debtor has changed its tune and is not alleging there is no disposable income for the unsecured creditors. What's more, the Debtor knowingly made material misrepresentations to the Court relating to the alleged "agreement" reached between the Debtor

and Balfour Beatty. Additionally, while the Debtor emphasizes the "Vazquez Exit Contribution" as a benefit to the estate, the record is clear that the "Vazquez Exit Contribution" is a fabrication made of whole cloth that only benefits the Debtor's counsel and Mr. and Mrs. Vazquez (who will receive almost all of the "Vazquez Exit Contribution" in return)—a direct violation of the Debtor's principals duty to the Debtor's creditors.[15] This does not include the fact that the Debtor omitted that Mr. and Mrs. Vazquez sold a significant non-exempt asset post-petition (which satisfied the only mortgage on the Vazquez's homestead) and are not providing equivalent value to the estate. This is nowhere near what the kind of substantial contribution contemplated for under *Seaside Eng'g*. As a result, the Debtor and its principals' post-petition actions are another factor reflecting the Amended Plan was filed in bad faith.

In sum, the several factors outlined above evidence that the Amended Plan will not achieve a result consistent with the purposes of Chapter 11 of the Bankruptcy Code. The Debtor is not feasible, is not attempting to reorganize its current business model, and has made material misrepresentations to the Court. The Amended Plan is no more than a scheme to get Mr. and Mrs. Vazquez out of their guaranties with their sureties. The only two people who will benefit from the confirmation of the Amended Plan are Mr. and Mrs. Vazquez, while everyone else – including the Debtor – will suffer. Thus, the Court should find that the Amended Plan was filed in bad faith and does not meet the requirements of 11 U.S.C. § 1129(a)(3).

**B.**    **The Debtor's Amended Plan of Reorganization is not feasible under 11 U.S.C. § 1129(a)(11).**

For a plan to be confirmed, it must be feasible in that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed

---

[15] There is no dispute the Debtor was and currently is still insolvent.

in the plan." 11 U.S.C. § 1129(a)(11). The purpose of the feasibility requirement is "to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Inv'rs Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) (citing *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989)); *accord In re Malkus, Inc.*, 03-07711-GLP, 2004 WL 3202212, at *4 (Bankr. M.D. Fla. Nov. 15, 2004) (citing *In re Sovereign Oil Co.*, 128 B.R. 585, 587 (Bankr. M.D. Fla. 1991)).

Factors which a court should consider in determining whether the feasibility standard is met include, but are not limited to,

(1)     the adequacy of the debtor's capital structure;

(2)     the earning power of its business;

(3)     economic conditions;

(4)     the ability of the debtor's management;

(5)     the probability of the continuation of the same management; and

(6)     any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

7 Collier on Bankruptcy P 1129.02 (16th 2023) (citing *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000); *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002)).

Additionally, "[a] debtor's past performance is one of the most important measures of whether a debtor's plan will succeed." *In re Malkus, Inc.*, 03-07711-GLP, 2004 WL 3202212, at *4 (Bankr. M.D. Fla. Nov. 15, 2004).

"Only a reasonable assurance of commercial viability under the plan is required; a debtor need not demonstrate that the plan is certain to succeed." *In re Inv'rs Florida Aggressive Growth Fund, Ltd.*, 168 B.R. at 765(citing same). "However where the financial realities do not support

the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied." *Id.* (citing same).

"The evidentiary standard for feasibility is a preponderance of the evidence. *In re Aspen Vill. at Lost Mountain Memory Care, LLC*, 609 B.R. 536, 543 (Bankr. N.D. Ga. 2019) (citing *Bank of the West v. Wiersma (In re Wiersma)*, 227 F. App'x 603, 605 (9th Cir. 2007); *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997)).

The Court should find that the Debtor's Amended Plan is simply not feasible under 11 U.S.C. § 1129(a)(11). The Debtor filed several Small Business Cash Flow Projections throughout this Bankruptcy to attempt to establish feasibility. Yet the Small Business Cash Flow Projections are problematic. As to revenues, when Mrs. Vazquez was asked how the Debtor calculated $50,000 in monthly revenues, Mrs. Vazquez's response was:

> I am calculating that at a minimum -- and, again, these are projections. We're only projecting -- that I'm going to have at a minimum $50,000 of um -- of receipts. **We are bidding work and we anticipate that we will get some projects. Will it be $50,000 a month? I'm not sure**. I just needed to start with a number and I felt comfortable with the $50,000."

**Exhibit "_,"** Dulce Vazquez Dep. Tr. 85:4–50 (emphasis added).

Mrs. Vazquez also could not identify whether the Debtor had any contracts that would be in place to justify the $50,000 monthly revenues starting as of January 2024. **Exhibit "J,"** Dulce Vazquez Dep. Tr. 86:7–11. These unreasonable and speculative projections cannot establish feasibility. *See In re Diplomat Constr., Inc.*, 09-68613-MGD, 2009 WL 6498180, at *3.

