*Tagged opinion*



**ORDERED in the Southern District of Florida on November 15, 2024.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

---

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:                                    Case No. 23-12217-BKC-LMI

EDGEWATER CONSTRUCTION            Chapter 11
GROUP, INC.                               Subchapter V

           Debtor.

_____/

### <u>ORDER ON DAMAGES</u>

THIS MATTER came before the Court on May 21 and 22, 2024 for trial (the "Trial") on (1) the damages phase of the *Order on Debtor's Emergency Motion for an Order Enforcing the Automatic Stay; Setting Further Hearing on Request for Sanctions for Intentional and Willful Violation of the Automatic Stay; and Setting Further Hearing on Request for Turnover* (the "Stay Violation Order") (ECF #242); and (2) Reorganized Debtor's *Objection to Balfour's Proof of Claim 27-3* (the "Claim

Objection") (ECF #516). The Court has considered the Stay Violation Order, the Claim Objection, the response to the Claim Objection, the parties' arguments, and the evidence presented at Trial in rendering the following ruling.[1]

## PROCEDURAL AND FACTUAL BACKGROUND

In October of 2021 BALFOUR BEATTY CONSTRUCTION, LLC ("Balfour," "Balfour Beatty," or "Contractor") and EDGEWATER CONSTRUCTION GROUP, INC. ("Edgewater" or "Debtor" or "Reorganized Debtor" or "Subcontractor") executed a Long Form Subcontract under which Edgewater was to perform stucco services on what has been called the RD East Las Olas Project (the "RD Project"). In January of 2022 Balfour Beatty and Edgewater entered into an almost identical Long Form Subcontract to perform stucco services on what has been called the 2000 Biscayne Project (the "2000 Project").[2]

At some point after Edgewater executed the Contracts, Edgewater began to experience financial difficulties at the many projects in which it was performing stucco subcontracting work, including the Projects. On March 20, 2023, Edgewater's field crew assigned to the RD Project stopped working and left the jobsite altogether based on Edgewater's failure to pay their wages. On March 21, 2023, Balfour Beatty emailed Edgewater as follows:

> Edgewater's field crew assigned to RD Las Olas stopped working and left the jobsite today. As a result of this action, ***this email is a delay***

---

[1] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."). To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, as conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

[2] The two contracts will be referred to collectively as the "Contracts" and the two projects will be referred to collectively as the "Projects".

> ***notice because production on site cannot stop***. ***Edgewater's decision to pull out all their personnel from the site without notice will delay the completion date of the project***. Cost and schedule impact may result due to this decision which may also affect other trades.
>
> ***Your written explanation and correction plan must be submitted via e-mail to all copied in this email by COB today***. We ask that you take appropriate measures to address this issue promptly.

On March 22, 2023, Balfour Beatty sent a second email to Edgewater demanding that the situation be corrected. Edgewater did not respond to either email. However, on March 22, 2023, Edgewater filed for protection under Subchapter V of Chapter 11 of the Bankruptcy Code (the "Petition Date"). At the time Edgewater filed bankruptcy, the RD Project was well underway, but the only work Edgewater had done on the 2000 Project was the preparation of mockups of different stucco applications for the owner's review.

What happened after that, leading up to the entry of the Stay Violation Order, is detailed in that order. There is no need for the Court to repeat those findings in this order.

The Stay Violation Order held that Balfour Beatty had willfully violated the automatic stay by issuing the Default Letters[3] and by wrongfully retaining Edgewater's scaffolding and stucco materials left at the Projects (collectively the "Stay Violations"). The Stay Violation Order directed the parties to confer regarding establishing trial procedures to adjudicate Edgewater's request for damages arising from the Stay Violations, which requests included (1) loss of

---

[3] All terms not defined herein shall have the meaning set forth in the Stay Violation Order.

profits; (2) the inability to monetize its scaffolding as a result of Balfour Beatty's wrongful retention; (3) the additional cost of Edgewater retaining personnel on the belief it would continue to work under the Contracts; (4) the inability to contain and resolve claims against the estate due to Balfour Beatty's unilateral decision to pay certain suppliers and subcontractors; (5) legal fees and costs; (6) lost opportunity costs related to the distractions of Edgewater's personnel dealing with the Stay Violations; and (7) punitive damages.[4]

In addition to the damages phase of the Stay Violation Order, by agreement, the parties agreed to try the Claim Objection, as well as Edgewater's request for turnover of unpaid draw requests, which draw requests will be described in more detail later in this opinion. The parties also tried by consent the issue of damages arising from the disappearance of at least half of the scaffolding that had been delivered to the Projects from the time the bankruptcy case was filed to the time the remaining scaffolding was sold by Edgewater to the subcontractor who replaced it on the Projects – James J. Brooks, Inc. d/b/a Advanced Stucco ("Advanced"), which relate, not only to the wrongful retention of the scaffolding, but, as more detailed below, also to the appropriateness and amount of the punitive damages.

---

[4] Prior to Trial the Court granted Balfour Beatty's *Motion for Partial Summary Judgment* (ECF #311) holding that Edgewater was not entitled to lost profits as a matter of law. *See Oral Ruling on Motion for Partial Summary Judgment* (ECF #544); *Order Granting Balfour Beatty Construction, LLC's Motion for Partial Summary Judgment* (ECF #622). Edgewater did not put on any proof at Trial regarding retention cost of personnel or lost opportunity costs. The issues relating to Balfour Beatty's unilateral payment to subcontractors and suppliers was addressed by the Court in its *Memorandum Opinion on Order Denying Application for Administrative Claim* (ECF #519).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. **Actual Damages for the Stay Violations**

As the Court noted in the Stay Violation Order "[i]f a party willfully violates the automatic stay a debtor who is injured by the willful violation is entitled to recover his or her actual damages including costs and attorneys' fees, and if appropriate, may also recover punitive damages." *In re Lyubarsky*, 615 B.R. 924, 929 (Bankr. S.D. Fla. 2020).  The actual damages for which evidence was presented at Trial by Edgewater are for the use of the scaffolding while it was being wrongfully retained by Balfour Beatty, the replacement value of the scaffolding that disappeared from the Projects, the value of the stucco material wrongfully retained, and attorneys' fees incurred in connection with the Stay Violations.[5] "[T]he debtor has the burden of proving damages from an automatic stay violation by a preponderance of the evidence." *In re Horne*, 876 F.3d 1076, 1083 (11th Cir. 2017).