Next, in terms of the ability to generate a profit, the projected expenses of the First Amended SBCFP nor the Second Amended SBCFP outweigh the projected revenues:

| First Amended SBCFP | | | |
|---|---|---|---|
| Year | Annual Projected Revenue | Annual Projected Expenses | Annual Projected Net Income |
| 2024 | $1,530,000[16] | $1,434,176[17] | $95,824[18] |
| 2025 | $600,000 | $631,698 | ($31,698) |
| 2026 | $600,000 | $616,406 | ($16,406) |
| Total | $2,730,000 | $2,682,280 | $47,720[19] |
| Second Amended SBCFP | | | |
| Annual Projected Revenue | Annual Projected Revenue | Annual Projected Revenue | Annual Projected Revenue |
| 2024 | $1,030,000 | $1,206,430 | ($176,430) |
| 2025 | $600,000 | $720,430 | ($120,430) |
| 2026 | $600,000 | $593,430 | $6,570 |
| Total | $2,230,000 | $2,520,290 | ($290,290) |

Including the discrepancies and material omissions (such as the sale of the office condominium and the inclusion of materials and labor to subcontractors) from the Second SBCFP, the Debtor would project to earn these revenues and expenses throughout the Amended Plan:

| Year | Annual Projected Revenue | Annual Projected Expenses | Annual Projected Net Income |
|---|---|---|---|
| 2024 | $1,530,000[20] | $1,770,000[21] | ($240,000) |
| 2025 | $600,000 | $873,930[22] | ($273,930) |
| 2026 | $600,000 | $746,930[23] | ($146,930) |
| Total | $2,730,000 | $3,390,860 | ($660,860) |

---

[16] Includes the $500,000 for the sale of the office condominium.

[17] Does not include the $411,000 owed to Banesco for the sale of the office condominium.

[18] Including the $411,000 Banesco expense, the actual annual projected net income is ($315,176).

[19] Does not include the $411,000 Banesco expense. If it did, the total projected net income would be ($267,456).

[20] Includes $500,000 for sale of the office condominium.

[21] Includes $411,000 paid to Banesco for office condominium and expenses for Materials ($63,500/year) and Labor ($90,000/year)

[22] Includes Materials ($63,500/year) and Labor ($90,000/year).

[23] Includes Materials ($63,500/year) and Labor ($90,000/year).

As a result, the adequacy of the Debtor's capital structure and its earning power are on shaky grounds. Additionally, as admitted by the Debtor, the economic realities of the COVID-19 pandemic produced the price of materials increasing by as much as 300%. These costs are still rapidly fluctuating and are not projected to stabilize any time soon. This is yet another factor demonstrating the lack of feasibility.

Finally, the ability of the Debtor's management is another factor signifying the Amended Plan is not feasible. The Debtor's management has been running its operations into the ground for the last several years, resulting in the Debtor having a net operating loss of $3,956,346.54 in 2022.

Even though the Debtor's management has been around since the 1990s and will have the same management going forward, this one factor does not outweigh the reality that the Debtor's Small Business Cash Flow Projections project the Debtor will need further financial reorganization or liquidation by 2027 (at the latest). Thus, the Debtor cannot establish feasibility under 11 U.S.C. § 1129(a)(11).

## **CONCLUSION**

In sum, not only was the Debtor's Amended Plan filed in bad faith (not meeting the requirements of 11 U.S.C. § 1129(a)(3)), but it is also not feasible (not meeting the requirements of 11 U.S.C. § 1129(a)(11)), evidenced by all of Debtor's Small Business Cash Flow Projections. Thus, the Court should deny the Debtor's Amended Plan of Reorganization [ECF #346].

**WHEREFORE**, BALFOUR BEATTY CONSTRUCTION, LLC, respectfully requests that the Court deny the Debtor's Amended Plan of Reorganization [ECF #346], along with all other relief the Court deems just and proper.

Dated: December 6, 2023,          Respectfully Submitted,

*/s/ Kenneth G.M. Mather, Esq.*
Kenneth G.M. Mather, Esq.
Florida Bar No.: 619647
Nicolaos Soulellis, Esq.
Florida Bar No.: 1031737
Gunster, Yoakley & Stewart, P.A.
401 E. Jackson Street, Suite 1500
Tampa, FL 33602
(813) 222-6630; Fax: (813) 228-6739
Primary Email:        kmather@gunster.com
                      nsoulellis@gunster.com
Secondary Email:      tbacchus@gunster.com
                      eservice@gunster.com
Attorneys for Balfour Beatty

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above document was furnished via regular U.S. Mail to Debtor, Edgewater Construction Group, Inc., 6962 S.W. 47th Street, Suite 6962, Miami, Florida 33155, and by electronic mail to Debtor's Counsel, Jacqueline Calderin, Esq. and Robert P. Charbonneau, Esq. of Agentis PLLC, 55 Alhambra Plaza, Suite 800, Miami, Florida 33131 at jc@agentislaw.com and rpc@agentislaw.com; and the U.S. Trustee, through its counsel, Dan L. Gold, Esq., 51 S.W. 1st Avenue, Suite 1204, Miami, Florida 33130 and all parties who receive notice electronically through CM/ECF on this 6th day of December, 2023.

*/s/ Kenneth G.M. Mather, Esq.*
Kenneth G.M. Mather, Esq.