### 1. **Scaffolding and Stucco**

Edgewater's *Emergency Motion for an Order (I) Enforcing the Automatic Stay, (II) Awarding Sanctions for Intentional and Willful Violation of the Automatic Stay (III) Requiring Turnover of Property of the Estate and Matured Debts* (ECF

---

[5] By separate motion Edgewater asks this Court to sanction Balfour Beatty as a vexatious litigant by requiring Balfour Beatty to pay almost all professional fees incurred in the main bankruptcy case. *See Reorganized Debtor's Motion for Attorneys' Fees and Costs as a Sanction* (ECF #569) (the "Fee Motion") and includes this request and additional fees unrelated to the Stay Violations in the *Reorganized Debtor's Supplemental Motion for Attorneys' Fees and Costs as a Sanction* (ECF #658) (the "Supplemental Fee Motion") (the portions of the Fee Motion and Supplemental Fee Motion unrelated to the Stay Violations are collectively referred to as the "Additional Fee Requests").  The Court will address the Additional Fee Requests in a separate order. This order will only address those fees directly related to the Stay Violations, including, without limitation, fees associated with the Trial on damages.

#52) (the "Stay Violation Motion") was filed on April 5, 2023. The Stay Violation Motion alleged that Balfour Beatty was wrongfully retaining Edgewater's scaffolding and some stucco material. The trial on the Stay Violation Motion was conducted on June 26, 2023. The Stay Violation Order was entered on August 2, 2023, holding that Balfour Beatty was wrongfully retaining Edgewater's scaffolding and stucco material in violation of the automatic stay.

Balfour Beatty never returned the scaffolding or the stucco material to Edgewater, not even after the Stay Violation Order was entered. Indeed, it was not until late November 2023 that Balfour Beatty even invited Edgewater to pick up some, but not all, of its scaffolding. Ultimately, Edgewater sold the scaffolding located at the Projects to Advanced but based on unrebutted testimony of both Michael Vazquez and Ulysses Vazquez, the scaffolding that was at the Projects at the time of the sale to Advanced was 50% to 60% less than the scaffolding that Edgewater delivered to the respective Projects.

At the time the Stay Violation Order was entered, Edgewater was seeking the value of the loss of use of the scaffolding up to that point. Since Balfour Beatty never turned over the scaffolding or the stucco material, Edgewater is seeking the value of the use of the scaffolding from the Petition Date through the date of sale to Advanced, based on what it asserts would be the rental value of the scaffolding, and then seeking the replacement value of the scaffolding that disappeared, as well as the stucco material that was, apparently, used by Advanced.

Balfour Beatty counters that (1) it was never obligated to turn over the scaffolding or stucco material since the Stay Violation Order did not explicitly order it to do so; (2) the Contracts include in the price the use of the scaffolding and the cost of material (the stucco), and therefore Balfour Beatty did not have to pay for the stucco or for scaffolding that it used until it wasn't needed anymore; (3) even if Edgewater were entitled to be paid for the use of the scaffolding, Edgewater has not met its burden of proof regarding the rental value of the scaffolding; and (4) Edgewater is not entitled to the replacement value of the wrongfully retained scaffolding since Edgewater was eventually paid by Advanced for the scaffolding.[6]

Balfour Beatty's argument is not only wrong, but, as the Court will address in the punitive damages section of this opinion, is sanctionable. The Court previously found in the Stay Violation Order that the scaffolding and stucco were wrongfully retained. At no time during the trial on the Stay Violation Motion did Balfour Beatty argue the Contracts entitled it to retain the scaffolding. At no time after the Court entered the Stay Violation Order did Balfour Beatty come to the Court and seek reconsideration of the Court's finding that Balfour Beatty's retention of the scaffolding was wrongful. Thus, even if there were an argument that Balfour Beatty was entitled to retain the scaffolding, that argument was never raised at any time before this Court until the damages phase of this dispute. Indeed, as the Court found in the Stay Violation Order, Balfour Beatty

---

[6] As to this last point Balfour Beatty appears to believe it is entitled to some kind of positive recognition since its retention of the scaffolding "made it easier" for Edgewater to sell the scaffolding to Advanced.

actually misrepresented several times what had happened to the scaffolding prior to the time of the trial on the Stay Violation Motion. And it came out at this Trial, that at the time of the Stay Violation Motion trial, Balfour Beatty knew that Advanced was using Edgewater scaffolding to perform its work on the RD Project. Apparently, Balfour Beatty believes that there should be no consequence for its not-so-clever attempt to disregard this Court's order finding the scaffolding was wrongfully retained. The Court holds otherwise. The Debtor is entitled to actual damages relating to the wrongful retention of the scaffolding and the stucco.[7]

Edgewater argues that the appropriate measure of damages for the wrongful retention of the scaffolding is the rental value of the scaffolding. In support of this argument the Debtor presented the testimony of Michael Vazquez, who is the person at Edgewater in charge of all things scaffolding. Michael testified that he has three certifications with respect to scaffolding and that he personally deployed the scaffolding at Edgewater's various projects.

Michael testified that he personally supervised Edgewater's renting of scaffolding to third parties approximately five times. Based on this experience, Michael testified that he would charge approximately $22,000.00-$25,000.00 per month to a third party to rent scaffolding in the amount and nature that Edgewater deployed (under his direct supervision) to the RD Project and $10,000.00-$12,000.00 per month to a third party to rent the scaffolding

---

[7] The Court will address the appropriate punitive damages for this flagrant disregard of the Stay Violation Order later in this opinion.

deployed at the 2000 Project. Ulysses Vazquez, one of the principals of Edgewater, testified that he had previously rented scaffolding to third parties "all the time," and that he would charge a third party $20,000.00-$25,000.00 per month to rent the scaffolding at the RD Project. Edgewater argues that the wrongful retention deprived it of the ability to rent or use the scaffolding elsewhere.

Ulysses also testified that the value of the unreturned stucco materials is approximately $15,552.00 consisting of 36 pallets with 48 bags per pallet at a cost of $9.00 per bag. That testimony was not disputed, except that Balfour Beatty argues the cost of the stucco was included in the Contracts.

Balfour Beatty did not provide any evidence that contradicted the testimony regarding the rental value of the scaffolding. However, Balfour Beatty argues that the Vazquezes were not qualified to present the testimony regarding the rental value of the scaffolding, that Michael's testimony was based solely on a document that the Court refused to admit into evidence,[8] and therefore Edgewater did not meet its burden of proof as to the amount of damages. Moreover, Balfour Beatty argues, that because the Contracts gave it the right to retain the scaffolding, and that because the use of the scaffolding is included in

---

[8] Balfour Beatty objected to the Vazquezes testimony at Trial arguing that the Vazquezes proffers violate Fed. R. Civ. P. 26(a)(2) and Fed. R. Civ. P. 37 because they were not disclosed as experts, whether retained or non-retained, and must be stricken. Balfour Beatty also argues that because Michael's testimony as to the rental value was based solely on figures set forth in an excluded exhibit, Michael's testimony was inadmissible hearsay. However, as the Court ruled at Trial, an owner of property may testify as to its value without being qualified as an expert. And, because Michael testified that his valuation came from his personal experience renting the scaffolding, it is not hearsay. *See Taxinet Corp. v. Leon,* 114 F.4th 1212, 1225 (11th Cir. 2024). This "opinion" testimony is admitted not due to expertise but due to the witness' particularized knowledge by virtue of the Vazquezes position in the business. *See id.* at 1225-26.

the Contract prices for the Projects, Edgewater cannot seek damages based on Balfour Beatty's use of the scaffolding.

The Court finds that the unrebutted testimony of Michael and Ulysses as to the rental value of the scaffolding is admissible under Federal Rule of Evidence 701, is not based on inadmissible hearsay, and that their testimony was truthful. However, the Court agrees with Balfour Beatty that the use of the scaffolding was included in the pricing of the Contracts, and therefore a separate "use fee" would not be recoverable under the Contracts. Moreover, Edgewater did not present any evidence that Edgewater had intended to, would have, or could have rented or used the wrongfully retained scaffolding had it been returned. Thus, the rental value of the scaffolding is not an element of the actual damages associated with Balfour Beatty's wrongful retention of the scaffolding. It is, however, an appropriate element of the measure of damages associated with the Claim Objection, which the Court will address more fully later in this opinion.

The Court will now turn to Edgewater's claim for the replacement value of the scaffolding. Edgewater seeks $287,500.00 less the $40,000.00 obtained by Edgewater from Advanced for the purchase of the scaffolding, for a total damage claim relating to the scaffolding of $247,500.00 which, Michael and Ulysses testified, is the combined replacement value of the scaffolding that was deployed at the Projects. Balfour Beatty counters that Edgewater is not entitled to replacement value and that the true measure of the market value of the scaffolding was what Advanced paid Edgewater for the scaffolding. Finally, Balfour Beatty makes the incredible argument that because the scaffolding

served as collateral for a loan to the Small Business Administration (the "SBA"), Edgewater did not hold any equity in the scaffolding.[9]  Therefore, Balfour Beatty argues, for all of these reasons, Edgewater is not entitled to any damages relating to the value of the scaffolding.

The Court agrees with Balfour Beatty that damages associated with the loss of the scaffolding is the value of the scaffolding at the time it was wrongfully retained, which the Court finds begins on March 30, 2023, the date Edgewater first demanded return of tools, equipment, and material.    Edgewater characterized the wrongful retention of the scaffolding as civil theft in an adversary proceeding (later dismissed) (the "Civil Theft Adversary")[10] filed against Balfour Beatty after repeated demands for the scaffolding, or payment for its use, were rebuffed.  Thus, the theory of damages arises in tort.  Tort law is clear that "damages for conversion are limited to the reasonable value of the property when converted and are not to be based on the replacement value." *Rosenthal as Tr. of Barry Rosenthal Revocable Tr. UAD 11-17-2009 v. Equus Prop. Homeowners HOA, Inc.*, 369 So. 3d 719, 723 (Fla. 4th DCA 2023) (internal citations omitted); *Small Bus. Admin. v. Echevarria*, 864 F. Supp. 1254, 1267 (S.D. Fla. 1994) ("Under Florida law, damages for conversion are limited to the reasonable value of the property when converted.").

---

[9] If this were a valid argument, then no plaintiff would ever be entitled to damages for the loss of any asset subject of a lien.  This ignores the very obvious issue that the asset, but for the loss, would be available to satisfy an obligation secured by the asset, the absence of which could create liability for the obligor.

[10] Adv. No. 24-1006-LMI.

There is some evidence regarding the value of the scaffolding at the time of the demand for its return. One possible value would be the value placed on the scaffolding as reflected in the Civil Theft Adversary - $19,035.87 for the scaffolding at the 2000 Project and $93,605.25 for the scaffolding at the RD Project,[11] which would mean, at most, Edgewater is entitled to actual damages for the loss of the scaffolding in the amount of $112,641.12, less the $40,000.00 for the scaffolding that was purchased by Advanced, for a total of $72,641.12. However, Michael testified the scaffolding had been purchased "several years ago" and did not testify that the value was the same on the Petition Date. Edgewater's bankruptcy schedules, which were filed on April 14, 2023 (ECF #98) listed the value of its scaffolding in two lines of Schedules A – (2015 $39,702.00) and (2015 $40,782.00), that is, a total of approximately $80,000.00.[12]

Balfour Beatty argues that Edgewater received full payment for the scaffolding, and that the $40,000.00 that Advanced paid for the scaffolding is an accurate reflection of its fair market value. While the Court agrees that the $40,000.00 paid by Advanced for the scaffolding is the best evidence of what was the value of the scaffolding when it was wrongfully retained[13], Balfour Beatty's argument completely ignores the testimony of Michael and Ulysses that the scaffolding purchased by Advanced was only 40% to 50% of the scaffolding that

---

[11] The Court finds that Michael Vazquez adequately explained an issue regarding whether the RD Project valuation included scaffolding at a different project, and that the $93,605.25 only relates to the scaffolding at the RD Project. In any event, the discrepancy is not relevant in light of the Court's ruling.

[12] The Debtor amended its schedules twice but never changed the valuation of its assets.

[13] In opening argument, Edgewater's counsel referred to the $40,000.00 as a "fire sale" but in light of Edgewater's own valuation in its schedules of the scaffolding, the price of $40,000.00 for half the scaffolding is not a "fire sale."

Edgewater deployed to the Projects. Michael testified that he personally supervised the deployment of the scaffolding at both Projects. Balfour Beatty argues that this testimony was "self-serving," but yet, provides no convincing evidence to counter Michael's first-hand knowledge of what he delivered. The Court finds that Michael's testimony as to what was delivered was truthful. Thus, even if the amount Advanced paid for the scaffolding was its fair market value, that would mean that the value of the scaffolding at the time it was wrongfully retained was at least $80,000.00. In the absence of other evidence as to value, the Court finds that the value of the scaffolding deployed at both Projects at the time of wrongful retention was $80,000.00, and therefore, after deducting the amount Advanced paid, Edgewater is entitled to actual damages for the loss of the scaffolding in the amount of **$40,000.00.**

As with the scaffolding, the Court agrees with Balfour Beatty that the cost of the stucco was included in the Contracts. However, since Advanced used the stucco at the RD Project, as addressed more fully below, Balfour Beatty's rejection damage claim will be discounted by the amount of **$15,552.00** in connection with the stucco usage.

### 2. Default Letters

Edgewater also seeks actual damages for the sending of the Default Letters, which the Court also held was a violation of the automatic stay. However, the Court finds that Edgewater has failed to demonstrate that Edgewater incurred any actual damages arising from the sending of the Default Letters, other than undifferentiated damages associated with the attorneys' fees

incurred in dealing with the Stay Violations, which damages the Court turns to next.

### 3. Attorneys' Fees and Costs

Edgewater seeks all the attorneys' fees and costs associated with the Stay Violations, the Stay Violation Motion, the Stay Violation Order, including those incurred with respect to the damages phase of the Stay Violation Order.[14]  The attorney fee requests relating to the Stay Violations are set forth in *Reorganized Debtor's Motion for Attorneys' Fees and Costs as a Sanction* (ECF #569) (the "Fee Motion") and in *Reorganized Debtor's Supplemental Motion for Attorneys' Fees and Costs as a Sanction* (ECF #658) (the "Supplemental Fee Motion") (collectively the "Fee Requests").

The Fee Motion seeks fees and costs totaling $458,736.15, for the period from March 28, 2023, to May 2, 2024.[15] This number includes Edgewater's expert witness costs in the amount of $32,197.25 for the fees of Berkowitz Pollack Brant Advisors & CPAs, retained as experts in connection with Edgewater's claim for lost profits. The Supplemental Fee Motion seeks fees and costs totaling $113,287.19, for the period of May 3, 2024 to May 22, 2024, and additionally seeks $57,500.00 for estimated fees and costs associated with reviewing the Trial transcripts and preparing the Proposed Findings of Fact and Conclusions of Law.

---

[14] As already noted, on theories tangent to, but separate from, the Stay Violations, Edgewater requests that Balfour Beatty pay virtually all attorneys' fees associated with the main bankruptcy case, which request will be dealt with by separate order.

[15] This amount includes the "Additional Fee Requests" referred to in *supra* notes 5 and 14.

Edgewater has not differentiated the amount of attorneys' fees solely associated with the Stay Violations, leaving it to the Court to figure out what is the amount sought. Balfour Beatty has calculated the fees unrelated to the Stay Violations at $189,637.00. Balfour Beatty argues that Edgewater is only entitled to $20,000.00 in attorneys' fees and costs, based on a series of arguments, some of which are well-founded and others that are not.

The Court has previously addressed the framework for considering actual damages relating to a stay violation in *Lyubarksky*:

> The Eleventh Circuit has held that the actual damages recoverable by a debtor who suffered damages from a creditor's stay violation under section 362(k) include those attorney's fees incurred not only in stopping the violation, but also attorney's fees and costs incurred in prosecuting a damages action and defending the damages on appeal. *Mantiply v. Horne (In re Horne)*, 876 F.3d 1076, 1081 (11th Cir. 2017)("This explicit, specific, and broad language permits the recovery of attorney's fees incurred in stopping the stay violation, prosecuting a damages action, and defending those judgments on appeal."). ***An award of attorney's fees may be awarded as actual damages even if a debtor has not suffered other actual damages for the stay violation***. *Parker v. Credit Central South, Inc.*, 634 Fed.Appx. 770 (11th Cir. 2015).

615 B.R. at 934 (emphasis added).

Generally, in determining the reasonableness of fees and costs for assessing actual damages, if valuing the services of an estate professional, the Court will first apply the criteria set forth in 11 U.S.C. §330.[16] However, when

---

[16] Section 330 directs the Court to:

> consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

that criteria is not applicable, the Court will use the criteria set forth in *Johnson v. Georgia Highway Exp.*, 488 F.2d 714 (5th Cir. 1974) as reaffirmed in *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292 (11th Cir. 1988).[17] The criteria are virtually the same. Once those fees are calculated based on the criteria, the Court may then consider the overall fees in light of the results achieved. *See Norman*, 836 F.2d at 1302.

Balfour Beatty argues that Edgewater did not provide any expert testimony to support its claim for fees. However, as this Court has stated on numerous occasions, including in this case, this Court practiced bankruptcy law for over 20 years before taking the bench, and has served on the bench almost 19 years. Expert testimony is only necessary when needed to assist the trier of fact. This Court does not need an expert in bankruptcy fees to assist this Court in determining the reasonableness of attorneys' fees and costs incurred in connection with bankruptcy representation.

---

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. §330(a)(3).

[17] Those factors are (i) the time and labor involved; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent.; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.

Balfour Beatty also argues that the rates charged by Edgewater's professionals are too high and that the hours spent on particular tasks were either duplicative or excessive.  Edgewater counters that the reasonableness of the time spent on particular tasks, whether there was duplication, and the reasonableness of the rates charged by Edgewater's professionals, has already been determined by this Court, when it entered its *Order Approving Second and Final Application of Jacqueline Calderin and Agentis PLLC for Allowance of Compensation and Reimbursement of Expenses as Counsel for the Debtor* (ECF #494) (the "Fee Order") entered on December 27, 2023.  That Fee Order was not appealed and is final.  Edgewater is correct that those fees and costs addressed in the Fee Order have already been determined by the Court to be reasonable as to the rates and the hours spent, up to the entry of the Fee Order. Thus, the Court overrules Balfour Beatty's objections to the reasonableness of the rates charged or the hours spent with respect to those fees and costs.   As to those fees and costs incurred after the Fee Order was entered, the Court has reviewed the hours spent with respect to those fees not otherwise eliminated or reduced in this order and finds that those fees are reasonable. As the Court previously ruled, the charged rates are reasonable.

However, even with respect to those hours included in the Fee Order, the Court is reviewing fees relating to a damages claim for the Stay Violations, and while the Court has found the hours and rates of Agentis are  reasonable for the work performed and appropriate to be paid by the estate, the Court agrees with Balfour Beatty that the award of fees relating to damages for a stay violation

should only include those fees directly associated with the violation and the damages that Edgewater incurred because of those violations. Moreover, while the Court agrees that to some extent fees and costs incurred on a theory ultimately unsuccessful are still otherwise compensable, that applies generally to fee applications and not necessarily to assessment of damages. Nonetheless, the extent to which it is appropriate to include fees and costs related to an ultimately unsuccessful claim lies in the court's discretion. That determination rests, in part, on the nature of a particular theory, the reason the court finds that the theory is unsuccessful, as well as whether, and to what extent, that theory has some nexus to ultimate recovery.

Taking all those factors into account, the Court holds that the damages related to professional fees and costs should not include fees and costs directly associated with the unsuccessful "lost profits" damages claim, which the Court previously struck.[18]  Consequently, the fees associated with any work done by Berkowitz Pollack Brant Advisors & CPAs and fees associated with work by Agentis directly associated with the lost profits claim will not be included in the damages award.

However, the Court finds it is appropriate to include in the attorneys' fee damages, with one exception,[19] fees associated with the scaffolding rental calculations, charges associated with the sale of the scaffolding to Advanced, as

---

[18] *See supra* note 4.
[19] The Court finds that most of the fees associated with Jonathan Loaiza should not be included in the attorneys' fee damages calculation. The witness was not timely disclosed as an expert; even Mr. Loaiza did not know he was intended as a testifying expert.

well as all costs associated with the Civil Theft Adversary. Indeed, but for Balfour Beatty's continued wrongful retention of the scaffolding, the Civil Theft Adversary would not have been filed.

In its objection and response to the Fee Motion (ECF #621) (the "Initial Objection") Balfour Beatty argues that $189,637.00 of the fees requested are unrelated to the Stay Violations. Having reviewed the Fee Motion in detail, the Court finds that $144,042.10 of the requested fees are unrelated to the Stay Violations, but that $45,493.90 of the fees highlighted by Balfour Beatty are appropriately included.

In the Initial Objection, Balfour Beatty argues that in the Fee Motion, Edgewater seeks fees totaling $65,140.43 relating to the lost profits claim. After review, the Court finds that $37,494.57 of the requested fees are attributable to the lost profits, but that the balance of the highlighted fees, $27,645.86, are appropriately included in the damages.

The balance of the challenges in the Initial Objection are overruled for the reasons outlined above. Accordingly, the Court finds that the $458,736.15 claimed in the Fee Motion should be reduced by $213,733.92, leaving a total of damages in the Fee Motion of $245,002.20.

Balfour Beatty addresses in detail its objection to the Supplemental Fee Motion based on a variety of reasons all outlined in its response to the Supplemental Fee Motion (ECF #660) (the "Supplemental Objection"). Having reviewed those objections, the Court agrees that most of the fees associated with the attempted testimony of Jonathan Loaiza should not be included but finds

the total reduction in the Supplemental Fee Motion should only be $8,568.50.

The Court overrules the balance of the objections raised in the Supplemental Objection except with respect to the Berkowitz fees, already addressed and discounted from the Fee Motion, and the estimated fees of $57,500.00 which the Court will address next.

Edgewater estimated its fees for review of the Trial transcripts and preparation of the Proposed Findings of Fact and Conclusions of Law in the amount of $57,500.00. However, Edgewater has never filed an itemized statement setting forth the actual fees and costs. To estimate the fees the Court will use a blended rate of $515.00 an hour (Mr. Charbonneau and Mr. Corp) with an estimated time spent of 50 hours, for a total of $25,750.00. In arriving at this number, the Court has considered the factors delineated above, and finds that both the rate and hours allowed are appropriate. If, however, the actual time spent was less, the Court directs counsel to immediately notify the Court and opposing counsel. Accordingly, the Court holds that the $170,787.19 requested in the Supplemental Fee Motion is reduced by $40,318.50, leaving a balance of $130,468.70.

Based on the Court's detailed review of the Fee Requests, and consideration of the objections, the Court finds that the total attorneys' fee damage award to which Edgewater is entitled with respect to the Stay Violations is **$375,470.90**.

**B. <u>Punitive Damages for the Stay Violations</u>**

As this Court outlined in *Lyubarsky*:

Punitive sanctions are appropriate when a party acts with "reckless or callous disregard for the law or rights of others." *Parker v. Credit Central South, Inc.*, 634 Fed.Appx. at 773 (internal citations omitted). "The imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner... where a violator's acts are egregious, malicious or accompanied by bad faith." *In re Roche*, 361 B.R. 615, 624 (Bankr. N.D. Ga. 2005).

"Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay[20]; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Harrison*, 599 B.R. 173, 182 (Bankr. N.D. Fla. 2019); *In re Roche*, 361 B.R. at 624.

615 B.R. at 937-38.

No one factor is dispositive, and whether to award punitive damages, and the amount to be awarded, rest within the Court's discretion. *See Lyubarsky*, 615 B.R. at 938. In this case there is absolutely no question that punitive damages are not just appropriate, but also necessary. The Court has already outlined in the Stay Violation Order the various claims, all false, made by Balfour Beatty about the scaffolding, including that it had been "returned" to a mystery owner. Those misrepresentations, themselves, would have been enough to warrant some kind of punitive damages. The Court has also previously found that Balfour Beatty knew about Edgewater's bankruptcy, but nonetheless, determined to carry on without any regard to the requirements of the Bankruptcy Code, or respect for the automatic stay. And yet, despite the very specific ruling of this Court in the Stay Violation Order, and notwithstanding numerous

---

[20] Balfour Beatty does not dispute it has the financial wherewithal to pay punitive damages.

attempts by Edgewater to retrieve its scaffolding,[21] Balfour Beatty refused to return the scaffolding, asserting that this Court did not order it to do so. That a party who violated the automatic stay by wrongfully retaining an asset and lying about it, somehow tries to justify extending its wrongful retention because the Court did not specifically direct it to return the wrongfully retained asset, is just breathtaking in its audacity.

Balfour Beatty claims that Edgewater never asked that its scaffolding be returned until November of 2023. This argument is contradicted by every witness, and all evidence, except for Balfour Beatty's witnesses. The Court finds that Edgewater's witnesses are believable with respect to their testimony on this point. Moreover, the documentary evidence, including the filing of the Civil Theft Adversary, belies this point. Finally, even if Edgewater had not requested the return of the scaffolding, the Court's Stay Violation Order should have prompted Balfour Beatty to immediately contact Edgewater or its counsel to arrange the return of the scaffolding or come to some other accommodation. Based on Balfour Beatty's egregious conduct and flagrant disregard of this Court's Stay Violation Order, the Court finds that it is appropriate to multiply the actual damages relating to wrongful retention of the scaffolding by a multiplier of ten, representing the ten months – from April of 2023 to January of 2024 – that the scaffolding was wrongfully retained. Therefore, with respect to this portion of the punitive damages, Edgewater is awarded **$400,000.00.**

---

[21] Apparently, the stucco material had already been used by Advanced and could not be returned.

The Court will now turn to the punitive damages that should be assessed with respect to the attorney fee award. Balfour Beatty argues that, with respect to the punitive damages, the multiplier should be one. The Court agrees this is the appropriate multiplier with respect to the attorney fee award. Therefore, the punitive damages award in connection with the attorneys' fees is **$375,470.90.**

In sum, the Court finds and holds that the actual damages awarded to Edgewater for the Stay Violations is **$415,470.90** and the punitive damages awarded to Edgewater for the Stay Violations is **$775,470.90**, bringing the total damages for the Stay Violations to **$1,190,941.80**.

### C. <u>The Claim Objection</u>

Balfour Beatty initially filed a proof of claim on June 16, 2023, Claim #27-1 (the "Initial Claim") seeking an administrative claim for an unspecified amount of damages based on the Debtor's post-petition filings of claims of lien, through an improperly appended "Motion to Allow Postpetition Claim for Damages Against the Debtor With The Priority of an Administrative Claim."[22] The Initial Claim was both untimely[23], insofar as it purported to be a valid proof of claim arising from a pre-petition obligation, which it was not, and procedurally improper.[24] Notwithstanding, on November 22, 2023, Balfour Beatty then filed an "amended" claim, Claim #27-2, in the amount of $1,771,032.92 which did

---

[22] Balfour Beatty has incorporated (or claims to have incorporated) motions in each proof of claim. This is not procedurally proper; a motion attached to a proof of claim is not considered filed.

[23] The Claims Bar Date for non-governmental entities was May 31, 2023.

[24] Balfour Beatty's request for a post-petition administrative claim was denied in this Court's *Order Denying Application for Administrative Claim* (ECF #462) and subsequent *Memorandum Opinion on Order Denying Application for Administrative Claim* (ECF #519).

not amend the Initial Claim. This claim sought damages for post-petition claims of lien filed by Edgewater against the Projects, and for rejection damages, as well as a request for setoff of any obligations owed by Balfour Beatty to Edgewater. Although Edgewater objected to this Claim #27-2, before the Court addressed that claim objection, Balfour Beatty filed Claim #27-3, which is the operative claim to which the Claim Objection has been asserted.

Claim #27-3 was filed as an amendment to Claim #27-2 seeking the same damages as those included in Claim #27-2 - damages totaling $1,771,032.92 as rejection damages, and unspecified "damages from the Debtor's filing of Claims of Lien." The detail for calculating the $1,771,032.92 indicates the claim amount is solely for rejection damages. There is no amount included for damages arising from the filing of the claims of liens, other than a reference to the previously filed motion seeking post-petition damages relating to claims of lien filed by Edgewater post-petition,[25] which was one of the scheduled issues to be resolved at the Trial, and a general statement that "the amount of damages remains to be adjudicated."[26]

Edgewater objects to Claim #27-3 on the grounds that Balfour Beatty should not be entitled to rejection damages because the claim is untimely, it is Balfour Beatty's fault that Edgewater had to reject the Contracts, and in any event, Balfour Beatty should not have a right to setoff the rejection damages from

---

[25] *Balfour Beatty Construction's Amended Motion to Allow Post-Petition Claim for Damages Against the Debtor with the Priority of an Administrative Claim* (ECF #353).

[26] Balfour Beatty did not put on any evidence regarding these damages at the Trial. Balfour Beatty is therefore not entitled to any claim relating to the filed claim of lien.

any claim that Edgewater asserts against Balfour Beatty.  Edgewater did not object to the actual calculation details included in Claim #27-3.

Balfour Beatty's claim for rejection damages is only untimely if rejection occurred before confirmation of the Debtor's plan, which plan specifically provides:

> Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section Article 6.2 of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all **unterminated or unexpired** executory contracts and leases as of the effective date. A proof of a claim arising from the rejection of an **unterminated or unexpired** executory contract or lease under this section must be filed no later than 30 days after the date of the order confirming this Plan.

*See Second Supplement to Amended Plan of Reorganization* (ECF #455) (the "Plan") (emphasis in the original).

Both Balfour Beatty and Edgewater have been inconsistent regarding when and whether the Contracts were terminated or rejected.  Balfour Beatty argues that Edgewater rejected the Contracts when Edgewater filed the *Emergency Motion for Entry of an Order Authorizing the Debtor to Pay Critical Vendor Claims in the Ordinary Course of Business* (ECF #14) (the "Critical Vendor Motion"). Balfour Beatty is wrong.  There is a process by which a debtor may seek to reject or assume executory contracts both of which require court authority, and, until Edgewater filed its Plan, it did not seek court authority to

reject the Contracts.[27]  Thus, the Court finds that the Contracts were not rejected until the Court entered the *Order Confirming the Debtor's Subchapter V Plan for Reorganization* (ECF #499) (the "Confirmation Order") on January 5, 2024.

Edgewater argues that Balfour Beatty terminated the Contracts pre-petition.  There is absolutely no evidence to support any such argument.  In fact, the evidence is very clear that, not only were the Contracts not terminated pre-petition, but one of the Stay Violations that got Balfour Beatty in hot water was sending the Default Letters which, under the Contracts, were conditions precedent to any termination.  Edgewater also argues the Contracts were terminated by Balfour Beatty post-petition because it would not agree to let Edgewater come back to the Projects, and, instead, retained Advanced to finish the stucco work on the RD Project, and do the stucco work on the 2000 Project.  This is also the reason Edgewater argues that Balfour Beatty essentially forced Edgewater to reject, rather than assume, the Contracts.

The Court finds that the Contracts were not terminated post-petition either.  The evidence is clear, and Edgewater's principals acknowledged, that Edgewater could not come back and finish the Projects unless Balfour Beatty would agree to modify the Contracts such that Edgewater's subcontractors and vendors would be paid by joint check.  However, as Balfour Beatty correctly argued, it was under no obligation whatsoever to agree to modify the Contracts.

---

[27] Balfour Beatty points out that Edgewater did not even schedule the Contracts as executory contracts until the third amendment to the schedules filed on June 19, 2023 (ECF #176), which is true.  The Court continues to wonder why Edgewater's counsel did not include the Contracts as executory contracts on the schedules until almost three months after the case had been filed. Nonetheless, the Contracts were executory on the Petition Date and therefore were subject to assumption or rejection.

*See In re Beverage Canners Intern. Corp.*, 255 B.R. 89, 95 (Bankr. S.D. Fla. 2000) ("[S]imply because a debtor determines that it wishes to maintain the benefits of a contract and not the concurrent obligations does not mean that a debtor can, under Code § 365, accept the benefits and reject the burdens. It is black letter law that an executory contract must be either assumed in its entirety, *cum onere*, or completely rejected."). Substituting Advanced to complete the stucco work did not terminate the Contracts either. Article 5, Section B of the Contracts allow Balfour Beatty to retain a substitute subcontractor to finish the stucco work when there is a failure to cure a default, without terminating the Contract.[28] The Contracts do not provide that the Contracts are terminated if a substitute comes in to finish the Projects, nor did Edgewater identify any law or case that holds otherwise.

Because the Contracts were not terminated either pre-petition or post-petition, and because the Contracts were not rejected until the Confirmation Order was entered, the rejection claim was timely filed.

Edgewater's argument that Balfour Beatty forced the rejection and is therefore not entitled to rejection damages is not well-founded. As the Court already held, the law is clear – neither non-bankruptcy law nor bankruptcy law

---

[28] Article 5, Section B of the Contracts states that if Edgewater failed to cure a default, Balfour Beatty had the option to, but was not required to, (1) terminate the Contracts for default, (2) "make demand on Subcontractor's surety to perform the Subcontract," (3) "allow Subcontractor to continue to perform in whole or in part, but collect all damages arising as a result of the default," (4) enter on the premises and take possession of all materials and equipment for the purposes of continuing or correcting the Work; (5) "supply additional materials or labor at Subcontractor's cost," (6) "employ other firms or persons at Subcontractor's cost to complete or correct all or any part of the Work," or (7) "accept the conditions arising from the default but collect from Subcontractor the difference in value between the condition as required by this Subcontract and the accepted condition."

requires a non-debtor party to an executory contract, such as the Contracts, to modify any of the provisions of the contract. Balfour Beatty was not under any legal obligation to proceed under modified terms.

Due to Balfour Beatty's use of the scaffolding and stucco at the RD Project, the Court finds it appropriate to reduce the amount of Balfour Beatty's rejection claim by the value of the stucco and the use value of the scaffolding.[29] Guy Reese testified that Advanced started working on the RD Project at the beginning of May and that, because Advanced was using the scaffolding that Edgewater had already installed, it did not include the cost of the scaffolding in its contract price with Balfour Beatty. Therefore, Advanced and Balfour Beatty both received the benefit of the use of Edgewater's scaffolding. Advanced purchased the scaffolding on or around January 29, 2024. Thus, Advanced used the scaffolding for nine months before Advanced purchased it. Using the lower monthly rental value of $22,000.00, the Court finds it is appropriate to reduce Balfour Beatty's rejection damages claim by **$198,000.00**. Because Advanced also used the stucco, the rejection claim is further reduced by **$15,552.00**.

### D. **Setoff**

Although not appropriately included in a proof of claim, Balfour Beatty asserts it is entitled to setoff any money it owes Edgewater against the amount of money Edgewater owes to it. Under the Bankruptcy Code, "a creditor [may] offset a mutual debt owing by such creditor to the debtor . . . against a claim of

---

[29] The scaffolding and stucco were only used on the RD Project, according to the testimony of Guy Reese, principal of Advanced.

such creditor against the debtor." 11 U.S.C. §553. "Three elements must be present for the right of setoff to arise pursuant to the plain and unambiguous language of Section 553(a): (i) the parties must have mutual debts owing to each other; (ii) the debts arose prepetition; and (iii) the setoff cannot fall within the three exceptions of Sections 553(a)(1), (2), or (3)." *In re McKay*, 420 B.R. 871, 877 (Bankr. M.D. Fla. 2009). "Although section 553 expressly preserves certain prepetition rights of setoff, it says nothing about setoff rights that are wholly postpetition in nature. Although this silence has created some confusion, the general rule is that . . . a postpetition claim may be offset against a postpetition debt so long as the claim and debt constitute valid, mutual obligations." 5 *Collier on Bankruptcy* ¶553.03 (16th ed. 2024). *See In re SunCruz Casinos LLC*, 342 B.R. 370, 379 (Bankr. S.D. Fla. 2006) ("both transactions giving rise to the setoff must either have occurred pre-petition or both must have occurred post-petition.").

Balfour Beatty may not seek to setoff its rejection damages claim from the sanctions that it is obligated to pay to Edgewater on account of the Stay Violations. First, entitlement to setoff requires mutuality, and here there is no mutuality between what Edgewater owes to Balfour Beatty on account of Balfour Beatty's rejection damages and the damages being awarded to Edgewater for the Stay Violations. *See In re Harrison*, 599 B.R. 173, 189 (Bankr. N.D. Fla. 2019) (holding creditor not entitled to setoff damages awarded for its bad conduct against the amount the debtor owed creditor pursuant to a final judgment for lack of mutuality). Second, even if there was mutuality, equitable principles preclude setoff. It would not be appropriate to allow Balfour Beatty to reduce

the sanctions imposed due to its wrongful conduct by unsecured general pre-petition bankruptcy claims. *See id.; In re Banderas*, 236 B.R. 841, 848 (Bankr. M.D. Fla. 1999) ("If an entity who violates the automatic stay could escape sanctions with impunity by claiming the right of setoff against his prepetition claim, the entity would in effect render the remedy provided for by § 362(h) of the Bankruptcy Code worthless. This is so because the entity who is charged with violating the automatic stay is inevitably a creditor who is holding a prepetition claim. If such creditor is permitted to offset the sanctions against the prepetition claim, the Debtor whose rights have been violated will be left without remedy."); *In re Acequia, Inc.,* 34 F.3d 800, 817 (9th Cir. 1994).

The Court holds that Balfour Beatty is not entitled to set off the sanctions awarded hereunder from its rejection claim. However, because rejection damages are considered pre-petition claims notwithstanding that they arise due to a post-petition event. *See* 11 U.S.C. §502(g), Balfour Beatty may setoff the amounts it owes Edgewater for the Unpaid Draws (defined hereinafter).

### E.  **Turnover of Unpaid Draws**

The final issue litigated at the Trial is whether and to what extent, by turnover or otherwise, Balfour Beatty is obligated to pay Edgewater the unpaid draws from Draw 4 (January 2023), Draw 5 (February 2023), and Draw 6 (March 2023) totaling $114,318.32, relating to work performed at the RD Project, and Draw 1 (March 2023) in the amount of $51,964.20, relating to work performed at the 2000 Project (collectively the "Unpaid Draws"). In the Stay Violation Motion, Edgewater demanded that Balfour Beatty turnover the Unpaid Draws

pursuant to 11 U.S.C. §542(b); Balfour Beatty countered that it was not obligated to pay the Unpaid Draws when demanded, first, because when initially requested, Balfour Beatty had not yet been paid by the owners of the Projects,[30] and then, because Edgewater had not paid certain subcontractors and suppliers within seven days after Edgewater received payment from Balfour Beatty on Draw 3 (December 2022), a condition precedent to payment of draws.

Section 542(b) of the Bankruptcy Code provides in pertinent part: "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. §542(b). "The turnover provision of Bankruptcy Code applies only to tangible property and money due to debtor *without dispute* which are fully matured and payable on demand." *In re Fontainebleau Las Vegas Holdings, LLC*, 417 B.R. 651, 666 (S.D. Fla. 2009) (emphasis in original) (citing *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990)). "Turnover proceedings are not to be used to liquidate disputed contract claims. Clearly, Congress envisioned the turnover provision of § 542 of the Code, to apply to tangible property and money due to the debtor without dispute which are fully matured and payable on demand." *Charter Co.*, 913 F.2d at 1579 (internal citations omitted).

---

[30] The Contracts each have a pay-when-paid provision, meaning Balfour Beatty was not obligated to pay Edgewater for any particular draw request until the owner paid Balfour Beatty for that particular draw request.

Edgewater argues that the amount of the Unpaid Draws relating to the RD Project (Draws 4-6) were not in dispute because Balfour Beatty did not reject the requests and because Balfour Beatty was paid by the RD Project owner. Edgewater acknowledges that Balfour Beatty rejected the 2000 Project draw request (Draw 1) and that the owner of the 2000 Project never paid Balfour Beatty for the 2000 Project draw request. [31]

There does not seem to be any dispute that Balfour Beatty approved Draw 4 and Draw 5 and Balfour Beatty acknowledged that it was paid by the RD Project owner for Draw 4 and Draw 5. Balfour Beatty argues that if it was paid by the RD Project owner for Draw 6, it believes it may have been a partial payment. Nonetheless, Balfour Beatty argues that it was entitled to withhold all the Unpaid Draws from Edgewater pursuant to the terms of the Contracts due to Edgewater's failure to pay certain subcontractors, and therefore, that Edgewater's entitlement to the Unpaid Draws was in dispute.

The Court agrees that the Unpaid Draws were not properly the subject of a turnover demand, because, on the Petition Date, the obligations were disputed. Nonetheless, the full amounts[32] of the three RD Project Draw Requests (Draws 4-6), totaling $114,318.32, are now due and owing.[33] Because Balfour Beatty was never paid by the 2000 Project owner for the 2000 Project Draw Request (Draw 1), Balfour Beatty does not owe Edgewater for that draw request.

---

[31] Balfour Beatty testified, without contradiction, that it was never paid for the retainage related to those draw requests.

[32] Less the unpaid retainage.

[33] Balfour Beatty's speculation that it "may not have been paid in full for Draw number 6" is not sufficient to reduce the obligation to Edgewater.

Because the amounts due to Edgewater for the Unpaid Draws arise from a pre-petition debt, Balfour Beatty may setoff those amounts from the amounts it is owed by Edgewater on account of its rejection claim.

## CONCLUSION

For the reasons set forth herein, the Court **ORDERS** as follows:

1.    With respect to the damages owed by Balfour Beatty to Edgewater for the Stay Violations, Balfour Beatty must pay Edgewater $1,190,941.80 calculated as follows:

      a.  Actual damages for the scaffolding $40,000.00.

      b.  Actual damages for attorneys' fees $375,470.90.

      c.  Punitive damages relating to the scaffolding $400,000.00.

      d.  Punitive damages for attorneys' fees $375,470.90.

2.    Balfour Beatty is entitled to a rejection claim in the amount of $1,557,480.92 calculated as follows:

      a.  $1,771,032.92 amount of claim filed minus $198,000.00 for the use of scaffolding minus $15,552.00 for the use of stucco.

3.    Balfour Beatty is indebted to Edgewater for the Unpaid Draws in the amount of $114,318.32.

4.    Balfour Beatty may apply the $114,318.32 to its allowed rejection damages claim, leaving an allowed total unsecured claim of $1,443,162.60.

# # #

Copy to:
Robert P. Charbonneau, Esq.
Kenneth G.M. Mather, Esq.

Attorney Charbonneau is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.